13-981 (L)
*Turkmen, et al. v. Hasty, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2013

(Argued: May 1, 2014     Decided: June 17, 2015)

Docket Nos. 13-981, 13-999, 13-1002, 13-1003, 13-1662

————————

IBRAHIM TURKMEN, AKHIL SACHDEVA, AHMER IQBAL ABBASI,
ANSER MEHMOOD, BENAMAR BENATTA, AHMED KHALIFA,
SAEED HAMMOUDA, PURNA BAJRACHARYA, on behalf of themselves and
all others similarly situated,

*Plaintiffs-Appellees-Cross-Appellants*,

-v.-

DENNIS HASTY, former Warden of the Metropolitan Detention Center,
MICHAEL ZENK, former Warden of the Metropolitan Detention Center,
JAMES SHERMAN, former Metropolitan Detention Center Associate
Warden for Custody,

*Defendants-Appellants*,

JOHN ASHCROFT, former Attorney General of the United States,
ROBERT MUELLER, former Director, Federal Bureau of Investigation,
JAMES W. ZIGLAR, former Commissioner, Immigration and
Naturalization Service,

*Defendants-Cross-Appellees*,

SALVATORE LOPRESTI, former Metropolitan Detention Center Captain, JOSEPH CUCITI, former Metropolitan Detention Center Lieutenant,

*Defendants.*[*]

———————————

Before:

POOLER, RAGGI, AND WESLEY, *Circuit Judges*.

———————————

Appeal from a January 15, 2013 Memorandum and Order of the United States District Court for the Eastern District of New York (Gleeson, J.) granting in part and denying in part Defendants' motions to dismiss.  Cross-appeal from an April 10, 2013 Judgment of the United States District Court for the Eastern District of New York (Gleeson, J.), which was entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure on April 11, 2013, granting certain Defendants' motions to dismiss.  We AFFIRM in part and REVERSE in part.  Judge Raggi concurs in part in the judgment and dissents in part in a separate opinion.

> RACHEL A. MEEROPOL, Center for Constitutional Rights, New York, NY (Michael Winger, Sunita Patel, Baher A. Azmy, Center for Constitutional Rights, New York, NY; Nancy L. Kestenbaum, Jennifer L. Robbins, Joanne Sum-Ping, Covington & Burling LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees-Cross-Appellants.*
>
> HUGH D. SANDLER, Crowell & Moring LLP, New York, NY (Shari Ross Lahlou, Crowell & Moring LLP, Washington, D.C., *on the brief*), *for Defendant-Appellant Dennis Hasty.*
>
> JOSHUA C. KLEIN (Allan N. Taffet, Kirk L. Brett, Megan E. Uhle, *on the brief*), Duval & Stachenfeld LLP, New York, NY, *for Defendant-Appellant Michael Zenk.*

---

[*] The Clerk of the Court is directed to amend the caption as set forth above.

JEFFREY A. LAMKEN, MoloLamken LLP, Washington, D.C. (Martin V. Totaro, MoloLamken LLP, Washington, D.C.; Debra L. Roth, Julia H. Perkins, Shaw, Bransford & Roth P.C., Washington, D.C., *on the brief*), *for Defendant-Appellant James Sherman.*

H. THOMAS BYRON III, Appellate Attorney, Civil Division (Stuart F. Delery, Assistant Attorney General, Ronald C. Machen Jr., United States Attorney, Dana Boente, United States Attorney, Barbara L. Herwig, Appellate Attorney, Civil Division, *on the brief*), U.S. Department of Justice, Washington, D.C., *for Defendants-Cross-Appellees John Ashcroft and Robert Mueller*.

WILLIAM ALDEN MCDANIEL, JR., Ballard Spahr LLP, Baltimore, MD, *for Defendant-Cross-Appellee James W. Ziglar*.

Trina Realmuto, National Immigration Project of the National Lawyers Guild, Boston, MA; Mary Kenney, American Immigration Council, Washington, D.C., *amici curiae in support of Plaintiffs-Appellees-Cross-Appellants*.

POOLER AND WESLEY, *Circuit Judges*:

On September 11, 2001, "19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda" hijacked four airplanes and killed over 3,000 people on American soil. *Ashcroft v. Iqbal* (*Iqbal*), 556 U.S. 662, 682 (2009). This case raises a difficult and delicate set of legal issues concerning

individuals who were caught up in the post-9/11 investigation even though they were unquestionably never involved in terrorist activity. Plaintiffs are eight male, "out-of-status" aliens[1] who were arrested on immigration charges and detained following the 9/11 attacks. Plaintiffs were held at the Metropolitan Detention Center (the "MDC") in Brooklyn, New York, or the Passaic County Jail ("Passaic") in Paterson, New Jersey; their individual detentions generally ranged from approximately three to eight months.

The operative complaint, a putative class action, asserts various claims against former Attorney General John Ashcroft; former Director of the Federal Bureau of Investigation (the "FBI") Robert Mueller; former Commissioner of the Immigration and Naturalization Service (the "INS") James Ziglar; former MDC Warden Dennis Hasty; former MDC Warden Michael Zenk; and former MDC Associate Warden James Sherman.[2] All claims arise out of allegedly

_____

[1] We use the term "out-of-status" alien to mean one who has either (1) entered the United States illegally and is deportable if apprehended, or (2) entered the United States legally but who has fallen "out of status" by violating the rules or guidelines for his nonimmigrant status (often by overstaying his visa) in the United States and is deportable.

[2] For ease of reference, we refer to Ashcroft, Mueller, and Ziglar collectively as the "Department of Justice ('DOJ') Defendants," and Hasty, Sherman, and Zenk collectively as the "MDC Defendants." The operative complaint also alleges claims against MDC officials Joseph Cuciti and Salvatore Lopresti. Cuciti did not appeal the district court's decision, and Lopresti filed a notice of appeal but did not timely pay the filing fee or file

discriminatory and punitive treatment Plaintiffs suffered while confined at the MDC or Passaic.

## BACKGROUND

**I.    Procedural History**[3]

Plaintiffs initiated this action over thirteen years ago on April 17, 2002. Over the following two and one-half years, Plaintiffs amended their complaint three times.  In June 2006, following a series of motions to dismiss, the district court dismissed Plaintiffs' unlawful-length-of-detention claims but permitted to proceed, *inter alia*, the substantive due process and equal protection claims challenging the conditions of confinement at the MDC.  *See Turkmen v. Ashcroft* (*Turkmen I*), No. 02 CV 2307(JG), 2006 WL 1662663, at *33–36, 40–41 (E.D.N.Y. June 14, 2006), *aff'd in part, vacated in part*, *Turkmen v. Ashcroft* (*Turkmen II*), 589 F.3d 542 (2d Cir. 2009) (per curiam), *remanded to Turkmen III*, 915 F. Supp. 2d at 314.  Plaintiffs and Defendants appealed various aspects of that ruling.

Two significant events occurred while the appeal was pending.  First, six of the original eight named Plaintiffs at that time withdrew or settled their claims

a brief.  Lopresti's appeal was dismissed pursuant to Federal Rule of Appellate Procedure 31(c).  Thus, we do not address the claims against Cuciti and Lopresti.
[3] For a more comprehensive review of this case's procedural history, see *Turkmen v. Ashcroft* (*Turkmen III*), 915 F. Supp. 2d 314, 331–33 (E.D.N.Y. 2013).

against the government. *See Turkmen II*, 589 F.3d at 544 n.1, 545. This left only Ibrahim Turkmen and Akhil Sachdeva, both of whom were detained at Passaic, as opposed to the MDC. Second, the Supreme Court issued *Iqbal*, 556 U.S. at 662, which altered the pleading regime governing Plaintiffs' claims. In light of these events and the remaining Plaintiffs' stated desire to replead claims unique to the settling Plaintiffs, this Court affirmed the dismissal of the length of detention claims but vacated and remanded with respect to the conditions of confinement claims. *See Turkmen II*, 589 F.3d at 546–47, 549–50.

On remand, the district court permitted Plaintiffs to amend their complaint and granted leave for six additional Plaintiffs, all of whom had been held at the MDC, to intervene. The eight current named Plaintiffs are of Middle Eastern, North African, or South Asian origin; six of them are Muslim, one is Hindu, and one is Buddhist. The Fourth Amended Complaint (the "Complaint"), the operative complaint in this case, restates Plaintiffs' putative class claims on behalf of the "9/11 detainees," a class of similarly situated non-citizens who are

Arab or Muslim, or were perceived by Defendants as Arab or Muslim, and were arrested and detained in response to the 9/11 attacks.[4]

The Complaint dramatically winnowed the relevant claims and defendants; it alleges seven claims against eight defendants. The first six claims, all brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), are: (1) a conditions of confinement claim under the Due Process Clause; (2) an equal protection claim alleging that Defendants subjected Plaintiffs to the challenged conditions because of their, or their perceived, race, religion, ethnicity, and/or national origin; (3) a claim arising under the Free Exercise Clause; (4) and (5) two claims generally alleging interference with counsel; and (6) a claim under the Fourth and Fifth Amendments alleging unreasonable and punitive strip searches. The seventh and final claim alleges a conspiracy under 42 U.S.C. § 1985(3). The DOJ and MDC Defendants moved to dismiss the Complaint for failure to state a claim, on

---

[4] Benamar Benatta was originally detained by Canadian authorities on September 5, 2001, after crossing the Canadian border with false documentation. Following the September 11 attacks, Benatta was transported back to the United States and detained in the challenged conditions of confinement and pursuant to the post-9/11 investigation; therefore, we call him a "9/11 detainee."

qualified immunity grounds, and, in some instances, based on a theory that

*Bivens* relief did not extend to the claim at issue.

**II.     The OIG Reports**

Plaintiffs supplemented the factual allegations in their amended complaints with information gleaned from two reports by the Office of the Inspector General of the United States Department of Justice (the "OIG reports")[5] that documented the federal law enforcement response to 9/11 and conditions at the MDC and Passaic.

The OIG reports, which the Complaint "incorporate[s] by reference except where contradicted by the allegations of [the Complaint]," Compl. ¶ 3 n.1, *see also id.* ¶ 5 n.2, play a significant role in this case.[6]  Primarily, the OIG reports provide

_____

[5] There are two OIG reports.  The first OIG report, published in June 2003, covers multiple aspects of law enforcement's response to 9/11.  *See* U.S. Dep't of Justice, Office of the Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks (April 2003) (the "OIG Report"), *available at* http://www.justice.gov/oig/special/0306/full.pdf.  The second OIG report, published in December 2003, focuses on abuses at the MDC.  *See* U.S. Dep't of Justice, Office of the Inspector General, Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York (Dec. 2003) (the "Supplemental OIG Report"), *available at* http://www.justice.gov/oig/special/0312/final.pdf.
[6] Various Defendants challenge the district court's decision to consider the OIG reports to the extent that they are not contradicted by the Complaint.  Defendants are correct that a complaint "include[s] any written instrument attached to it as an exhibit or any

8

invaluable context for the unprecedented challenges following 9/11 and the various strategies federal agencies employed to confront these challenges. The reports help orient our analysis of the Complaint.

**III. Plaintiffs' Allegations**[7]

In the aftermath of the 9/11 attacks, the FBI and other agencies within the DOJ immediately initiated an immense investigation aimed at identifying the 9/11 perpetrators and preventing any further attacks. *See* OIG Report at 1, 11–12. PENTTBOM, the Pentagon/Twin Towers Bombings investigation, was initially run out of the FBI's field offices, but shortly thereafter, Mueller ordered that management of the investigation be switched to the FBI's Strategic Information

---

statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *accord DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). But their objection misses the point. The district court accurately explained that at the pleading stage, although we must consider the words on the page (that is, we cannot disregard the fact that the OIG reports make particular findings), we need not consider the truth of those words to the extent disputed by Plaintiffs. *See Turkmen III*, 915 F. Supp. 2d at 342 n.14 (*citing DiFolco*, 622 F.3d at 111). Even were we to view the OIG reports as fully incorporated, reliance on any assertion of fact requires a credibility assessment that we are fundamentally unsuited to undertake at the Rule 12(b)(6) stage. And although the OIG reports cannot determinatively prove or disprove Plaintiffs' allegations, they remain relevant to our analysis because they supplement our understanding of the law enforcement response to 9/11.

[7] The allegations set forth herein are drawn from the Complaint and those portions of the OIG reports incorporated by reference. *See supra* note 6. We presume the veracity of Plaintiffs' well-pleaded allegations. *Iqbal*, 556 U.S. at 679.

and Operations Center (the "SIOC") at FBI Headquarters in Washington, D.C. Mueller personally directed PENTTBOM from the SIOC and remained in daily contact with FBI field offices.

In conjunction with PENTTBOM, the Deputy Attorney General's Office (the "DAG's Office") established the SIOC Working Group to coordinate "efforts among the various components within the [DOJ] that had an investigative interest in[,] or responsibility for[,] the September 11 detainees." *Id*. at 15.[8] The SIOC Working Group included representatives from, among other agencies, the FBI, the INS, and the DAG's Office. This group met daily—if not multiple times in a single day—in the months following 9/11; its duties included "coordinat[ing] information and evidence sharing among the FBI, INS, and U.S. Attorneys' offices" and "ensur[ing] that aliens detained as part of the PENTTBOM investigation would not be released until they were cleared by the FBI of involvement with the September 11 attacks or terrorism in general." *Id*.

Given that the 9/11 hijackers were all foreign nationals, the DOJ response carried a major immigration law component. *See id.* at 12. Ashcroft and Mueller developed "a policy whereby any Muslim or Arab man encountered during the

---

[8] The SIOC Working Group acquired this name because its initial meetings occurred at the FBI's SIOC.

investigation of a tip received in the 9/11 terrorism investigation . . . and discovered to be a non-citizen who had violated the terms of his visa, was arrested." Compl. ¶ 1; *see also id.* ¶¶ 39–49. Ashcroft also created the related "hold-until-cleared" policy, which mandated that individuals arrested in the wake of 9/11 not be released from "custody until [FBI Headquarters] affirmatively cleared them of terrorist ties." *Id*. ¶ 2; *see also* OIG Report at 38–39.

Within a week of 9/11, the FBI had received approximately 96,000 tips from civilians across the country. These tips varied significantly in quality and reliability.[9] "Mueller [nonetheless] ordered that every one of these tips be investigated, even if they were implausible on their face." Compl. ¶ 40. Ultimately, 762 detainees were placed on the INS Custody List (the "INS List") that then made them subject to Ashcroft's hold-until-cleared policy.

In the months following 9/11, the DOJ Defendants "received detailed daily reports of the arrests and detentions." *Id*. ¶ 47. Ashcroft and Mueller also "met

[9] For instance, Turkmen came to the FBI's attention when his landlord called the FBI's 9/11 hotline and reported "that she rented an apartment in her home to several Middle Eastern men, and she 'would feel awful if her tenants were involved in terrorism and she didn't call.'" Compl. ¶ 251. "The FBI knew that her only basis for suspecting these men was that they were Middle Eastern; indeed, she reported that they were good tenants, and paid their rent on time." *Id.* Another alien was arrested after the FBI received a tip that stated that the small grocery store where he worked was overstaffed, thus arousing the tipster's suspicions about the "Middle Eastern men" that worked there. OIG Report at 17.

11

regularly with a small group of government officials in Washington, D.C., and mapped out ways to exert maximum pressure on the individuals arrested in connection with the terrorism investigation." *Id.* ¶ 61.[10] This small group "discussed and decided upon a strategy to restrict the 9/11 detainees' ability to contact the outside world and delay their immigration hearings. The group also decided to spread the word among law enforcement personnel that the 9/11 detainees were suspected terrorists[] . . . and that they needed to be encouraged in any way possible to cooperate." *Id.*

Plaintiffs, with the exception of Turkmen and Sachdeva, were held at the MDC. Under MDC confinement policy, the 9/11 detainees placed in the MDC were held in the MDC's Administrative Maximum Special Housing Unit (the "ADMAX SHU")—"a particularly restrictive type of SHU not found in most [Bureau of Prisons ('BOP')] facilities because the normal SHU is usually sufficient

---

[10] It is unclear whether this "small group" refers to the SIOC Working Group or a distinct group involving Ashcroft, Mueller, and other senior Washington, D.C., officials. One possibility is that Plaintiffs are referring to the small group that consisted of Ashcroft, Mueller, Michael Chertoff, who was then Assistant Attorney General of the Criminal Division, and the Deputy Attorney General. *See* OIG Report at 13. According to Chertoff, this group discussed the DOJ's post-9/11 law enforcement strategy and policies. Given the makeup of this group and the SIOC Working Group, it is reasonable to infer that information flowed between them; for instance, Chertoff's deputy, Alice Fisher, was placed in charge of immigration issues for the Criminal Division and personally established the SIOC Working Group.

for correcting inmate misbehavior and addressing security concerns." *Id.* ¶ 76. The confinement policy was created by the MDC Defendants "in consultation with the FBI." *Id*. ¶ 65.

Conditions in the ADMAX SHU were severe and began to receive media attention soon after detentions began. *See* OIG Report at 2, 5. Detainees were: "placed in tiny cells for over 23 hours a day," Compl. ¶ 5; "strip-searched every time they were removed from or returned to their cell[s], . . . even when they had no conceivable opportunity to obtain contraband," *id.* ¶ 112; provided with "meager and barely edible" food, *id.* ¶ 128; denied sleep by "bright lights" that were left on in their cells for 24 hours a day, *id.* ¶ 119, and, "[o]n some occasions, correctional officers walked by every 20 minutes throughout the night, kicked the doors to wake up the detainees, and yelled" highly degrading and offensive comments, *id.* ¶ 120; constructively denied recreation and exposed to the elements, *see id.* ¶¶ 122–23; "denied access to basic hygiene items like toilet paper, soap, towels, toothpaste, [and] eating utensils," *id.* ¶ 130; and prohibited from moving around the unit, using the telephone freely, using the commissary, or accessing MDC handbooks, which explained how to file complaints about mistreatment, *see id.* ¶¶ 76, 83, 129, 140.

13

MDC staff also subjected the 9/11 detainees to frequent physical and verbal abuse. The abuse included slamming the 9/11 detainees into walls; bending or twisting their arms, hands, wrists, and fingers; lifting them off the ground by their arms; pulling on their arms and handcuffs; stepping on their leg restraints; restraining them with handcuffs and/or shackles even while in their cells; and handling them in other rough and inappropriate ways. *See id.* ¶ 105; *see also* Supplemental OIG Report at 8–28. MDC staff also referred to the 9/11 detainees as "'terrorists,' and other offensive names; threaten[ed] them with violence; curs[ed] at them; insult[ed] their religion; and ma[de] humiliating sexual comments during strip-searches." Compl. ¶ 109. Specifically, Plaintiffs and putative class members at the MDC were referred to by staff as "camel[s]," "fucking Muslims," and "Arabic asshole[s]," *id.* ¶¶ 110, 147, 218.

The MDC Plaintiffs did not receive copies of the Koran for weeks or months after requesting them, and one Plaintiff never received a copy, "pursuant to a written MDC policy . . . that prohibited the 9/11 detainees from keeping anything, including a Koran, in their cell[s]." *Id.* ¶ 132. The MDC Plaintiffs were also "denied the Halal food required by their Muslim faith." *Id.* ¶ 133. And "MDC staff frequently interrupted Plaintiffs' and class members' prayers,"

14

including "by banging on cell doors," yelling derogatory comments, and mocking the detainees while they prayed. *Id.* ¶ 136.

The named MDC Plaintiffs' individual experiences—several of which are highlighted below—add further texture to their collective allegations concerning the arrest and confinement of the 9/11 detainees.

**A. Anser Mehmood**

Mehmood, a citizen of Pakistan and devout Muslim, entered the United States on a business visa in 1989 with his wife, Uzma, and their three children. After his visa expired, Mehmood remained in the country and started a trucking business that provided enough earnings to purchase a home in New Jersey and to send funds to his family in Pakistan. In 2000, while living in New Jersey, he and Uzma had their fourth child. In May 2001, Uzma's brother—a United States citizen—submitted an immigration petition for the entire family.

On the morning of October 3, 2001, Mehmood was asleep with Uzma and their one-year-old son when FBI and INS agents knocked on his door. The agents searched Mehmood's home and asked whether he "was involved with a jihad." *Id*. ¶ 157. Mehmood admitted that he had overstayed his visa. The FBI informed Mehmood that they were not interested in him; they had come to arrest

15

his wife Uzma, whose name the FBI had encountered when investigating Plaintiff Ahmer Abbasi, her brother. Mehmood convinced the FBI to arrest him instead of Uzma because their son was still breastfeeding. "The Agent told Mehmood that they had no choice but to arrest one of the parents, but that Mehmood faced a minor immigration violation only, and he would be out on bail within days." *Id*. ¶ 159.

Upon his arrival at the MDC, Mehmood "was dragged from the van by several large correctional officers, who threw him into several walls on his way into the facility." *Id*. ¶ 162. "His left hand was broken during this incident" and "[t]he guards threatened to kill him if he asked any questions." *Id*. His experience in the ADMAX SHU tracked that of other 9/11 detainees. For instance, "[w]henever Mehmood was removed from his cell, he was placed in handcuffs, chains, and shackles. Four or more MDC staff members typically escorted him to his destination, frequently inflicting unnecessary pain along the way, for example, by banging him into the wall, dragging him, carrying him, and stepping on his shackles and pushing his face into the wall." *Id.* ¶ 166. Neither the FBI nor INS interviewed Mehmood following his arrest. Mehmood was not released from the ADMAX SHU until February 6, 2002.

**B. Ahmed Khalifa**

Khalifa, who had completed five years toward a medical degree at the University of Alexandria in Egypt, came to the United States on a student visa in July 2001. He came to the FBI's attention after the FBI received a tip that "several Arabs who lived at Khalifa's address were renting a post-office box, and possibly sending out large quantities of money." *Id.* ¶ 195. On September 30, 2001, FBI, INS, and officers from the New York City Police Department came to the apartment Khalifa shared with several Egyptian friends. The officers searched his wallet and apparently became "very interested in a list of phone numbers of friends in Egypt." *Id.* ¶ 196. After searching the apartment, the agents asked Khalifa for his passport and "if he had anything to do with September 11." *Id.* ¶ 197. One FBI agent told Khalifa that they were only interested in three of his roommates, but another agent said they also needed Khalifa, whom they arrested for "working without authorization." *Id.*

On October 1, 2001, after briefly stopping at a local INS detention facility to complete paperwork, Khalifa and his roommates were transported to the MDC. When he arrived at the MDC, Khalifa "was slammed into the wall, pushed and kicked by MDC officers and placed into a wet cell, with a mattress on the floor."

17

*Id.* ¶ 201. "[His] wrists were cut and bruised from his handcuffs, and he was worried about other detainees, whom he heard gasping and moaning through the walls of his cell." *Id*.

FBI and INS agents interviewed Khalifa on October 7, 2001. One of the agents apologized to Khalifa after noticing the bruises on his wrists. When Khalifa stated that MDC guards were abusing him, the agents "stated it was because he was Muslim." *Id.* ¶ 202. In notes from the interview, the agents did not question Khalifa's credibility, and noted no suspicion of ties to terrorism or interest in him in connection with PENTTBOM.

Following the interview, MDC guards strip searched Khalifa and "laughed when they made him bend over and spread his buttocks." *Id.* ¶ 203. Khalifa complains of the conditions associated with detention in the ADMAX SHU, including arbitrary and abusive strip searches, sleep deprivation, constructive denial of recreational activities and hygiene items, and deprivation of food and medical attention.

By November 5, 2001, the New York FBI field office affirmatively cleared Khalifa of any ties to terrorism and sent his name to FBI Headquarters for final

clearance. Khalifa was not officially cleared until December 19, 2001. He remained confined in the ADMAX SHU until mid-January 2002.

### C. Purna Raj Bajracharya

Bajracharya is neither Muslim nor Arab. He is a Buddhist and native of Nepal who entered the United States on a three-month business visa in 1996. After overstaying his visa, Bajracharya remained in Queens, New York, for five years, working various odd jobs to send money home to his wife and sons in Nepal. Having planned to return home in the fall or winter of 2001, Bajracharya used a video camera to capture the streets he had come to know in New York. He came to the FBI's attention on October 25, 2001, when a Queens County District Attorney's Office employee "observed an '[A]rab male' videotaping outside a Queens[] office building that contained the Queens County District Attorney['s] Office and a New York FBI office." *Id.* ¶ 230. When approached by investigators from the District Attorney's Office, Bajracharya tried to explain that he was a tourist. The investigators took him inside the building and interrogated him for five hours. FBI and INS agents arrived at some point during the interrogation. Bajracharya subsequently took the agents to his apartment;

19

provided them with his identification documents, which established his country of origin; and admitted to overstaying his visa.

Apparently due to the videotaping, Bajracharya was designated as being of "special interest" to the FBI and on October 27, 2001, he was transported to the MDC. *Id.* ¶¶ 233–34. On October 30, 2001, the FBI agent assigned to Bajracharya's case, along with other law enforcement personnel, interviewed him with the aid of an interpreter. During the interview, "Bajracharya was asked whether he was Muslim or knew any Muslims." *Id.* ¶ 235. Bajracharya explained that he was not Muslim and knew no Muslims. The FBI agent's notes from the interview do not question Bajracharya's credibility or express any suspicion of ties to terrorism. Two days later, the same agent affirmatively cleared Bajracharya of any link to terrorism. By November 5, 2001, the New York FBI field office completed its investigation and forwarded Bajracharya's case to FBI Headquarters for final clearance. Documents at FBI Headquarters note that the FBI had no interest in Bajracharya by mid-November 2001. Nonetheless, he was not released from the ADMAX SHU until January 13, 2002. The FBI agent assigned to Bajracharya's case did not understand why Bajracharya remained in the ADMAX SHU throughout this period; the agent

20

eventually called the Legal Aid Society and advised an attorney that Bajracharya needed legal representation.

Bajracharya, who is 5'3" and weighed about 130 pounds at the time of his arrest, complains of the same conditions common to the other MDC Plaintiffs. For instance, he could not sleep due to the light in his cell, and when he was removed from his cell, he would be placed in handcuffs, chains, and shackles and escorted by four or more MDC staff members. Bajracharya became so traumatized by his experience in the ADMAX SHU that he wept constantly. When an attorney requested that the MDC transfer Bajracharya to general population, an MDC "doctor responded that Bajracharya was crying too much, and would cause a riot." *Id.* ¶ 241.

**IV.    The New York List and the "Of Interest" Designation**

As originally articulated by Ashcroft, following 9/11, the DOJ sought to prevent future terrorism by arresting and detaining those people who "have been identified as persons who participate in, or lend support to, terrorist activities." OIG Report at 12 (internal quotation marks omitted). To that end, Michael Pearson, who was then INS Executive Associate Commissioner for Field Operations, issued a series of Operational Orders, which addressed the

responsibilities of INS agents operating with the FBI to investigate leads on illegal aliens. A September 22, 2001 order instructed agents to "exercise sound judgment" and to limit arrests to those aliens in whom the FBI had an "interest" and discouraged arrest in cases that were "clearly of no interest in furthering the investigation of the terrorist attacks of September 11th." *Id*. at 45 (internal quotation marks omitted). The "of interest" designation by an FBI agent had significant implications for a detainee. "Of interest" detainees were placed on the INS List, subject to the hold-until-cleared policy, and required FBI clearance of any connection to terrorism before they could be released or removed from the United States. Detainees who were not designated "of interest" to the FBI's PENTTBOM investigation were not placed on the INS List, did not require clearance by the FBI, and could be processed according to normal INS procedures. *Id*. at 40.

The arrest and detention mandate was not uniformly implemented throughout the country. Specifically, the New York FBI investigated all PENTTBOM leads without vetting the initial tip and designated as "of interest" "anyone picked up on a PENTTBOM lead . . . regardless of the strength of the evidence or the origin of the lead." *Id*. at 41; *see also* Compl. ¶¶ 43–45. For

22

instance, days after 9/11, New York City police stopped three Middle Eastern men in Manhattan on a traffic violation and found plans to a public school in the car. The next day, their employer confirmed that the men had the plans because they were performing construction work on the school. Nonetheless, the men were arrested and detained. *See* OIG Report at 42. In another instance, a Middle Eastern man was arrested for illegally crossing into the United States from Canada over a week before 9/11. After the attacks, the man was placed on New York's "'special interest' list even though a document in his file, dated September 26, 2001, stated that FBI New York had no knowledge of the basis for his detention." *Id*. at 64 (internal quotation marks omitted).

In many cases, the New York FBI did not even attempt to determine whether the alien was linked to terrorism, *see id*. at 14, 16, 41–42, 47, and it "never labeled a detainee 'no interest' until *after* the clearance process was complete," *id*. at 18 (emphasis added). Thus, aliens encountered and arrested pursuant to a PENTTBOM lead in New York were designated "of interest" (or special interest) and held until the local field office confirmed they had no ties to terrorism. *Id.* at

23

14; *see also id.* at 53.[11]  The result was that the MDC Plaintiffs and others similarly situated in New York were held at the MDC ADMAX SHU as if they met the national "of interest" designation.  These practices—specifically the absolute lack of triage—appear to have been unique to New York.  *See id.* at 47, 56.[12]

At some point in October 2001, INS representatives to the SIOC Working Group learned that the New York FBI was maintaining a separate list (the "New York List") of detainees who had not been included in the national INS List.  One explanation for maintaining a separate New York List was that the New York FBI could not determine if the detainees had any connection with terrorist activity.  *Id*. at 54.

After INS Headquarters learned of the separate New York List, small groups of senior officials from the DAG's Office, the FBI, and the INS convened on at least two occasions in October and November 2001 to suggest how to deal with the two separate lists of detainees.  In discussing how to address the New

---

[11] The OIG Report indicates that 491 of the 762 detainees were arrested in New York. OIG Report at 21–22.  However, the OIG Report does not identify how many New York arrests were the result of the New York FBI's efforts.

[12] The OIG Report posits that the New York response differed from the rest of the nation, at least in part, as a result of the New York FBI and U.S. Attorney's Office's long tradition of independence from their headquarters in Washington, D.C.  *See* OIG Report at 54.

24

York List, "officials at the INS, FBI, and [DOJ] raised concerns about, among other things, whether the aliens [on the New York List] had any nexus to terrorism." *Id*. at 53. Nonetheless, this list was merged with the INS List due to the concern that absent further investigation, "the FBI could unwittingly permit a dangerous individual to leave the United States." *Id*. The decision to merge the lists ensured that some of the individuals on the New York List would remain detained in the challenged conditions of confinement as if there were some suspicion that those individuals were tied to terrorism, even though no such suspicion existed.

**V.     The Issues on Appeal**

In a January 15, 2013 Memorandum and Order, the district court granted in part and denied in part Defendants' motions to dismiss the Complaint. The district court dismissed all claims against the DOJ Defendants. As to the MDC Defendants, the district court denied their motions to dismiss Plaintiffs' substantive due process conditions of confinement claim (Claim 1); equal protection conditions of confinement claim (Claim 2); free exercise claim (Claim 3); unreasonable strip search claim (Claim 6); and conspiracy claim under 42 U.S.C. § 1985(3) (Claim 7). *See Turkmen III*, 915 F. Supp. 2d at 324. The MDC

25

Defendants appealed, and Plaintiffs cross-appealed the dismissal of the claims against the DOJ Defendants based on a judgment that was entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.[13]

## DISCUSSION[14]

## I.    Pleading Standard

To satisfy *Iqbal*'s plausibility standard, Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  556 U.S. at 678.  Although plausibility is not a "probability requirement," Plaintiffs must allege facts that permit "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).  Factual allegations that are "merely consistent with" unlawful conduct do not create a reasonable inference of liability.  *Id.*

Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Well-pleaded factual allegations, in contrast, should be presumed true, and we must determine

---

[13] Plaintiffs have not appealed the district court's dismissal of their interference with counsel claims (Claims 4 and 5).

[14] We review the district court's determination of Defendants' Rule 12(b)(6) motions to dismiss de novo.  *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 88 (2d Cir. 2011).

"whether they plausibly give rise to an entitlement to relief." *Id*. at 679. Ultimately, every plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

With the exception of the Section 1985 conspiracy claim, all of Plaintiffs' claims allege constitutional violations based on injuries first recognized by the Supreme Court in *Bivens*, 403 U.S. at 388. During the course of this litigation, the Supreme Court made it clear in *Iqbal* that a federal tortfeasor's *Bivens* liability cannot be premised on vicarious liability. 556 U.S. at 676. Thus, Plaintiffs must plausibly plead that each Defendant, "through the official's own individual actions," violated Plaintiffs' constitutional rights. *Id*. In other words, *Bivens* relief is available only against federal officials who are personally liable for the alleged constitutional tort. *Id*. at 676–77. *Iqbal* precludes relying on a supervisor's mere knowledge of a subordinate's mental state (*i.e.*, discriminatory or punitive intent) to infer that the supervisor shared that intent. *Id*. at 677. Knowing that a subordinate engaged in a rogue discriminatory or punitive act is not enough. But that is not to say that where the supervisor condones or ratifies

a subordinate's discriminatory or punitive actions the supervisor is free of *Bivens*'s reach. *See id.* at 683.

**II.      Availability of a *Bivens* Remedy for Plaintiffs' Claims**

Unlike the MDC Defendants, none of the DOJ Defendants challenge the existence of a *Bivens* remedy in their briefs to this Court. While the DOJ Defendants did raise this issue below, and are represented by able counsel on appeal, they have chosen to not offer that argument now as a further defense of their victory in the district court. However, as the reader will later discover, our dissenting colleague makes much of this defense, raising it as her main objection to our resolution of the appeal. Given the MDC Defendants' arguments, as well as the dissent's decision to press the issue, legitimately noting that a district court's judgment can be affirmed on any ground supported by the record, Dissenting Op., *post* at 7 n.4 (citing *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014)), we think it appropriate to explain our conclusion that a *Bivens* remedy is available for the MDC Plaintiffs' punitive conditions of confinement and strip search claims against both the DOJ and the MDC Defendants.

28

In *Bivens*, 403 U.S. at 388, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Id*. at 70. Because a *Bivens* claim has judicial parentage, "the Supreme Court has warned that the *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in new contexts." *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009) (en banc) (internal quotation marks omitted). Thus, a *Bivens* remedy is not available for all who allege injury from a federal officer's violation of their constitutional rights.

In *Arar*, we outlined a two-step process for determining whether a *Bivens* remedy is available. First, the court must determine whether the underlying claims extend *Bivens* into a "new context." *Id*. at 572. If, and only if, the answer to this first step is yes, the court must then consider (a) "whether there is an alternative remedial scheme available to the plaintiff," and, even if there is not, (b) "whether special factors counsel hesitation in creating a *Bivens* remedy." *Id*. (internal quotation marks and brackets omitted). As *Arar* noted, case law provides limited guidance regarding how to determine whether a claim presents

29

a new context for *Bivens* purposes. Thus, "[w]e construe[d] the word 'context' as it is commonly used in law: to reflect a potentially recurring scenario that has similar legal and factual components." *Id*.

Determining the "context" of a claim can be tricky. The MDC Defendants contend that the context of Plaintiffs' claims is the nation's "response to an unprecedented terrorist attack." Sherman Br. 45. The DOJ Defendants made a similar argument before the district court in an earlier round of this litigation. *See Turkmen I*, 2006 WL 1662663, at *30. The MDC Defendants, and the dissent on behalf of the DOJ Defendants, contend that *Arar* supports this view. But if that were the case, then why did *Arar* take pains to note that the "context" of Arar's claims was not the nation's continuing response to terrorism, but the acts of federal officials in carrying out Arar's extraordinary rendition? 585 F.3d at 572. We looked to both the rights injured and the mechanism of the injury to determine the context of Arar's claims. In rejecting the availability of a *Bivens* remedy, we focused on the *mechanism* of his injury: extraordinary rendition—"a distinct phenomenon in international law"—and determined this presented a new context for *Bivens*-based claims. *Id*. Only upon concluding that extraordinary rendition presented a new context did we examine the policy

concerns and competing remedial measures available to Arar. In our view, setting the context of the *Bivens* claims here as the national response in the wake of 9/11 conflates the two-step process dictated by this Court in *Arar*. The reasons why Plaintiffs were held at the MDC as if they were suspected of terrorism do not present the "context" of their confinement—just as the reason for Arar's extraordinary rendition did not present the context of his claim. Without doubt, 9/11 presented unrivaled challenges and severe exigencies—but that does not change the "context" of Plaintiffs' claims. "[M]ost of the rights that the Plaintiff[s] contend[] were violated do not vary with surrounding circumstances, such as the right not to be subjected to needlessly harsh conditions of confinement, the right to be free from the use of excessive force, and the right not to be subjected to ethnic or religious discrimination. The strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times." *Iqbal v. Hasty* (*Hasty*), 490 F.3d 143, 159 (2d Cir. 2007), *rev'd on other grounds sub nom. Iqbal*, 556 U.S. 662.

Thus, we think it plain that the MDC Plaintiffs' conditions of confinement claims are set in the following context: federal detainee Plaintiffs, housed in a federal facility, allege that individual federal officers subjected them to punitive

31

conditions. This context takes account of both the rights injured (here, substantive due process and equal protection rights)[15] and the mechanism of injury (punitive conditions without sufficient cause). The claim—that individual officers violated detainees' constitutional rights by subjecting them to harsh treatment with impermissible intent or without sufficient cause—stands firmly within a familiar *Bivens* context. Both the Supreme Court and this Circuit have recognized a *Bivens* remedy for constitutional challenges to conditions of confinement. In *Carlson v. Green*, 446 U.S. 14, 17–20 (1980), the Supreme Court recognized an implied remedy for the plaintiff's claim alleging an Eighth Amendment violation for prisoner mistreatment. Furthermore, in *Malesko*, in refusing to extend a *Bivens* remedy to claims against private corporations housing federal detainees, the Supreme Court observed in dicta that, while no

---

[15] The rights-injured component of Plaintiffs' claims fall within a recognized *Bivens* context. This Circuit has presumed the availability of a *Bivens* remedy for substantive due process claims in several cases. *See Arar*, 585 F.3d at 598 (Sack, J., dissenting) (citing cases). In addition, the Supreme Court has acknowledged the availability of "a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment." *Iqbal*, 556 U.S. at 675 (citing *Davis v. Passman*, 442 U.S. 228 (1979)). And while it is true that the Supreme Court has subsequently declined to extend *Davis* to other employment discrimination claims, such as in *Chappell v. Wallace*, 462 U.S. 296, 300–04 (1983), the Court's analysis was focused on the special nature of the employer-employee relationship in the military—or, in other words, the mechanism of injury. Here, where the mechanism of injury is also familiar, a *Bivens* remedy is plainly available.

32

claim was available against the *private corporation*, a federal prisoner would have a remedy against *federal officials* for constitutional claims. 534 U.S. at 72. "If a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the offending individual officer, subject to the defense of qualified immunity." *Id*. The Court went on to recognize that the "prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP." *Id*. The MDC Plaintiffs' claims here plainly follow *Malesko*'s guidance: the claims are raised against the individual officers, both at the DOJ and the MDC, who were responsible for subjecting the Plaintiffs to punitive conditions of confinement.

The Second Circuit has also recognized the availability of *Bivens* relief for federal prisoners housed in federal facilities bringing claims against individual federal officers. In *Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006), this Court reversed the district court's dismissal of the prisoner plaintiff's *Bivens* claim for violation of his due process rights against supervisory prison officials. *See also Tellier v. Fields*, 280 F.3d 69, 80–83 (2d Cir. 2000) (recognizing a *Bivens* remedy for a claim of deprivation of procedural due process brought by a federal prisoner against federal prison officials). Furthermore, in *Hasty*, where we considered

claims nearly identical to those at issue in this case, we "did not so much as hint either that a *Bivens* remedy was unavailable or that its availability would constitute an unwarranted extension of the *Bivens* doctrine." *Arar*, 585 F.3d at 597 (Sack, J., dissenting) (discussing *Hasty*, 490 F.3d at 177–78).

Our sister circuits have also permitted *Bivens* claims for unconstitutional conditions of confinement. In *Cale v. Johnson*, 861 F.2d 943, 947 (6th Cir. 1988), *abrogated on other grounds by Thaddeus–X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc), the Sixth Circuit held that "federal courts have the jurisdictional authority to entertain a *Bivens* action brought by a federal prisoner, alleging violations of his right to substantive due process." The Third Circuit has also permitted a federal inmate to bring a civil rights action against prison officials. *See Bistrian v. Levi*, 696 F.3d 352, 372–75 (3d Cir. 2012) (assuming availability of a *Bivens* remedy for plaintiff's Fifth Amendment substantive due process and other constitutional claims challenging his conditions of confinement).

Notwithstanding the persuasive precedent suggesting the availability of a *Bivens* remedy for the MDC Plaintiffs' conditions of confinement claims, the MDC Defendants, and our dissenting colleague, argue that the MDC Plaintiffs' claims present a new *Bivens* context because the Plaintiffs are illegal aliens. But

34

because the MDC Plaintiffs' right to be free from punitive conditions of confinement is coextensive with that of a citizen, their unlawful presence in the United States at the time of the challenged confinement does not place their standard mistreatment claim into a new context. Indeed, the Fifth Circuit has recognized a *Bivens* claim raised by a Mexican national for violations of her Fourth and Fifth Amendment rights to be free from false imprisonment and the use of excessive force by law enforcement personnel. *See Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006). The Ninth Circuit has also recognized a *Bivens* claim for due process violations that occurred during an illegal alien plaintiff's detention. S*ee Papa v. United States*, 281 F.3d 1004, 1010–11 (9th Cir. 2002).[16] Thus, we conclude that a *Bivens* remedy is available for the Plaintiffs' substantive due process and equal protection conditions of confinement claims.

Our understanding of *Bivens* and this Court's decision in *Arar* do not however suggest the availability of a *Bivens* remedy for the Plaintiffs' free exercise claim. That claim—that Defendants deliberately interfered with

---

[16] We note that the Ninth Circuit has declined to provide illegal aliens with an implied *Bivens* remedy for *unlawful detention* during deportation proceedings. *Mirmehdi v. United States*, 689 F.3d 975, 981–83 (9th Cir. 2012). Of course, that decision is plainly inapposite here where the MDC Plaintiffs do not challenge the fact that they were detained, but rather the conditions in which they were detained.

Plaintiffs' religious practices by: (1) denying them timely access to copies of the Koran; (2) denying them Halal food; and (3) failing to stop MDC staff from interfering with Plaintiffs' prayers—does not fall within a familiar *Bivens* context. Here, it is the right injured—Plaintiffs' free exercise right—and not the mechanism of injury that places Plaintiffs' claims in a new *Bivens* context. Indeed, the Supreme Court has "not found an implied damages remedy under the Free Exercise Clause" and has "declined to extend *Bivens* to a claim sounding in the First Amendment." *Iqbal*, 556 U.S. at 675 (citing *Bush v. Lucas*, 462 U.S. 367 (1983)). Accordingly, we agree with the MDC Defendants that Plaintiffs' free exercise claim should have been dismissed.

But the MDC Plaintiffs' claim that they were subjected to unlawful strip searches falls within an established *Bivens* context: federal detainee plaintiffs, housed in a federal facility, allege that individual federal officers subjected them to unreasonable searches in violation of the Fourth Amendment. The MDC Defendants fail to persuasively explain why recognizing the MDC Plaintiffs' unlawful strip search claim would extend *Bivens* to a new context. Indeed, the right violated certainly falls within a recognized *Bivens* context: the Fourth Amendment is at the core of the *Bivens* jurisprudence, as *Bivens* itself concerned a

36

Fourth Amendment claim. In *Bivens*, the plaintiff brought a Fourth Amendment claim for the defendants' use of unreasonable force without probable cause, resulting in the plaintiff's unlawful arrest. 403 U.S. at 389–90; *see also Groh v. Ramirez*, 540 U.S. 551, 555 (2004) (recognizing the availability of a *Bivens* remedy for a Fourth Amendment claim of an unreasonable search, as a result of a facially invalid warrant). This Circuit has also permitted *Bivens* relief for Fourth Amendment claims involving unreasonable searches. *See, e.g.*, *Castro v. United States*, 34 F.3d 106, 107 (2d Cir. 1994). And the mechanism of the violation—here, an unreasonable search performed by a prison official—has also been recognized by this Circuit. Indeed, in *Arar*, we stated that "[i]n the small number of contexts in which courts have implied a *Bivens* remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued. . . . [T]he immigration officer who subjected an alien to multiple strip searches without cause should have left the alien in his clothes." 585 F.3d at 580; *see also Hasty*, 490 F.3d at 170–73 (assuming the existence of a *Bivens* remedy to challenge strip searches under the Fourth Amendment).

Accordingly, we conclude that a *Bivens* remedy is available for Plaintiffs'

conditions of confinement claims, under both the Due Process and Equal

Protection Clauses of the Fifth Amendment, and Fourth Amendment

unreasonable and punitive strip searches claim.[17]  However, Plaintiffs' free

exercise claim would require extending *Bivens* to a new context, a move we

decline to make absent guidance from the Supreme Court.

**III.   Claim 1:     Substantive Due Process Conditions of Confinement**

The MDC Plaintiffs allege that the harsh conditions of confinement in the

MDC violated their Fifth Amendment substantive due process rights and that all

Defendants are liable for this harm.[18]  Plaintiffs present distinct theories of

liability as to the DOJ and MDC Defendants.

**A. Applicable Legal Standard**

The Fifth Amendment's Due Process Clause forbids subjecting pretrial

detainees to punitive restrictions or conditions.  *See Bell v. Wolfish* (*Wolfish*), 441

---

[17] Because we conclude that Plaintiffs' substantive due process, equal protection, and unreasonable punitive strip searches claims do not extend *Bivens* to a new context, we need not address "whether there is an alternative remedial scheme available to the plaintiff" or "whether special factors counsel hesitation in creating a *Bivens* remedy." *Arar*, 585 F.3d at 572 (internal quotation marks and brackets omitted).

[18] Turkmen and Sachdeva, the Passaic Plaintiffs, do not bring a substantive due process conditions of confinement claim or unreasonable strip search claim (Claims 1 and 6).

38

U.S. 520, 535 & n.16 (1979).[19]  Plaintiffs must plausibly plead that Defendants, (1)
with punitive intent, (2) personally engaged in conduct that caused the
challenged conditions of confinement.  *See id*. at 538; *see also Iqbal*, 556 U.S. at 676–
77.  Absent "an expressed intent to punish," *Wolfish*, 441 U.S. at 538, we may only
infer that Defendants acted with punitive intent if the challenged conditions
were "not reasonably related to a legitimate goal—if [they were] arbitrary or
purposeless," *id*. at 539.

**B.  The DOJ Defendants**

While the DOJ Defendants do not raise a no-*Bivens*-claim defense, they do
forcefully contest liability here with powerful post-*Iqbal* assertions that "the
former Attorney General and FBI Director did not themselves require or specify
any of the particular conditions set forth in the complaint.  And they cannot be
held liable on what amounts to a theory of *respondeat superior* for the actions of
others who may have imposed those conditions."  Ashcroft & Mueller Br. 10.
They contend that because the former Attorney General's initial detention order
was constitutional, having been approved by the Supreme Court in *Iqbal*, the DOJ

---

[19] The parties have not argued for a different standard in this appeal.  Accordingly, we do not address whether the rights of civil immigration detainees should be governed by a standard that is even more protective than the standard that applies to pretrial criminal detainees.

39

Defendants were "entitled to presume that the facially constitutional policy would in turn be implemented lawfully . . . ." *Id*. at 9.  We agree . . . to a point.

The MDC Plaintiffs concede that the DOJ Defendants did not create the particular conditions in question.  *See Turkmen III*, 915 F. Supp. 2d at 326 n.4; *see also* OIG Report at 19, 112–13 (reporting that, at least initially, BOP officials determined the conditions under which detainees would be held, without direction from the FBI or elsewhere).  The MDC Plaintiffs similarly fail to plead that Ashcroft's initial arrest and detention mandate required subordinates to apply excessively restrictive conditions to civil detainees against whom the government lacked individualized suspicion of terrorism.  Given the mandate's facial validity, the DOJ Defendants had a right to presume that subordinates would carry it out in a constitutional manner.  *See Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065–66 (2d Cir. 1989).  But that is not the end of the matter.

The MDC Plaintiffs plausibly plead that the DOJ Defendants were aware that illegal aliens were being detained in punitive conditions of confinement in New York and further knew that there was no suggestion that those detainees were tied to terrorism except for the fact that they were, or were perceived to be,

40

Arab or Muslim.[20] The MDC Plaintiffs further allege that while knowing these facts, the DOJ Defendants were responsible for a decision to merge the New York List with the national INS List, which contained the names of detainees whose detention was dependent not only on their illegal immigrant status and their perceived Arab or Muslim affiliation, but also a suspicion that they were connected to terrorist activities. The merger ensured that the MDC Plaintiffs would continue to be confined in punitive conditions. This is sufficient to plead a Fifth Amendment substantive due process violation.[21] Given the lack of

---

[20] The dissent counters that "[t]his is not apparent in the record," citing Plaintiff Bajracharya's videotaping of a building in Queens as evidence of that Plaintiff's possible tie to terrorism. Dissenting Op., *post* at 43 n.28. The dissent makes no mention, of course, of Plaintiff Khalifa, who was told that the FBI was only interested in his roommates, but who was arrested and then detained in the ADMAX SHU anyway, Compl. ¶ 197; or of Plaintiff Mehmood, who was arrested and detained in the ADMAX SHU in place of his wife, in whom the FBI had apparently expressed interest, but who was still breastfeeding their son, *id*. ¶ 159. The dissent further claims that detainees were not sent to the ADMAX SHU based on their perceived race or religion, but—as the OIG Report states—based on whether they were designated of "high interest" to the PENTTBOM investigation. Dissenting Op., *post* at 44 n.28 (citing OIG Report at 18, 111). But, as the dissent concedes, *id*., Plaintiffs' well-pleaded Complaint specifically contradicts this point: the MDC Plaintiffs were detained in the ADMAX SHU "even though they had not been classified 'high interest,'" Compl. ¶ 4.

[21] We acknowledge, as the dissent points out, that the MDC Plaintiffs did not advance the "lists-merger theory" before this Court or the district court. Dissenting Op., *post* at 43 n.28. Rather, they structured the Complaint to challenge Ashcroft's arrest and detention mandate as initially formulated and generally applied. In examining the Complaint's sufficiency, we have been clear that the pleadings are inadequate to challenge the validity of the policy *ab initio*, but do state a claim with regard to the merger decision, an event that Plaintiffs explicitly reference in the Complaint. *See*

41

individualized suspicion, the decision to merge the lists was not "reasonably related to a legitimate goal." *See Wolfish*, 441 U.S. at 539. The only reason why the MDC Plaintiffs were held as if they were suspected of terrorism was because they were, or appeared to be, Arab or Muslim. We conclude that this plausibly pleads punitive intent. *Id*.

### 1. *Punitive Conditions of Confinement*

Contrary to the district court's conclusion that Plaintiffs failed to "allege that the DOJ [D]efendants were even aware of [the] conditions," *Turkmen III*, 915 F. Supp. 2d at 340, the Complaint and the OIG Report each contain allegations of the DOJ Defendants' knowledge of the challenged conditions. Plaintiffs allege, *inter alia*, that Mueller ran the 9/11 investigation out of FBI Headquarters; and that "Ashcroft, Mueller[,] and Ziglar received detailed daily reports of the arrests and detentions," Compl. ¶ 47; *see also id*. ¶¶ 63–65.

The OIG Report makes plain the plausibility of Plaintiffs' allegations. The "[DOJ] was aware of the BOP's decision to house the September 11 detainees in high-security sections in various BOP facilities." OIG Report at 19. The Deputy Chief of Staff to Ashcroft told the OIG that an allegation of mistreatment was

Compl. ¶ 47; Pls.' Br. 38. Sufficiency analysis requires a careful parsing of the Complaint and that is all that has occurred here.

42

called to the Attorney General's attention. *Id*. at 20. And BOP Director Kathy Hawk Sawyer stated that in the weeks following 9/11, the Deputy Attorney General's Chief of Staff and the Principal Associate Deputy Attorney General "called her . . . with concerns about detainees' ability to communicate both with those outside the facility and with other inmates," *id*. at 112, which she said confirmed for her that the decision to house detainees in the restrictive conditions of the ADMAX SHU was appropriate, *id*. at 112–113. This supports the reasonable inference that not only was Ashcroft's office aware of some of the conditions imposed, but affirmatively supported them. *See also id*. at 113 (DOJ officials told Sawyer to "take [BOP] policies to their legal limit").[22] Furthermore, the OIG Report also makes clear that conditions in the ADMAX SHU began to

---

[22] The dissent attempts to minimize the force of these comments, claiming that communications about a condition of confinement that was lifted before the merger decision cannot support an inference as to what the DOJ Defendants knew about the conditions in the ADMAX SHU. Dissenting Op., *post* at 56–57. Simply put, we disagree. The fact remains that a condition of confinement, less severe and abusive than the conditions at issue here, garnered the attention of senior officials; it stands to reason that conditions that kept detainees in their cells for twenty-three hours a day, denied them sleep by bright lights, and involved excessive strip searches and physical abuse, would have come to the DOJ Defendants' attention.

receive media attention soon after detentions began, *see id*. at 2, 5;[23] thus, it seems

implausible that the public's concerns did not reach the DOJ Defendants' desks.

Of course, we cannot say for certain that daily reports given to Ashcroft

and Mueller detailed the conditions at the ADMAX SHU or that the daily

meetings of the SIOC Working Group (containing representatives from each of

the DOJ Defendants' offices) discussed those conditions.  But on review of a

motion to dismiss, Plaintiffs need not *prove* their allegations; they must *plausibly*

*plead* them.  At a minimum, a steady stream of information regarding the

challenged conditions flowed between the BOP and senior DOJ officials.  Given

the MDC Plaintiffs' allegations, the media coverage of conditions at the MDC,

and the DOJ Defendants' announced central roles in PENTTBOM, it seems to us

plausible that information concerning conditions at the MDC, which held eighty-

four of the 9/11 detainees, reached the DOJ Defendants.[24]

---

[23] *See, e.g.*, Neil A. Lewis, *A Nation Challenged: The Detainees; Detentions After Attacks Pass 1,000, U.S. Says*, N.Y. TIMES, Oct. 30, 2001, *available at* http://www.nytimes.com/2001/10/30/us/a-nation-challenged-the-detainees-detentions-after-attacks-pass-1000-us-says.html (citing "common news reports of abuse involv[ing] mistreatment of prisoners of Middle Eastern background at jails").

[24] Furthermore, the OIG reports were issued pursuant to the Office of the Inspector General's responsibilities under the USA PATRIOT Act, which was enacted on October 26, 2001.  *See* OIG Report at 3 n.6.  The PATRIOT Act, Section 1001, reads: "The Inspector General of the Department of Justice shall designate one official who shall— (1) review information and receive complaints alleging abuses of civil rights and civil

44

## 2. *Lack of Individualized Suspicion*

The MDC Plaintiffs also plausibly plead that the DOJ Defendants were aware that the FBI had not developed any connection between some of the detainees and terrorist activities. The Complaint and OIG Report both make clear that the New York FBI arrested all "out-of-status" aliens encountered—even coincidentally—in the course of investigating a PENTTBOM lead. OIG Report at 41–42, 69–70. These arrestees were "deemed 'of interest' for purposes of the 'hold until cleared' policy, regardless of the strength of the evidence or the origin of the lead." *Id*. at 41. Those deemed of "high interest" were sent to the MDC's ADMAX SHU, *id.* at 111, but "there was little consistency or precision to the process that resulted in detainees being labeled 'high interest,'" *id*. at 158.[25]

---

liberties by employees and officials of the Department of Justice." PATRIOT Act, Pub. L. No. 107-56, § 1001, 115 Stat. 272 (2001). "On October 30, 2001, the OIG reviewed a newspaper article in which a September 11 detainee alleged he was physically abused when he arrived at the MDC on October 4, 2001. Based on the allegations in the article, the OIG's Investigations Division initiated an investigation into the matter." OIG Report at 144. It seems to us most plausible that if the OIG—who is "under the authority, direction, and control of the Attorney General with respect to audits or investigations," 5 U.S.C. App. 3 § 8E(a)(1)—was aware of the challenged conditions at the MDC, the DOJ Defendants were as well.

[25] Even some detainees who were not labeled "high interest" were nonetheless sent to the MDC's ADMAX SHU. For example, "Abbasi, Bajracharya, Mehmood, and Khalifa[] were placed in the ADMAX SHU even though they had not been classified 'high interest' and despite the absence of any information indicating they were dangerous or involved in terrorism, or any other legitimate reason for such treatment." Compl. ¶ 4.

45

Even if the DOJ Defendants were not initially aware of this practice, the Complaint and OIG reports support the reasonable inference that Ashcroft and Mueller learned of it within weeks of 9/11. The Complaint clearly alleges that the DOJ Defendants agreed that individuals for whom the FBI could only articulate an immigration law violation as a reason for detention—and for whom the FBI had not developed any reliable tie to terrorism—would continue to be treated as if the FBI had reason to believe the detainees had ties to terrorist activity. Compl. ¶ 67. Plaintiffs point to the detailed daily reports that the DOJ Defendants received regarding arrests and detentions and allege that the DOJ Defendants "were aware that the FBI had no information tying Plaintiffs and class members to terrorism prior to treating them as 'of interest' to the PENTTBOM investigation." *Id.* ¶ 47. Indeed, they claim that Ashcroft, in particular, "insisted on regular, detailed reporting on arrests"; they allege that he received a daily "Attorney General's Report" on persons arrested. *Id*. ¶ 63. They further allege that it was Ziglar who was ultimately responsible for providing much of this information—which he gleaned from his twice daily briefings with his staff regarding the 9/11 detentions—to Ashcroft, indicating that he too was aware of the lack of individualized suspicion. *Id*. ¶ 64.

46

Once again, the OIG reports also support the MDC Plaintiffs' allegation that the DOJ Defendants became aware of the lack of individualized suspicion for some detainees held in the challenged conditions of confinement. The OIG Report states that "[a] variety of INS, FBI, and [DOJ] officials who worked on the[] September 11 detainee cases told the OIG that it soon became evident that many of the people arrested during the PENTTBOM investigation might not have a nexus to terrorism." OIG Report at 45. Other DOJ officials also stated that it "soon became clear" that only some of the detainees were of "genuine investigative interest"—as opposed to aliens identified by the FBI as "of interest" for whom the FBI had no suspicion of a connection to the attacks or terrorism in general. *Id*. at 47.

The OIG Report supports the reasonable inference that this information, known by other DOJ officials, came to the attention of the DOJ Defendants. In particular, the OIG Report specifies that Ashcroft and Mueller were involved in a "'continuous meeting' for the first few months" after 9/11, at which "the issue of holding aliens until they were cleared was discussed." *Id*. at 39–40. Furthermore, the OIG Report makes clear that the SIOC Working Group, containing representatives from the offices of each of the DOJ Defendants, was

47

aware of the lack of evidence tying detainees to terrorism. *Id*. at 53–57. As we have already noted, the OIG Report details how at some point in October 2001, the SIOC Working Group learned about the New York List and that "officials at the INS, FBI, and [DOJ] raised concerns about, among other things, whether the aliens had any nexus to terrorism." *Id*. at 53. Clearly this created a major problem for the DOJ. The existence of the New York List suddenly presented the possibility of more than doubling the number of detainees subject to the hold-until-cleared policy.[26] It seems quite *plausible* that DOJ officials would confer with the Attorney General and the Director of the FBI (it was, after all, his agents who were arresting out-of-status Arab and Muslim aliens and holding them as if they were "of interest" without any suspicion of terrorist connections) about the problem of the New York List and the hundreds of detainees picked up in contravention of Ashcroft's stated policy. Indeed, it seems to us *implausible* they did not. Finally, the OIG Report once again makes clear that media reports regarding allegations of mistreatment of detainees alleged that detainees

---

[26] In October and November of 2001, the New York List contained approximately 300 detainees while the INS List for the rest of the nation contained only 200 detainees. OIG Report at 54.

remained in detention even though they had no involvement in terrorism. *Id*. at 2, 5.

3. *The Decision to Merge the Lists*

Plaintiffs plausibly plead that, despite the DOJ Defendants' knowledge of the conditions at the ADMAX SHU and the lack of any form of verified suspicion for a large number of those detainees on the New York List, Ashcroft approved, or at least endorsed, a decision to merge the New York List. The MDC Plaintiffs contend that he did so notwithstanding vocal opposition from various internal sources. The Complaint clearly alleges that "[a]gainst significant internal criticism from INS agents and other federal employees involved in the sweeps, Ashcroft ordered that, despite a complete lack of any information or a statement of FBI interest, all such Plaintiffs and class members [on the New York List] be detained until cleared and otherwise treated as 'of interest.'" Compl. ¶ 47. By taking this action, Ashcroft ensured that some of the individuals on the New York List would be placed in, or remain detained in, the challenged conditions of confinement.

Our dissenting colleague levels a concern as to the import of the merger of the lists and counters that nothing in the OIG reports confirms Ashcroft's

49

personal knowledge of the correlation between the merger of the lists and the lack of individualized suspicion as to the MDC Plaintiffs. The dissent contends that, because Plaintiffs' allegations are not based on personal knowledge, there is no factual basis in the record for them. Dissenting Op., *post* at 45. True enough that Ashcroft did not acknowledge that he was aware of the merger of the lists and its implication for the MDC Plaintiffs, nor did he take responsibility for it. But then again a review of the OIG Report gives no indication that anybody asked him.

The absence of an inquiry to the former Attorney General is not a criticism of the Office of the Inspector General's methods, but a simple recognition of a fact that points out a key difference between our view of the OIG reports and that of the dissent. For us, the OIG reports provide context for the allegations of the Complaint. *See supra* note 6. However, it would be a mistake to think of the OIG reports as a repository of all relevant facts of that troubled time; but that is exactly what the dissent seems inclined to do. The dissent measures plausibility by the absence or presence of fact-findings in the OIG reports. Thus, for the dissent, the fact that the Attorney General may not have been questioned is confirmation that he knew nothing. The reports make no such assertion.

It may be that following discovery it will be clear that Ashcroft was not responsible for the merger decision (nor was Mueller or Ziglar), but that is not the question at the pleading stage. The question is whether the MDC Plaintiffs plausibly plead that Ashcroft was responsible. Given the importance of the merger and its implications for how his lawful original order was being carried out, we think the MDC Plaintiffs plausibly allege that he was.

Indeed, the OIG Report supports the MDC Plaintiffs' allegation that Ashcroft was responsible for the merger decision. An incident at one of the New York List meetings provides additional context that supports that allegation. At the November 2, 2001 meeting, the group discussed the necessity of CIA checks, often a prerequisite to a 9/11 detainee's release from detention. OIG Report at 55. In response, Stuart Levey, the Associate Deputy Attorney General responsible for oversight of immigration issues, stated that he had to "check" before communicating a decision on whether "any detainees could be released without the CIA check." *Id*. at 56. This response could reasonably indicate (a) a lack of authority to respond to the question, or (b) that Levey wanted to consider other views before making the decision. Because either is plausible, it is irrelevant that

51

only inference (a) supports the conclusion that Levey could not answer the question on his own and had to take it to more senior officials.[27]

Furthermore, in late November 2001, when the INS Chief of Staff approached Levey about the CIA check policy, Levey said that he "did not feel comfortable making the decision about [the] request to change the CIA check policy without additional input." *Id*. at 62. It seems to us that if Levey was not comfortable changing the CIA check policy without input from more senior officials, he certainly would not have been comfortable making the decision on his own to double the number of detainees subject to that policy in the first instance.[28]

---

[27] The OIG Report states that Levey specifically consulted David Laufman, the Deputy Attorney General's Chief of Staff. OIG Report at 62. The dissent takes this as definitive proof that Ashcroft was not consulted on this, or the merger, decision. Dissenting Op., *post* at 47–49. The dissent mischaracterizes our reference to the CIA checks decision. We do not contend that Levey consulted Ashcroft about *that* decision, nor do we need to. In our view, the fact that Levey spoke to Laufman about *that* decision is not the end of the matter; indeed, the only relevance of the CIA checks decision, period, is that Levey was not capable of making it on his own, suggesting that he also would not be able to make the list-merger decision on his own.

[28] Indeed, Ziglar told the OIG that he contacted Ashcroft's office on November 7, 2001, to discuss concerns about the process of clearing names from the INS Custody List, especially the impact that merging the lists would have on that process and said that "based on these and other contacts with senior Department officials, he believed the Department was fully aware" of the INS's concerns. OIG Report at 66–67. This also suggests that Levey had communicated those concerns to Ashcroft, who nonetheless made the decision to merge the lists.

The dissent argues that the OIG Report forecloses the plausibility of the allegation that Levey brought the list-merger decision to Ashcroft because "Levey made the lists-merger decision '[a]t the conclusion of the [November 2] meeting' at which the subject was first raised to him." Dissenting Op., *post* at 49 (quoting OIG Report at 56). But the OIG Report does *not* indicate that the merger issue was first raised to Levey at the November 2 meeting. Rather, the OIG Report makes clear that the issue of the New York List was discovered in October 2001,[29] and that the decision to merge the lists was communicated at the November 2 meeting. Thus, surely it is plausible that Levey consulted with more senior officials, including Ashcroft, *prior to* that meeting.[30] Of course, discovery may show that Levey was solely responsible for the decision. But, again, the

---

[29] While the dissent's observation that Levey did not attend the October 22, 2001 meeting during which the "problems presented by the New York List" were discussed is accurate, it is also irrelevant. *See* Dissenting Op., *post* at 49–50 (quoting OIG Report at 55). We do not contend that Levey learned about the New York List at the October 22 meeting, but simply that he learned about it *before* the November 2 meeting, giving him time to consult with more senior officials, including Ashcroft, before communicating a decision at that November meeting. Indeed, one would think that Levey would not attend the November 2 meeting without knowing its agenda.

[30] The dissent challenges the sufficiency of Plaintiffs' allegations and our reading of them as "wholly speculative." Dissenting Op., *post* at 48. Of course, Plaintiffs have no way of knowing what Levey and Ashcroft discussed; nor do we. *Iqbal* does not require as much, but rather "sufficient factual matter, accepted as true" to allow the court to draw the reasonable inference that Ashcroft was ultimately responsible for the decision. 556 U.S. at 678. We believe that Plaintiffs have met this burden.

question is whether Plaintiffs' allegations support the inference that the decision was Ashcroft's; they do.

The MDC Plaintiffs' allegations against Mueller and Ziglar are also sufficient. The Complaint alleges, *inter alia*, that Ashcroft made the decision to merge the lists in spite of the lack of individualized suspicion linking the MDC Plaintiffs to terrorism and that "Mueller and Ziglar were fully informed of this decision, and complied with it." Compl. ¶ 47; *see also id.* ¶¶ 55–57, 67. Mueller and Ziglar are not exculpated from this claim merely because Plaintiffs allege that they complied with, as opposed to ordered, the list merger. Plaintiffs plausibly plead that both were aware that the separate list contained detainees for whom the FBI had asserted no interest and that subjecting them to the challenged conditions would be facially unreasonable. Even if an official is not the source of a challenged policy, that official can be held personally liable for constitutional violations stemming from the execution of his superior's orders if those orders are facially invalid or clearly illegal. *See, e.g.*, *Varrone v. Bilotti*, 123 F.3d 75, 81 (2d Cir. 1997) (granting defendants qualified immunity where there was "no claim that the order was facially invalid or obviously illegal"). In this instance, Plaintiffs plausibly allege that Ashcroft's decision was facially invalid; it

54

would be unreasonable for Mueller and Ziglar to conclude that holding ordinary civil detainees under the most restrictive conditions of confinement available was lawful.

####    4. *Punitive Intent*

The MDC Plaintiffs must show not only that the DOJ Defendants knew of and approved continued use of the ADMAX SHU, but also that they did so with punitive intent—that they endorsed the use of those conditions with an intent to punish the MDC Plaintiffs. Federal courts have long recognized that punitive intent is not often admitted. The Supreme Court has noted that it can be inferred if the conditions of confinement are "not reasonably related to a legitimate goal." *Wolfish*, 441 U.S. at 539. If the conditions under which one is held have no reasonable connection to a legitimate goal of the state, then one logical assumption is that they are imposed for no other purpose than to punish. *See id*.

The DOJ Defendants argue that even if they knew of the plight of the MDC Plaintiffs, the decision to continue their confinement at the MDC under exceptionally harsh conditions was motivated by national security concerns—a legitimate worry during the days following the 9/11 attacks—and not some animus directed at the MDC Plaintiffs. They seem to imply that once "national

55

security" concerns become a reason for holding someone, there is no need to show a connection between those concerns and the captive other than that the captive shares common traits of the terrorist: illegal immigrant status and a perceived Arab or Muslim affiliation. Indeed, our dissenting colleague asserts that because the MDC Plaintiffs were, or appeared to be, members of the group—Arab or Muslim males—that was targeted for recruitment by al Qaeda that they could be held in the ADMAX SHU without any reasonable suspicion of terrorist activity. Dissenting Op., *post* at 64–65, 76–77. Under this view, the MDC Plaintiffs were not held with punitive intent because there was no way to know that they were not involved in terrorist activities. Simply being in the United States illegally and being, or appearing to be, Arab or Muslim was enough to justify detention in the most restrictive conditions of confinement available. Indeed, Levey admitted that the decision to merge the lists, ensuring that some of the 9/11 detainees would be subject to the challenged harsh conditions of confinement, was made because he "wanted to err on the side of caution so that a terrorist would not be released by mistake." OIG Report at 56.

This argument rests on the assumption that if an individual was an out-of-status Arab or Muslim, and someone called the FBI for even the most absurd

56

reason, that individual was considered a possible threat to national security. It presumes, in essence, that all out-of-status Arabs or Muslims were potential terrorists until proven otherwise. It is built on a perception of a race and faith that has no basis in fact. There was no legitimate governmental purpose in holding someone in the most restrictive conditions of confinement available simply because he happened to be—or, worse yet, appeared to be—Arab or Muslim.

To be clear, it is "no surprise"—nor is it constitutionally problematic—that the enforcement of our immigration laws in the wake of 9/11 had a "disparate, incidental impact on Arab Muslims." *Iqbal*, 556 U.S. at 682. And we do not contend that Supreme Court, or our own, precedent requires individualized suspicion to subject detainees to *generally* restrictive conditions of confinement; restriction is an incident of detention. Rather, we simply acknowledge that "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Wolfish*, 441 U.S. at 539. We believe, then, that the challenged conditions—keeping detainees in their cells for twenty-three

hours a day, constructively denying them recreation and exposing them to the elements, strip searching them whenever they were removed from or returned to their cells, denying them sleep by bright lights—were not reasonably related to a legitimate goal, but rather were punitive and unconstitutional.

While national security concerns could justify detaining those individuals with suspected ties to terrorism in these challenged conditions for the litany of reasons articulated by the dissent, *see* Dissenting Op., *post* at 67–68, those concerns do not justify detaining individuals solely on the basis of an immigration violation and their perceived race or religion in those same conditions.  Individualized suspicion is required here because, absent some indication that the detainees had a tie to terrorism, the restrictions or conditions of the ADMAX SHU were "arbitrary or purposeless."  *Wolfish*, 441 U.S. at 539.[31]

---

[31] The dissent cites several cases that it claims demonstrate that individualized suspicion is not required for imposing restrictive conditions of confinement.  Dissenting Op., *post* at 62–63.  We do not disagree: individualized suspicion is not required to impose conditions that are reasonably related to a legitimate governmental objective.  *Wolfish*, 441 U.S. at 539.  Thus, in each of the cases cited by the dissent, rather than announce that individualized suspicion was not required, the Supreme Court determined that the restrictions at issue in each of those cases were related to the legitimate goal of prison security and, therefore, were not punitive.  Thus, the cases cited by the dissent do not change our conclusion here, where the challenged conditions—the most restrictive available and imposed on detainees *qua* detainees—are not reasonably related to either the goal of prison security, or national security.

Indeed, in *Wolfish*, the Supreme Court acknowledged that "loading a detainee with chains and shackles and throwing him in a dungeon may ensure his [detention] and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." *Id*. at 539 n.20. That is the situation before us. Clearly detention conditions less restrictive than the ADMAX SHU were feasible for the MDC Plaintiffs, given that the detainees held in the Passaic facility "were not held in isolation or otherwise placed in restrictive confinement." Compl. ¶ 66. Placing the MDC Plaintiffs in chains and shackles and throwing them in the ADMAX SHU ensured that they posed no threat in the aftermath of 9/11; but we can reach no conclusion other than that the DOJ Defendants' decision to do so was made with punitive intent.

In view of the foregoing, we hold that the MDC Plaintiffs fail to plausibly plead a substantive due process claim against the DOJ Defendants coextensive with the entire post-9/11 investigation and reaching back to the time of Plaintiffs' initial detention. Nonetheless, Plaintiffs' well-pleaded allegations, in conjunction

59

with the OIG Report's documentation of events such as the New York List controversy, render plausible the claim that by the beginning of November 2001, Ashcroft knew of, and approved, the MDC Plaintiffs' confinement under severe conditions, and that Mueller and Ziglar complied with Ashcroft's order notwithstanding their knowledge that the government had no evidence linking the MDC Plaintiffs to terrorist activity. Discovery may ultimately prove otherwise, but for present purposes, the MDC Plaintiffs' substantive due process claim—with the exception of the temporal limitation noted above—may proceed against the DOJ Defendants.

## 5. *Qualified Immunity*

A defendant is entitled to qualified immunity if he can establish (1) that the complaint fails to plausibly plead that the defendant personally violated the plaintiff's constitutional rights, or (2) that the right was not clearly established at the time in question. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Varrone*, 123 F.3d at 78 (noting that the qualified immunity inquiry turns, generally, on the objective legal reasonableness of a defendant's actions).

For the reasons stated above, the MDC Plaintiffs plausibly plead that the DOJ Defendants violated their substantive due process rights. With regard to the

60

second prong of this inquiry, the law regarding the punishment of pretrial detainees was clearly established in the fall of 2001.  As discussed, *Wolfish* made clear that a particular condition or restriction of pretrial detention not reasonably related to a legitimate governmental objective is punishment in violation of the constitutional rights of detainees.  *See* 441 U.S. at 535–39 & n.20.  And in *Hasty*, this Court denied qualified immunity with respect to a materially identical conditions claim against Hasty.  490 F.3d at 168–69.  We explained that "[t]he right of pretrial detainees to be free from punitive restraints was clearly established at the time of the events in question, and no reasonable officer could have thought that he could punish a pretrial detainee by subjecting him to the practices and conditions alleged by the Plaintiff."  *Id*. at 169.

*Hasty* further rejected the argument that the post-9/11 context warranted qualified immunity even if it was otherwise unavailable.  *Id*. at 159–60, 169.  Recognizing the "gravity of the situation" that 9/11 presented, we explained that qualified immunity remained inappropriate because a pretrial detainee's right to be free from punishment does not vary with the surrounding circumstances.  *Id*. at 159.  Nothing has undermined the logic or precedential authority of our qualified immunity holding in *Hasty*.  We therefore conclude that the DOJ

Defendants are not entitled to qualified immunity on the MDC Plaintiffs'

conditions of confinement claim.

**C. The MDC Defendants**

In his opinion below, Judge Gleeson divided the MDC Plaintiffs'

conditions of confinement claim against the MDC Defendants into two

categories: "official conditions" allegations and "unofficial abuse" allegations.

The "official conditions" allegations concern express confinement policies that

the MDC Defendants approved and implemented; the "unofficial abuse"

allegations concern the physical and verbal abuse that the MDC Defendants

employed or permitted their subordinates to employ. We find this taxonomy

helpful in analyzing the conditions claim against Hasty, Sherman, and Zenk.[32]

1. *Official Conditions*

The MDC Plaintiffs generally allege that the "official conditions" to which

the MDC Defendants subjected them constituted punishment. We do not

address whether Plaintiffs have sufficiently alleged an express intent to punish,

but rather analyze whether they have plausibly pleaded that (1) the MDC

---

[32] Plaintiffs' allegations against Zenk do not extend to the "unofficial abuse" nor to any harm arising from the "official conditions" that occurred prior to April 22, 2002, the date he became MDC Warden.

Defendants caused them to suffer the challenged conditions, and that (2) the challenged conditions were "not reasonably related to a legitimate goal," which allows us to infer punitive intent, *Wolfish*, 441 U.S. at 539.

The MDC Plaintiffs plausibly plead that Hasty and Sherman are personally responsible for and caused the MDC Plaintiffs to suffer the challenged conditions. The Complaint contains allegations that Hasty ordered the creation of the ADMAX SHU and directed two of his subordinates to design "extremely restrictive conditions of confinement." Compl. ¶¶ 24, 75; *see also id.* ¶ 76 (describing the extreme conditions in the ADMAX SHU). According to the Complaint, those conditions were then approved and implemented by Hasty and Sherman. *Id*. ¶ 75.

The OIG reports support these allegations. While the decision to impose highly restrictive conditions was made at BOP headquarters, OIG Report at 19, MDC officials created the particular conditions imposed, *id*. at 124–25. The reports specify that MDC officials modified one wing of the preexisting SHU to accommodate the detainees and that the ADMAX SHU was "designed to confine the detainees in the most restrictive and secure conditions permitted by BOP policy." Supplemental OIG Report at 2–3. As Warden and Associate Warden of

63

the MDC, Hasty and Sherman had the responsibility to carry out these tasks. But that alone would not sustain liability for either.

However, the MDC Plaintiffs also plausibly plead that Hasty and Sherman subjected them to the challenged conditions with punitive intent because the conditions were "not reasonably related to a legitimate goal." *Wolfish*, 441 U.S. at 539. Specifically, the MDC Plaintiffs allege that Hasty and Sherman imposed these harsh conditions despite the fact that they "were aware that the FBI had not developed any information to tie the MDC Plaintiffs [and other detainees] they placed in the ADMAX SHU to terrorism." Compl. ¶ 69. As discussed above with respect to the DOJ Defendants, individualized suspicion was not required to subject detainees to the restrictive conditions of confinement inherent in any detention. But the challenged conditions were not simply restrictive; they were punitive: there is no legitimate governmental purpose in holding someone as if he were a terrorist simply because he happens to be, or appears to be, Arab or Muslim.

The MDC Defendants, and our dissenting colleague, note that BOP Headquarters ordered that the detainees "be placed in the highest level of restrictive detention" and, thus, argue that we cannot infer punitive intent from

the MDC Defendants' compliance with that order. *See* Dissenting Op., *post* at 70 n.40, 71 (quoting OIG Report at 112). They further claim that because the FBI had designated the individuals held in the ADMAX SHU as "of interest," the MDC Defendants are absolved from liability. *See, e.g.*, Hasty Br. 17, 25–26.

But even if Hasty and Sherman *initially* believed that they would be housing only those detainees who were suspected of ties to terrorism, the Complaint contains sufficient factual allegations that the MDC Defendants eventually knew that the FBI lacked any individualized suspicion for many of the detainees that were sent to the ADMAX SHU. Plaintiffs allege that Hasty and Sherman received regular written updates explaining why each detainee had been arrested and including "all evidence relevant to the danger he might pose" to the MDC, and that these updates often lacked any indication of a suspicion of a tie to terrorism. Compl. ¶ 69.[33] They further explain that "[t]he exact language of these updates was repeated weekly, indicating the continued lack of any

---

[33] For example, the MDC Defendants were informed that Plaintiff Abbasi was "'encountered' by INS pursuant to an FBI lead; that he used a fraudulent passport to enter the U.S. to seek asylum, and later destroyed that passport; that he requested and was denied various forms of immigration relief; that he obtained and used a fraudulent advance parole letter to enter the country, and that he was thus inadmissible. The update included no statement of FBI interest in Abbasi." Compl. ¶ 72.

information tying [Plaintiffs] to terrorism, or tending to show that any of them might pose a danger." *Id*. ¶ 73.

The MDC Plaintiffs relatedly allege that Hasty and Sherman knew that BOP regulations require individualized assessments for detainees placed in the SHU for more than seven days, yet ordered the MDC Plaintiffs' continued detention in the ADMAX SHU without performing these assessments, and Hasty "ordered [his] subordinates to ignore BOP regulations regarding detention conditions." *Id.* ¶ 68; *see also id.* ¶¶ 73–74.

The MDC Plaintiffs further allege that Hasty and Sherman approved a document that falsely stated that "executive staff at MDC had classified the 'suspected terrorists' as 'High Security' based on an individualized assessment of their 'precipitating offense, past terrorist behavior, and inability to adapt to incarceration.'" *Id*. ¶ 74. In addition, the MDC Plaintiffs allege that Hasty and Sherman continued to detain them in the ADMAX SHU even after affirmatively learning that the FBI lacked individualized evidence linking Plaintiffs to terrorism. *See id.* ¶¶ 69−71, 74. These allegations are buttressed by Plaintiffs' assertions that they remained confined in the ADMAX SHU even after receiving final clearance from the New York FBI field office and FBI Headquarters. For

66

instance, the Complaint alleges that Benamar Benatta was cleared on November 14, 2001, that this information was available to the MDC, and that Benatta nonetheless remained in the ADMAX SHU until April 30, 2002. *See id.* ¶ 188.

The OIG Report directly supports these allegations; as stated by one BOP official, all 9/11 detainees at the MDC were placed in the ADMAX SHU and subjected to the official conditions because, at least initially, "the BOP did not really know whom the detainees were." OIG Report at 19; *see also* Compl. ¶ 4; OIG Report at 112, 126. Specific factual allegations that Hasty and Sherman failed to assess whether the restrictive conditions were appropriate for individual 9/11 detainees buttress the MDC Plaintiffs' claim that the challenged conditions were not reasonably related to a legitimate goal, and that Hasty and Sherman were personally responsible for the treatment.

We recognize that the MDC Defendants may have been in a difficult position when they received detainees without accompanying information regarding those individuals. Record proof may eventually establish that the MDC Plaintiffs' claim is limited to the period of time that Hasty and Sherman knew that the MDC Plaintiffs were being held without suspicion of ties to terrorism. But we cannot conclude, at least at the motion to dismiss stage, that it

was reasonable to take a default position of imposing the most restrictive form of detention available when one *lacks* individualized evidence that the detainee poses a danger to the institution or the nation. Accordingly, we conclude that the MDC Plaintiffs plausibly plead a substantive due process claim against Hasty and Sherman as to the official conditions.

The Complaint does not, however, permit an inference of personal liability as to Zenk, who did not become MDC Warden until April 22, 2002, when only two Plaintiffs remained in the ADMAX SHU. Fundamentally, the allegations that personally identify Zenk are too general and conclusory to support Plaintiffs' claim. We therefore dismiss the MDC Plaintiffs' substantive due process claim against Zenk.

## 2. *Unofficial Abuse*

The district court properly viewed the MDC Plaintiffs' "unofficial abuse" allegations under the deliberate indifference standard commonly applied in the Eighth Amendment prisoner-mistreatment context. *See Turkmen III*, 915 F. Supp. 2d at 341 & n.13.[34] Given the nature of the MDC Plaintiffs' "unofficial abuse"

---

[34] The deliberate indifference standard would clearly apply if the MDC Plaintiffs had been prisoners entitled to the Eighth Amendment's protection against cruel and unusual punishment. *See Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Because a

allegations, premising liability on Hasty and Sherman's deliberate indifference is consistent with *Iqbal*'s holding that *Bivens* defendants are liable only if, through their own actions, they satisfy each element of the underlying constitutional tort. *See* 556 U.S. at 676.

Prior to *Iqbal*, this Court recognized claims against a supervisory defendant so long as the defendant was personally involved with the alleged constitutional violation. In *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), this Court identified five ways in which a plaintiff may establish a defendant's personal involvement. One is through a defendant's "deliberate indifference." *Id.* As the district court explained, the fact that a particular type of conduct constitutes "personal involvement" under *Colon* does not inherently preclude the conduct from also supporting a theory of direct liability. *Turkmen III*, 915 F. Supp. 2d at 335–36. For instance, plausibly pleading that a defendant "participated directly in the alleged constitutional violation"—one form of personal involvement

---

pretrial detainee's rights are at least as robust as those of a sentenced prisoner, we have applied the Eighth Amendment deliberate indifference test to pretrial detainees bringing claims under the Due Process Clause of the Fifth Amendment. *See, e.g., Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). We do not address whether civil immigration detainees should be governed by an even more protective standard than pretrial criminal detainees.

enumerated in *Colon*, 58 F.3d at 873—could establish direct, as opposed to vicarious, liability. The proper inquiry is not the name we bestow on a particular theory or standard, but rather whether that standard—be it deliberate indifference, punitive intent, or discriminatory intent—reflects the elements of the underlying constitutional tort. *See Iqbal*, 556 U.S. at 676 ("The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue.").

Our conclusion is consistent with *Iqbal*, this Court's prior rulings, *see Walker*, 717 F.3d at 125, and the weight of Circuit precedent. For instance, in *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011), the Ninth Circuit determined that *Iqbal* does not preclude *Bivens* claims premised on deliberate indifference when the underlying constitutional violation requires no more than deliberate indifference. *See also Dodds v. Richardson*, 614 F.3d 1185, 1204–05 (10th Cir. 2010); *Sandra T.E. v. Grindle*, 599 F.3d 583, 590–91 (7th Cir. 2010); *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 49 (1st Cir. 2009).

The MDC Plaintiffs' "unofficial abuse" claim therefore survives so long as Plaintiffs plausibly plead that the conditions were sufficiently serious, and Hasty and Sherman "kn[e]w of, and disregard[ed], an excessive risk to inmate health or

70

safety." *Walker*, 717 F.3d at 125 (internal quotation marks omitted); *accord Cuoco*, 222 F.3d at 107. The MDC Plaintiffs clearly meet this standard with respect to Hasty. Simply stated, their factual allegations permit the inference that he knew that MDC staff subjected the MDC Plaintiffs to the "unofficial abuses" and permitted—if not facilitated—the continuation of these abuses. *See* Compl. ¶¶ 24, 77–78, 107, 109–10.

For example, the Complaint contains allegations that Hasty avoided evidence of detainee abuse by "neglecting to make rounds on the ADMAX [SHU] unit," as was required of him by BOP policy. *Id*. ¶ 24. The MDC Plaintiffs also allege that Hasty was nonetheless made aware of the abuse "through inmate complaints, staff complaints, hunger strikes, and suicide attempts." *Id*.; *see also id*. ¶¶ 77–78 (detailing how Hasty made it difficult for detainees to file complaints and ignored the evidence when they did, and how staff officials who complained were called "snitches" and were threatened). Indeed, complaints about abuse of 9/11 detainees were pervasive enough to cause the BOP to videotape all detainee movements and resulted in the investigations later detailed in the OIG reports. *Id*. ¶ 107. The MDC Plaintiffs also complain that

71

Hasty encouraged his subordinates' harsh treatment of the detainees by himself referring to the detainees as terrorists. *Id*. ¶¶ 77, 109.

The allegations against Sherman, because they are more general and conclusory in nature, are more tenuous. For instance, Plaintiffs allege principally that Sherman "allowed his subordinates to abuse MDC Plaintiffs and class members with impunity. Sherman made rounds on the ADMAX SHU and was aware of conditions there." *Id.* ¶ 26. These allegations lack a specific factual basis to support a claim that Sherman was aware of the particular abuses at issue. Therefore, we hold that the MDC Plaintiffs fail to plausibly plead an unofficial conditions claim as to Sherman.[35]

### 3. *Qualified Immunity*

The MDC Defendants claim that qualified immunity is appropriate because they were merely following the orders of BOP superiors, "with the input and guidance of the FBI and INS." *See, e.g.*, Hasty Br. 33. Specifically, Hasty claims that the "BOP, INS, and FBI officials ordered [him] to place 'high interest' 9/11 detainees in the ADMAX SHU, and directed that they be subject to the 'tightest' security possible." *Id*. He further argues that "[t]he sole basis for the

---

[35] The MDC Plaintiffs nonetheless maintain a substantive due process claim against Sherman as to the official conditions, as discussed *supra*.

detainees' confinement in the ADMAX SHU—the FBI's investigative interest—was outside the scope of MDC officials' discretion." *Id*. at 35. By extension, he claims that it was reasonable to detain the MDC Plaintiffs and other "high interest" 9/11 detainees in the ADMAX SHU.

These arguments fail. First, as with the DOJ Defendants, our qualified immunity analysis in *Hasty* applies with equal force to the MDC Plaintiffs' conditions claim against Hasty and Sherman in this case. *See Hasty*, 490 F.3d at 168–69. In 2001, it was clearly established that punitive conditions of confinement, like those involved here, could not be imposed on pretrial detainees such as the MDC Plaintiffs. As discussed above with respect to the DOJ Defendants, *Wolfish* made clear that a condition of pretrial detention not reasonably related to a legitimate governmental objective is punishment in violation of the constitutional rights of detainees. *See* 441 U.S. at 535–39 & n.20; *Hasty*, 490 F.3d at 169. Furthermore, given the nearly identical claims and circumstances in *Hasty* and this case, we see no reason to depart from our prior determination that Hasty was not entitled to qualified immunity.

Nor is Hasty entitled to qualified immunity with regard to the unofficial conditions claim. As discussed, the MDC Plaintiffs have plausibly alleged that

73

Hasty personally violated their constitutional rights by knowing of, and disregarding, an excessive risk to their health or safety. The right of the MDC Plaintiffs to be free from such unofficial abuse was clearly established at the time of the events in question. *See, e.g., DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process Clause."); *see also Walker*, 717 F.3d at 125, 130; *Cuoco*, 222 F.3d at 106.

Plaintiffs' allegations, the OIG Report, and the MDC Defendants' arguments confirm that Hasty and Sherman housed 9/11 detainees for extended periods of time in highly restrictive conditions without ever obtaining individualized information that would warrant this treatment. Because Plaintiffs' allegations support an inference of punitive intent, and it would be inappropriate to wrestle with competing factual accounts at this stage of the litigation, we hold that a reasonable officer in the MDC Defendants' position

74

would have concluded that this treatment was not reasonably related to a legitimate goal.

**IV. Claim 2: Equal Protection – Conditions of Confinement**

Plaintiffs next assert a claim that Defendants subjected them to the harsh conditions of confinement detailed above based on their race, ethnicity, religion, and/or national origin, in violation of the equal protection guarantee of the Fifth Amendment.[36]

**A. Applicable Legal Standard**

To state an equal protection violation under the Fifth Amendment, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676. "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences." *Id.* (internal quotation marks omitted). "It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Id.* at 676–77 (alteration in original) (internal quotation marks omitted).

---

[36] All Plaintiffs assert an equal protection claim against the DOJ Defendants. Abbasi, Khalifa, Mehmood, and Bajracharya do not assert this claim against Zenk, and Sachdeva and Turkmen do not make this claim against any of the MDC Defendants.

75

A plaintiff can show intentional discrimination by: (1) "point[ing] to a law or policy that expressly classifies persons on the basis of" a suspect classification; (2) "identify[ing] a facially neutral law or policy that has been applied in an intentionally discriminatory manner[;]" or (3) "alleg[ing] that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2d Cir. 2000) (internal quotation marks omitted).

The district court characterized Plaintiffs' equal protection claim as falling within the first category—that is, a claim that Defendants subjected Plaintiffs to the challenged conditions of confinement pursuant to a policy that expressly classified Plaintiffs on the basis of their race, ethnicity, religion, and/or national origin. Given our reading of Plaintiffs' allegations and arguments on appeal, we will not analyze this claim, particularly as it relates to the MDC Defendants, under the first equal protection theory alone.

**B. The DOJ Defendants**

The district court concluded that Plaintiffs failed to state an equal protection claim against the DOJ Defendants, but "f[ou]nd the issue to be a close one." *Turkmen III*, 915 F. Supp. 2d at 345. In view of our analysis of Plaintiffs'

76

substantive due process claim against the DOJ Defendants, and particularly these Defendants' roles with respect to the merger of the New York List, we hold that the MDC Plaintiffs have adequately alleged an equal protection claim against Ashcroft, Mueller, and Ziglar.

Plaintiffs' well-pleaded allegations and the OIG Report give rise to the following reasonable inferences, which render plausible the MDC Plaintiffs' equal protection claim against the DOJ Defendants: (1) the New York FBI field office discriminatorily targeted individuals in the 9/11 investigation not based on individualized suspicion, but rather based on race, ethnicity, religion, and/or national origin, and those individuals were then placed on the New York List; (2) the DOJ Defendants knew about the discriminatory manner in which the New York FBI field office placed individuals on the New York List; and (3) the DOJ Defendants condoned the New York FBI's discrimination by merging the New York List with the INS List, thereby ensuring that some of the individuals on the New York List would be subjected to the challenged conditions of confinement.

Plaintiffs allege that the New York FBI field office targeted individuals in the PENTTBOM investigation and placed them on the New York List based on race, ethnicity, religion, and/or national origin. "[T]he head of the New York FBI

77

field office stated that an individual's Arab appearance and status as a Muslim were factors to consider in the investigation." Compl. ¶ 42. Even more telling, a supervisor in the same local FBI office, "who oversaw the clearance process[,] stated that a tip about Russian tourists filming the Midtown tunnel was 'obviously' of no interest, but that the same tip about Egyptians was of interest." *Id.* Individuals who were arrested by the New York FBI and INS in connection with a PENTTBOM lead were automatically treated as "of interest," OIG Report at 40–41, and were placed on the New York List, *see id.* at 53.

This discriminatory approach, focusing on "an individual's Arab appearance," Compl. ¶ 42, is consistent with what is alleged to have occurred in Bajracharya's case. Bajracharya, who as noted, is a Buddhist and native of Nepal, came to the FBI's attention when an employee from the Queens County District Attorney's Office "observed an '[A]rab male' videotaping outside a Queens[] office building that contained the Queens County District Attorney['s] Office and a New York FBI office." *Id.* ¶ 230. Investigators from the District Attorney's Office questioned Bajracharya about "why he was taking pictures," and Bajracharya "tried to explain that he was a tourist." *Id.* He was arrested after acknowledging he overstayed his visa and was detained in the ADMAX SHU.

78

Given the Complaint's allegations regarding the New York FBI's tactics, it is reasonable to infer that officials in the New York FBI targeted certain individuals, including Plaintiffs, for investigation, arrest, and placement on the New York List simply because they were, or appeared to be, Arab or Muslim, *and not because* of any suspicion regarding a link to terrorism.

As we conclude above with respect to the substantive due process claim, the DOJ Defendants were informed of the problems presented by the New York List. As noted, the OIG Report reveals that by October 2001 the SIOC Working Group learned about the New York List and that "officials at the INS, FBI, and [DOJ] raised concerns about, among other things, whether the aliens had any nexus to terrorism." OIG Report at 53. Plaintiffs allege that a high-ranking DOJ official noted that individuals were detained "without any attempt" to determine if they were of "actual interest," and that the official "was concerned early in the investigation that detainees were being held simply on the basis of their ethnicity." Compl. ¶ 45. The DOJ Defendants were unlikely to have remained unaware of these concerns, as they "received detailed daily reports of the arrests and detentions," *id.* ¶ 47, *see also id.* ¶¶ 63–64, and Mueller "was in daily contact with the FBI field offices regarding the status of individual clearances," *id.* ¶ 57.

In light of these allegations, we can reasonably infer that these Defendants were aware that the New York FBI field office was placing individuals on the New York List not because of any suspected ties to terrorism but rather because they were, or were perceived to be, Arab or Muslim.

While the DOJ Defendants' mere knowledge of this discriminatory action by the New York FBI field office would be insufficient to allow for the reasonable inference that these Defendants possessed the discriminatory purpose required to state an equal protection claim, Plaintiffs' allegations are not limited to the DOJ Defendants' knowledge alone. Rather, as we discuss in detail in the substantive due process analysis above, Plaintiffs plausibly plead that Ashcroft made the decision to merge the New York List with the national INS List, ensuring that some of the individuals on the New York List would be placed in, or remain detained in, the challenged conditions of confinement. Plaintiffs further allege that Mueller and Ziglar were aware that the New York List contained detainees against whom the FBI had asserted no interest and that subjecting them to the challenged conditions would be facially unreasonable. In ordering and complying with the merger of the New York List, the DOJ

Defendants actively condoned the New York FBI field office's discriminatory formulation of that list.

The DOJ Defendants' condonation of the New York FBI field office's purposeful discrimination allows us to reasonably infer at the motion to dismiss stage that the DOJ Defendants themselves acted with discriminatory purpose. The Supreme Court in *Iqbal* stated that "discrete wrongs—for instance, beatings—by lower level Government actors[] . . . if true, and if condoned by [Ashcroft and Mueller], could be the basis for some inference of wrongful intent on [Ashcroft and Mueller's] part." 556 U.S. at 683. In a similar vein, we have held, in a case involving an equal protection claim under 42 U.S.C. § 1983, that a reasonable factfinder could conclude that the Commissioner of the Fire Department of the City of New York intended to discriminate when he decided to continue to use the results of employment examinations that he knew had a disparate impact based on race. *See United States v. City of New York*, 717 F.3d 72, 94 (2d Cir. 2013). Here, it is reasonable to infer that Ashcroft, Mueller, and Ziglar possessed the requisite discriminatory intent because they knew that the New York List was formed in a discriminatory manner, and nevertheless condoned that discrimination by ordering and complying with the merger of the lists,

81

which ensured that the MDC Plaintiffs and other 9/11 detainees would be held in the challenged conditions of confinement.

Contrary to the dissent's contentions, *see* Dissenting Op., *post* at 76–78, this case is distinguishable from *Iqbal*, where the Supreme Court concluded that the plaintiff failed to state an equal protection claim. In *Iqbal*, there were "more likely explanations" for why the plaintiff was detained in harsh conditions other than his race, religion, or national origin. 556 U.S. at 681. Those more likely explanations for the plaintiff's treatment, according to the Supreme Court, were that Ashcroft and Mueller supported "a legitimate policy . . . to arrest and detain individuals *because of their suspected link to the attacks*," which "produce[d] a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 682 (emphasis added). The Supreme Court noted that "*[o]n the facts respondent alleges* the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States *and who had potential connections to those who committed terrorist acts*." *Id.* (emphasis added); *see also id.* at 683 (noting that all the allegations in *Iqbal* "suggest[ed] is that the Nation's top law enforcement officers . . . sought to keep *suspected terrorists* in the most secure

82

conditions available until the suspects could be cleared of terrorist activity"

(emphasis added)).

In this case, unlike in *Iqbal*, it is not "more likely" that the MDC Plaintiffs were detained in the challenged conditions *because of* their suspected ties to the 9/11 attacks. Indeed, as discussed at length earlier, Plaintiffs have plausibly alleged that they were detained without *any* suspicion of a link to terrorist activity and that the DOJ Defendants knew that the government lacked information tying Plaintiffs to terrorist activity, but decided to merge the lists anyway.[37] Thus, unlike in *Iqbal*, there was no legitimate reason to detain the MDC Plaintiffs in the challenged conditions and, thus, no obvious, more likely

---

[37] Given the clear language used by the Supreme Court in *Iqbal* regarding the detainees' connections to terrorism, 556 U.S. at 682–83, we understand the *Iqbal* Court to have rejected as conclusory the allegation in the *Iqbal* complaint identified by the dissent, which only pleads in the broadest terms that the *Iqbal* plaintiffs were confined without "any individual determination" that such restrictions were "appropriate or should continue." *See* Dissenting Op., *post* at 81–82 (quoting First Am. Compl. ¶ 97, App. to Pet. for Cert. 173a, *Ashcroft v. Iqbal*, No. 07-1015 (U.S. Feb. 6, 2008), *available at* http://1.usa.gov/1CfHJQF). Here, in contrast, the well-pleaded allegations, as supported by the OIG reports, allege that the DOJ Defendants made, and complied with, the decision to merge the New York List with the national INS List, thereby ensuring that the MDC Plaintiffs, and others, remained in the challenged conditions of confinement despite the absence of any suspicion that they were tied to terrorism.

explanation for the DOJ Defendants' actions with respect to the New York List merger.[38]

The dissent also argues that we cannot plausibly infer the DOJ Defendants' discriminatory intent from the merger decision because not all of the individuals on the New York List were subjected to the same level of restrictive confinement. *See* Dissenting Op., *post* at 79–80. But the fact that some individuals of the same race, ethnicity, religion, and/or national origin as the MDC Plaintiffs were restrained in the Passaic County Jail, as opposed to the ADMAX SHU, hardly dooms the MDC Plaintiffs' claim against the DOJ Defendants. There is no allegation that the DOJ Defendants were responsible for the assignment of certain actual or perceived Arab and Muslim males to Passaic as opposed to the more restrictive ADMAX SHU. *See* OIG Report at 17–18, 126–27, 158 (noting that assignment responsibility fell largely to the arresting FBI agent). Rather, Plaintiffs have plausibly alleged that the DOJ Defendants condoned and ratified the New York FBI's discrimination in *identifying* detainees by merging the New

---

[38] Furthermore, the fact that Plaintiffs plausibly plead that the DOJ Defendants merged the New York List, and complied with the list merger, based on punitive intent (the substantive due process claim) arguably suggests the plausibility of the MDC Plaintiffs' allegations that the DOJ Defendants also possessed the discriminatory intent required for an equal protection claim. *See supra* Section III.B.

York List with the INS List.  The DOJ Defendants, apparently deferring to others' designation of detainees for particular facilities, thus ensured that some (and for all they knew, all) of the individuals on the New York List would be subjected to the challenged conditions of confinement solely on the basis of discriminatory criteria.  The fact that some of these individuals were actually assigned to the less restrictive Passaic facility is thus a red herring.[39]

Based on the foregoing, we conclude that the MDC Plaintiffs' allegations are sufficient to state an equal protection claim against Ashcroft, Mueller, and Ziglar for their condonation of the New York FBI's discriminatory formulation of the New York List, which resulted in the MDC Plaintiffs being subjected to the conditions of confinement challenged here.

---

[39] Moreover, to the extent this differential assignment of class members, again apparently by agents of the New York FBI and not the DOJ Defendants, might be relevant to Plaintiffs' equal protection claim, because it could suggest that the New York FBI was not actually discriminating, it is more appropriately considered at summary judgment.  Indeed, the cases embraced by the dissent conclude that evidence of differential treatment of members of the same class may weaken an inference of discrimination *at the summary judgment stage*. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 309 (1996) (summary judgment); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 116 (2d Cir. 2010) (summary order) (summary judgment); *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 151 (2d Cir. 2000) (summary judgment).  In light of the well-pleaded allegations regarding discrimination by the New York FBI, Plaintiffs have hardly pleaded themselves out of court on this point.

**C. The MDC Defendants**

We agree with the district court that the MDC Plaintiffs have stated a plausible equal protection claim against Hasty and Sherman, although we base our decision on somewhat different reasoning than that employed by the court below. However, we do not agree with the district court that the MDC Plaintiffs have adequately alleged this claim against Zenk.

Our conclusion focuses on allegations of mendacity by Hasty and Sherman regarding the basis for detaining the MDC Plaintiffs in the ADMAX SHU. The Complaint asserts that Hasty and Sherman "were aware that placing the 9/11 detainees in the ADMAX SHU unit without an individualized determination of dangerousness or risk was unlawful." Compl. ¶ 74. However, these Defendants never actually undertook that "required individualized assessment." *Id.* ¶ 73. Nevertheless, Hasty and Sherman approved a document that "untruthfully stated that the executive staff at [the] MDC had classified the 'suspected terrorists' as 'High Security' based on an individualized assessment of their 'precipitating offense, past terrorist behavior, and inability to adapt to incarceration.'" *Id.* ¶ 74. In fact, neither Hasty nor Sherman "saw or considered information in any of these categories in deciding to place the 9/11 detainees in

86

the ADMAX SHU." *Id.*;[40] *see also id.* ¶¶ 68–72 (Hasty and Sherman held the MDC Plaintiffs in the ADMAX SHU knowing that they were not tied to terrorism and without performing the required individualized assessment of whether Plaintiffs posed a danger to the facility).

Based on the foregoing allegations of duplicity regarding the basis for confining the 9/11 detainees, it is reasonable to infer that Hasty and Sherman approved this false document to justify detaining actual or perceived Arabs and Muslims in the harsh conditions of the ADMAX SHU based on discriminatory intent. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (in the employment discrimination context, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"); *id.* (an inference of discriminatory purpose based on an employer's false explanation "is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt" (internal quotation marks

---

[40] As previously noted, the term "9/11 detainees" is defined in the Complaint as non-citizens from the Middle East, South Asia, and elsewhere who are Arab or Muslim, or were perceived to be Arab or Muslim. Individuals with certain of these characteristics who were arrested and detained in response to the 9/11 attacks constitute the putative class in this case.

omitted)); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may . . . show intentional discrimination" in the employment discrimination context).

The dissent argues that we cannot infer discriminatory intent from the MDC Defendants' approval of this false document, concluding that the "more likely" reason for this mendacity is these Defendants' concern for national security. *See* Dissenting Op., *post* at 83–84. Although recognizing that the MDC Defendants might be faulted for approving a false document stating that each detainee had been assessed as a "High Security" "suspected terrorist[]," our dissenting colleague believes Hasty and Sherman's actions are more likely explained by reliance on the FBI's designation of each MDC Plaintiff as a person "of interest" or "of high interest" to the ongoing terrorism investigation. Yet, the allegations in the Complaint belie this alternative explanation for Hasty and Sherman's dishonesty. Plaintiffs allege that the "MDC Defendants were aware that the FBI had not developed *any information*" to tie the 9/11 detainees to terrorism. Compl. ¶ 69 (emphasis added). Indeed, the MDC Defendants received regular updates on the FBI's investigation, *including* the dearth of

88

evidence connecting the 9/11 detainees to terrorism. Such briefing—placing Hasty and Sherman on repeated notice of the lack of any specific information justifying restrictive confinement in the ADMAX SHU—renders implausible the innocent explanation for their mendacity.

As an additional matter, the fact that the false document that Hasty and Sherman approved, on its face, applied to suspected terrorists and not just actual or perceived Arabs and Muslims does not undermine the reasonableness of the inference that these Defendants acted based on discriminatory intent. Plaintiffs allege that Hasty and Sherman approved the document even though they had not performed the required individualized assessments and knew that keeping "the 9/11 detainees" in the ADMAX SHU without those assessments was unlawful. *Id.* ¶¶ 73–74. They further allege that, in approving the document, Hasty and Sherman failed to consider the past offenses, past terrorist activity, and inability to adapt to incarceration with respect to "the 9/11 detainees." *Id.* ¶ 74. Based on Plaintiffs' allegations about how the false document related in particular to the 9/11 detainees, a group the Complaint specifically defines on racial, ethnic, and religious grounds, *see id.* ¶ 1, it is reasonable to infer, at least at

89

the motion to dismiss stage, that Hasty and Sherman lied in order to conceal an intent to discriminate on the basis of suspect classifications.

Further buttressing this inference, the Complaint asserts that MDC staff used racially, ethnically, and religiously charged language to refer to the MDC Plaintiffs. *See id*. ¶ 109 (MDC staff referred to the MDC Plaintiffs as terrorists and insulted their religion); *id.* ¶ 110 (Saeed Hammouda and others complained "that MDC staff called them 'camel[s]'"); *id.* ¶ 136 (MDC staff mocked Plaintiffs' prayers and interrupted their praying by "screaming derogatory anti-Muslim comments"); *id.* ¶ 218 (during his transport and processing Hammouda was called "Arabic asshole"). These allegations are supported by the OIG reports. *See* OIG Report at 144 (noting allegations that MDC officers used racial slurs); Supplemental OIG Report at 28–30 (concluding that some MDC staff verbally abused detainees based on their Muslim faith, among other grounds).

The context in which the term "terrorist" was used at the MDC bolsters the inference that the MDC Plaintiffs were believed to be terrorists simply because they were, or were perceived to be, Arab or Muslim. Significantly, the term "terrorist" was not used in isolation. Rather, MDC staff called the MDC Plaintiffs "'fucking Muslims' and 'terrorists,'" Compl. ¶ 147, as well as

90

"'terrorist' and 'Arabic asshole,'" *id.* ¶ 218; *see also* Supplemental OIG Report at 28 (noting that along with the term "terrorists," MDC staff referred to detainees as "fucking Muslims" and "bin Laden Junior" (internal quotation marks omitted)).

While most of the aforementioned comments are not directly attributed to Hasty, Sherman, or Zenk, Plaintiffs do allege that the use of racially, ethnically, and religiously charged language was brought to the attention of the MDC Defendants through detainee complaints and reports from MDC staff, among other means. Mere knowledge of the MDC staff's discriminatory comments, of course, is insufficient to infer shared discriminatory intent by Hasty, Sherman, or Zenk. *See Iqbal*, 556 U.S. at 676–77. However, with respect to Hasty, Plaintiffs allege more than mere awareness of the MDC staff's discriminatory treatment of the MDC Plaintiffs. Plaintiffs claim that Hasty fostered the MDC staff's use of discriminatory language to refer to the MDC Plaintiffs by himself "referring to the detainees as 'terrorists,'" Compl. ¶ 77, *see also id.* ¶ 109, notwithstanding Hasty's knowledge that the MDC Plaintiffs lacked ties to terrorism. Hasty's knowledge about the charged manner in which the term "terrorist" was used to refer to the MDC Plaintiffs, and his personal use of the term in that context,

91

renders even more plausible the conclusion that he approved the false document justifying the MDC Plaintiffs' detention in the ADMAX SHU based on discriminatory animus. Given the fact that the 9/11 hijackers were Arab Muslims, and Hasty knew that there were no articulable ties between the MDC Plaintiffs and terrorism, Plaintiffs plausibly plead that Hasty referred to the MDC Plaintiffs as terrorists, and treated them as if they were, simply because they were, or he believed them to be, Arab or Muslim.

In view of the foregoing, the MDC Plaintiffs have stated a plausible claim that Hasty and Sherman detained them in the challenged conditions because of their race, ethnicity, religion, and/or national origin. These Defendants' approval of the false document, and Hasty's use of charged language in the particular context of the MDC Plaintiffs' detention, support the reasonable inference that Hasty and Sherman subjected the MDC Plaintiffs to harsh conditions of confinement based on suspect classifications.

With respect to Zenk, the MDC Plaintiffs' allegations are more limited and fail to support the reasonable inference that he established or implemented the alleged conditions of confinement based on animus that offends notions of equal protection.

**D. Qualified Immunity**

The DOJ Defendants, Hasty, and Sherman are not entitled to qualified immunity on the MDC Plaintiffs' equal protection claim. With regard to the first prong of this inquiry, whether the complaint plausibly pleads that a defendant personally violated the plaintiff's constitutional rights, for the reasons stated above, the MDC Plaintiffs have plausibly alleged that Ashcroft, Mueller, Ziglar, Hasty, and Sherman violated their rights under the equal protection guarantee.

With respect to the second prong of the inquiry, it was clearly established at the time of Plaintiffs' detention that it was illegal to hold individuals in harsh conditions of confinement and otherwise target them for mistreatment because of their race, ethnicity, religion, and/or national origin. Plaintiffs' right "not to be subjected to ethnic or religious discrimination[] w[as] . . . clearly established prior to 9/11, and . . . remained clearly established even in the aftermath of that horrific event." *Hasty*, 490 F.3d at 160. In *Hasty*, the plaintiff alleged "that he was deemed to be 'of high interest,' and accordingly was kept in the ADMAX SHU under harsh conditions, solely because of his race, ethnicity, and religion," and "that Defendants specifically targeted [him] for mistreatment because of [his] race, religion, and national origin." *Id.* at 174 (alterations in original). We

93

concluded "that any reasonably competent officer would understand [those alleged actions] to have been illegal under prior case law." *Id.* (internal quotation marks omitted). There is no reason that this analysis should not govern here. Although, as the dissent notes, *see* Dissenting Op., *post* at 62, *Hasty* employed a more lenient pleading standard than what we now utilize in assessing factual allegations, this hardly prevents us from relying on its conclusions as to whether certain legal principles were clearly established at the time of Plaintiffs' detention. Accordingly, in view of the sufficiency of the MDC Plaintiffs' allegations here, the DOJ Defendants, Hasty, and Sherman are not entitled to qualified immunity on this claim.

We reverse the portion of the district court's decision that dismissed the MDC Plaintiffs' equal protection claim against the DOJ Defendants, affirm the district court's denial of Hasty and Sherman's motions to dismiss the MDC Plaintiffs' claim, and reverse the district court's decision denying Zenk's motion to dismiss the equal protection claim.

Because the Passaic Plaintiffs were held in the general population and not the ADMAX SHU, we agree with the district court that they have failed to adequately plead that they were subjected to harsh conditions of confinement

94

because of their race, ethnicity, religion, and/or national origin. Thus, we affirm the district court's dismissal of the Passaic Plaintiffs' equal protection claim.

**V.     Claim 6:     Unreasonable and Punitive Strip Searches**

The MDC Plaintiffs claim that they were subject to unreasonable and punitive strip searches while detained at the MDC, in violation of the Fourth and Fifth Amendments.[41]

**A. Applicable Legal Standard**

Determining the legal standard that applies to this claim turns on whether the MDC Plaintiffs were held in a prison or a jail. *See Hasty*, 490 F.3d at 172. In *Hasty*, we decided that the plaintiff, who was detained in the ADMAX SHU at the MDC (like the MDC Plaintiffs here), should be treated in accordance with the standard governing prisons. *See id.* Under that standard, a "regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482

---

[41] Only the MDC Plaintiffs assert this claim, which is only raised against the MDC Defendants. Benatta and Hammouda alone assert this claim against Zenk. To the extent that the MDC Plaintiffs' allegations regarding the strip searches are cognizable under the Fifth Amendment, we factor these allegations into our analysis of the substantive due process claim, which is discussed above. *See supra* Section III.C.

U.S. 78, 89 (1987).  Given that the parties here do not argue for a different standard, we assume that the foregoing standard applies in this case.[42]

 **B. The MDC Defendants**

The MDC Plaintiffs allege that Defendant Joseph Cuciti, a former lieutenant at the MDC and not a party on appeal, was tasked with "developing the strip-search policy on the ADMAX [SHU]."  Compl. ¶ 111.  Plaintiffs further claim that "Hasty ordered . . . Cuciti to design extremely restrictive conditions of confinement."  *Id.* ¶ 75.  The reasonable inference based on these allegations is that Hasty ordered Cuciti to develop the strip-search policy, which was "then approved and implemented by Hasty and Sherman, and, later, by Zenk."  *Id.*

Plaintiffs allege that the 9/11 detainees at the MDC were strip searched upon arrival, and again after they had been escorted in shackles and under continuous guard to the ADMAX SHU.  They were also strip searched every time they were taken from or returned to their cells, including after non-contact

---

[42] We note, however, that this standard governs prison regulations, *see Turner*, 482 U.S. at 89, and that the application of this standard in *Hasty* may have been justified because the plaintiff in that case faced criminal charges (apparently felonies), *see* 490 F.3d at 147–48 & n.1, 162 n.8, 172.  In contrast, Plaintiffs here were almost exclusively charged with civil immigration violations and were detained on that basis.  While it may be that a different standard, one more favorable to detainees, should govern the constitutionality of searches in the context of civil immigration detention, we leave that question for another day.

attorney visits, when "physical contact between parties was prevented by a clear partition," OIG Report at 123, and when being transferred from one cell to another.  Benatta was strip searched on September 23, 24, and 26 of 2001, even though he was not let out of his cell on any of those days.  Numerous strip searches were documented in a "visual search log" that was created for review by MDC management, including Hasty.  Compl. ¶ 114 (internal quotation marks omitted).

Plaintiffs' allegations regarding the strip searches are supported by the Supplemental OIG Report, which concluded that MDC staff "inappropriately used strip searches to intimidate and punish detainees."  Supplemental OIG Report at 35.  That report also "questioned the need for the number of strip searches, such as after attorney and social visits in non-contact rooms."  *Id.*

The foregoing allegations, supported as they are by the Supplemental OIG Report, are sufficient to establish at this stage of the litigation that Hasty and Sherman were personally involved in creating and executing a strip-search policy that was not reasonably related to legitimate penological interests.  Hasty ordered the policy, and both he and Sherman approved and implemented it.  Under that policy, the MDC Plaintiffs were strip searched when there was no

97

possibility that they could have obtained contraband. Plaintiffs have alleged that Hasty and Sherman were aware of these searches either based on the search log that was created for review by MDC management, or because they were involved in the implementation of the strip-search policy.[43] These allegations give rise to a plausible Fourth Amendment claim against Hasty and Sherman. *See Hasty*, 490 F.3d at 172 (finding a plausible allegation of a Fourth Amendment violation in the post-9/11 context where the plaintiff alleged that he "was routinely strip searched twice after returning from the medical clinic or court and that, on one occasion, [he] was subjected to three serial strip and body-cavity searches in the same room"); *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983) (noting that because "there was no possibility that [the plaintiff] could have obtained and concealed contraband[] . . . the second search appears to have been unnecessary").[44]

---

[43] To the extent the dissent believes that we premise Hasty and Sherman's personal involvement entirely on these Defendants' alleged review of the visual search log, *see* Dissenting Op., *post* at 90, that assertion is incorrect. As discussed, Plaintiffs have plausibly alleged that Hasty ordered the development of, and that he and Sherman approved and implemented, the challenged strip-search policy. Plaintiffs' allegations regarding the visual search log only buttress the inference of Hasty's personal involvement.

[44] Although the dissent correctly notes that *Hodges* was decided before the Supreme Court's opinion in *Turner*, *see* Dissenting Op., *post* at 88, we have ratified *Hodges* in subsequent strip search case law. *See Hasty*, 490 F.3d at 172; *N.G. v. Connecticut*, 382 F.3d

98

With respect to Zenk, however, the MDC Plaintiffs fail to state a plausible Fourth Amendment claim. As noted earlier, Plaintiffs do not assert any claim against Zenk for injuries they suffered prior to the date on which he became Warden of the MDC, which was April 22, 2002. Only two Plaintiffs, Benatta and Hammouda, were still detained at the MDC as of that date. These Plaintiffs have not sufficiently alleged that they were unlawfully strip searched during the period in which Zenk was Warden of the MDC.

**C. Qualified Immunity**

Hasty and Sherman are not entitled to qualified immunity on the MDC Plaintiffs' strip search claim. With respect to the first prong of the qualified immunity analysis, Plaintiffs have plausibly alleged that Hasty and Sherman each violated the MDC Plaintiffs' rights under the Fourth Amendment. With regard to the second prong of the inquiry, Plaintiffs' Fourth Amendment rights were clearly established at the time of the searches at issue.

---

225, 233–34 (2d Cir. 2004). Similarly, we reject the dissent's attempt to confine *Hodges* to its facts, only finding the absence of a legitimate penological purpose where the strip searches are "*immediately* successive." Dissenting Op., *post* at 88 (emphasis added). Like previous panels, we read *Hodges* as holding that a search may be unnecessary and purposeless where "there was no possibility that [the plaintiff] could have obtained and concealed contraband." 712 F.2d at 35; *see also N.G.*, 382 F.3d at 233–34. Here, consistent with *Hodges,* Plaintiffs have plausibly alleged that they were strip searched when there was no opportunity to acquire contraband, including in instances where they were shackled and under escort, or were never permitted to leave their cells.

In *Hasty*, we denied Hasty qualified immunity on the plaintiff's Fourth Amendment claim, stating that in the wake of 9/11 "it was clearly established that even the standard most favorable to prison officials required that strip and body-cavity searches be rationally related to legitimate government purposes." 490 F.3d at 172; *see also id.* at 159–60 (the "right not to be needlessly harassed and mistreated in the confines of a prison cell by repeated strip and body-cavity searches" was "clearly established prior to 9/11, and . . . remained clearly established even in the aftermath of that horrific event"). Because the MDC Plaintiffs' claim here is substantially the same as the Fourth Amendment claim at issue in *Hasty*, we are bound by that decision and thus deny Hasty and Sherman qualified immunity on the Fourth Amendment claim in this case.

Accordingly, we affirm the district court's denial of Hasty and Sherman's motions to dismiss the MDC Plaintiffs' Fourth Amendment strip search claim, and reverse the district court's denial of Zenk's motion to dismiss this claim.

**VI.    Claim 7:    Conspiracy Under 42 U.S.C. § 1985**

Plaintiffs' final claim is that Defendants conspired to deprive them of their rights in violation of 42 U.S.C. § 1985(3).

**A. Applicable Legal Standard**

A conspiracy claim under Section 1985(3) has four elements: "(1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen." *Hasty*, 490 F.3d at 176.[45] In addition, this claim requires that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *accord Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012).

**B. The Sufficiency of the Allegations**

In this case, the MDC Plaintiffs have sufficiently alleged that Ashcroft, Mueller, and Ziglar met regularly and eventually agreed to subject the detainees to the challenged conditions of confinement by merging, and complying with the

---

[45] Section 1985(3) of Title 42 of the United States Code provides, in pertinent part, that:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

101

merger of, the New York List. The MDC Plaintiffs have also plausibly alleged that the DOJ Defendants' actions with respect to the New York List merger were based on the discriminatory animus required for a Section 1985(3) conspiracy claim, as we conclude above in our analysis of the equal protection claim. With respect to Hasty and Sherman, their joint approval of the false document without performing the requisite individualized assessment supports the reasonable inference that these two Defendants came to an agreement to and did subject Plaintiffs to harsh conditions of confinement based on the discriminatory animus required by Section 1985(3).

Plaintiffs also allege an agreement, albeit not an explicit one, among the DOJ Defendants and Hasty and Sherman to effectuate the harsh conditions of confinement with discriminatory intent. Such a tacit agreement can suffice under Section 1985(3). *See Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003). The Complaint asserts that the conditions of confinement at the MDC "were formulated in consultation with the FBI." Compl. ¶ 65. In addition, Hasty ordered, and Hasty and Sherman approved and implemented, the conditions of confinement "[t]o carry out Ashcroft, Mueller[,] and Ziglar's unwritten policy to subject the 9/11 detainees to harsh treatment." *Id.* ¶ 75; *see also id.* ¶ 68. The

102

foregoing allegations are sufficient to support the reasonable inference that the DOJ Defendants, Hasty, and Sherman shared such a tacit understanding about carrying out the unlawful conduct with respect to the MDC Plaintiffs' detention.

Accordingly, the MDC Plaintiffs' allegations state a plausible claim for a Section 1985(3) conspiracy against Ashcroft, Mueller, Ziglar, Hasty, and Sherman.

**C. The Intracorporate Conspiracy Doctrine**

The MDC Defendants argue that they are legally incapable of conspiring with each other, and with the DOJ Defendants, because they are all part of the same governmental entity—the DOJ. In *Girard v. 94th Street & Fifth Avenue Corp.*, 530 F.2d 66, 70–72 (2d Cir. 1976), we recognized that the defendants—officers and directors of a single corporation, and the corporation itself—could not legally conspire with one another in violation of Section 1985(3). We reached that conclusion because the defendants formed a "single business entity with a managerial policy implemented by the one governing board." *Id.* at 71. Thus, the defendants could not satisfy the statutory requirement of a conspiracy between two or more persons. *Id.* We also noted, however, that where various entities in a single institution have "disparate responsibilities and functions," a

103

conspiracy claim could lie because the actions of those entities would not be

"actions of only one policymaking body." *Id.*

Assuming that Defendants can ultimately invoke the intracorporate

conspiracy doctrine in this case, at this stage of the litigation, we cannot conclude

that Ashcroft, Mueller, Ziglar, Hasty, and Sherman acted as members of a single

policymaking entity for purposes of the MDC Plaintiffs' Section 1985(3)

conspiracy claim. According to the Complaint, the former Attorney General, the

former Director of the FBI, the former Commissioner of the INS, and the former

Warden and Associate Warden at the MDC had varied responsibilities and

functions that distinguish them from the single corporate entity in *Girard*.

Although Hasty and Sherman may have acted, at least in part, to implement the

DOJ Defendants' policy, it is also the case that Hasty and Sherman themselves

established policies at the MDC. Thus, factual questions about how disparate or

distinct Defendants' functions were, and how policy was created by the various

Defendants, preclude us from deciding as a matter of law that Defendants

resemble the single policymaking body of a corporation.[46]

---

[46] We note that the BOP and, therefore, the MDC, are subject to the supervision of the Attorney General. *See* 18 U.S.C. § 4041. We have also found one unpublished district court decision that concludes that the Attorney General and employees of a BOP facility

104

**D. Qualified Immunity**

The DOJ Defendants, Hasty, and Sherman are not entitled to qualified immunity on this claim. First, the MDC Plaintiffs have plausibly alleged a Section 1985(3) conspiracy claim against these Defendants. In addition, as we concluded in *Hasty*, in the wake of the 9/11 attacks, "even without a definitive ruling from this Court on the application of section 1985(3) to federal officials, federal officials could not reasonably have believed that it was legally permissible for them to conspire with other federal officials to deprive a person of equal protection of the laws." 490 F.3d at 177. In that case, we denied the defendants qualified immunity on the Section 1985(3) claim. *See id.* Given the sufficiency of the allegations in this case, our qualified immunity decision in *Hasty* controls here.

Accordingly, we reverse the district court's dismissal of the Section 1985(3) claim against the DOJ Defendants and affirm the denial of Hasty and Sherman's motions to dismiss this claim. Because the MDC Plaintiffs fail to adequately

---

cannot conspire together under Section 1985. *See Chesser v. Walton*, No. 12-cv-01198-JPG, 2013 WL 1962285, at *3 (S.D. Ill. May 10, 2013). However, for the reasons stated above, neither this statutory provision nor district court case satisfy us that Defendants here were sufficiently similar to the members of a single corporate policymaking body such that the intracorporate conspiracy doctrine should apply.

105

plead that Zenk acted with discriminatory animus, we reverse the denial of Zenk's motion to dismiss the conspiracy claim. This claim is also dismissed with respect to the Passaic Plaintiffs, as they fail to adequately plead that Defendants acted with the requisite discriminatory animus.

**VII. Final Thoughts**

If there is one guiding principle to our nation it is the rule of law. It protects the unpopular view, it restrains fear-based responses in times of trouble, and it sanctifies individual liberty regardless of wealth, faith, or color. The Constitution defines the limits of the Defendants' authority; detaining individuals as if they were terrorists, in the most restrictive conditions of confinement available, simply because these individuals were, or appeared to be, Arab or Muslim exceeds those limits. It might well be that national security concerns motivated the Defendants to take action, but that is of little solace to those who felt the brunt of that decision. The suffering endured by those who were imprisoned merely because they were caught up in the hysteria of the days immediately following 9/11 is not without a remedy.

Holding individuals in solitary confinement twenty-three hours a day with regular strip searches because their perceived faith or race placed them in the

group targeted for recruitment by al Qaeda violated the detainees' constitutional rights. To use such a broad and general basis for such severe confinement without any further particularization of a reason to suspect an individual's connection to terrorist activities requires certain assumptions about the "targeted group" not offered by Defendants nor supported in the record. It assumes that members of the group were already allied with or would be easily converted to the terrorist cause, until proven otherwise. Why else would no further particularization of a connection to terrorism be required? Perceived membership in the "targeted group" was seemingly enough to justify extended confinement in the most restrictive conditions available.

Discovery may show that the Defendants—the DOJ Defendants, in particular—are not personally responsible for detaining Plaintiffs in these conditions. But we simply cannot conclude at this stage that concern for the safety of our nation justified the violation of the constitutional rights on which this nation was built. The question at this stage of the litigation is whether the MDC Plaintiffs have plausibly pleaded that the Defendants exceeded the bounds of the Constitution in the wake of 9/11. We believe that they have.

107

**CONCLUSION**

For the foregoing reasons, we affirm in part and reverse in part the district court's decision on Defendants Rule 12(b)(6) motions. More specifically, we conclude that: (1) the MDC Plaintiffs have plausibly alleged a substantive due process claim against the DOJ Defendants, against Hasty with regard to both official and unofficial conditions, and against Sherman with regard to official conditions only, and these Defendants are not entitled to qualified immunity on this claim; (2) the MDC Plaintiffs have plausibly alleged an equal protection claim against the DOJ Defendants, Hasty, and Sherman, and these Defendants are not entitled to qualified immunity on this claim; (3) the free exercise claim is dismissed as to all Defendants; (4) the MDC Plaintiffs have plausibly alleged their Fourth Amendment strip search claim against Hasty and Sherman, and these Defendants are not entitled to qualified immunity on this claim; (5) the MDC Plaintiffs have plausibly alleged the Section 1985(3) conspiracy claim against the DOJ Defendants, Hasty, and Sherman, and these Defendants are not entitled to qualified immunity on this claim; and (6) the MDC Plaintiffs have not plausibly alleged any claims against Zenk. We affirm the dismissal of the claims brought by the Passaic Plaintiffs.

108

The Clerk of the Court is directed to enter an order consistent with these conclusions, AFFIRMING in part and REVERSING in part, and REMANDING the matter to the district court for further proceedings consistent with this opinion.

REENA RAGGI, *Circuit Judge*, concurring in part in judgment and dissenting in part:

Today, our court becomes the first to hold that a <u>Bivens</u> action can be maintained against the nation's two highest ranking law enforcement officials—the Attorney General of the United States and the Director of the Federal Bureau of Investigation ("FBI")—for policies propounded to safeguard the nation in the immediate aftermath of the infamous al Qaeda terrorist attacks of September 11, 2001 ("9/11").[1] I respectfully dissent from this extension of <u>Bivens</u> to a context not previously recognized by Supreme Court or Second Circuit precedent. I do not suggest that executive action in this, or any other, context is not subject to constitutional constraints. I conclude only that when, as here, claims challenge official executive policy (rather than errant conduct by a rogue official—the typical <u>Bivens</u> scenario), and particularly a national security policy pertaining to the detention of illegal aliens in the aftermath of terrorist attacks by aliens operating within this country, Congress, not the judiciary, is the appropriate branch to decide whether the detained aliens should be allowed to sue executive policymakers in

---

[1] To date, four Courts of Appeals—for the Fourth, Seventh, Ninth, and D.C. Circuits—have declined to extend <u>Bivens</u> to suits against executive branch officials for national security actions taken after the 9/11 attacks. <u>See</u> <u>Vance v. Rumsfeld</u>, 701 F.3d 193 (7th Cir. 2012) (<u>en banc</u>); <u>Mirmehdi v. United States</u>, 689 F.3d 975 (9th Cir. 2012); <u>Doe v. Rumsfeld</u>, 683 F.3d 390 (D.C. Cir. 2012); <u>Lebron v. Rumsfeld</u>, 670 F.3d 540 (4th Cir. 2012); <u>see also</u> <u>Ali v. Rumsfeld</u>, 649 F.3d 762 (D.C. Cir. 2011); <u>Rasul v. Myers</u>, 563 F.3d 527 (D.C. Cir. 2009).

their individual capacities for money damages.

Even if a <u>Bivens</u> action were properly recognized in this context—which I submit it is not—I would still dissent insofar as the majority denies qualified immunity to five former federal officials, Attorney General John Ashcroft, FBI Director Robert Mueller, Immigration and Naturalization Service ("INS") Commissioner James Ziglar ("DOJ Defendants"), Metropolitan Detention Center ("MDC") Warden Dennis Hasty, and Associate Warden James Sherman ("MDC Defendants"), on plaintiffs' policy-challenging claims of punitive and discriminatory confinement and unreasonable strip searches. The majority does narrow these claims by allowing their pursuit only (1) by those aliens confined in the MDC's most restrictive housing unit, the "ADMAX SHU" ("MDC Plaintiffs"); and (2) for restrictive confinement after defendants purportedly learned that plaintiffs were being detained without individualized suspicion of their connection to terrorism. <u>See</u> Majority Op., <u>ante</u> at 41–42, 77. Even with the claims so narrowed, however, I think defendants are entitled to qualified immunity because plaintiffs fail to plead plausible policy-challenging claims that were clearly established at law in the period September 2001 to April 2002, when one or more MDC Plaintiffs were confined in the ADMAX SHU. As the majority acknowledges, the 9/11 attacks killed 3,000

2

people and presented "unrivaled challenges and severe exigencies" for the security of the nation. Majority Op., ante at 31. The law did not then clearly alert federal authorities responding to these challenges that they could not hold lawfully arrested illegal aliens—identified in the course of the 9/11 investigation and among the group targeted for recruitment by al Qaeda—in restrictive (as opposed to general) confinement pending FBI-CIA clearance of any ties to terrorism unless there was prior individualized suspicion of a terrorist connection. Indeed, I am not sure that conclusion is clearly established even now.

Accordingly, because I conclude both that a Bivens remedy should not be extended to plaintiffs' policy-challenging claims and that the DOJ and MDC defendants are entitled, in any event, to qualified immunity, I dissent from the majority's refusal to dismiss these claims.[2]

---

[2] In concluding its opinion, the majority asserts that plaintiffs' claims cannot be dismissed because "[i]f there is one guiding principle to our nation it is the rule of law." Majority Op., ante at 106. The rule of law, however, is embodied not only in amendments to the Constitution, but also, and first, in that document's foundational structure of separated powers. See 1 Annals of Cong. 581 (1789) (reporting Madison's statement in first Congress that "if there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive, and Judicial powers"); see also Mass. Const. of 1780, Part the First, art. XXX (John Adams) (separating powers "to the end it may be a government of laws, and not of men"); Bowsher v. Synar, 478 U.S. 714, 721–22 (1986) (observing that "declared purpose of separating . . . powers of government, of

I.    ***Bivens* Should Not Be Extended to Plaintiffs' Policy-Challenging Claims**

    A.    The Narrow Scope of *Bivens* Actions

On three occasions in the decade between 1971 and 1980, the Supreme Court implied directly from the Constitution private damages actions against federal officials for alleged violations of rights. See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) (implying action for unlawful

---

course, was to 'diffus[e] power the better to secure liberty,'" (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring))). Thus, it is the rule of law that demands that a court do more than identify a possible wrong; it must consider what authority the judiciary has to imply a remedy—specifically, a damages remedy—in the absence of legislative action. See The Federalist No. 47, at 251–52 (James Madison) (Carey & McClellan, ed. 2001) (quoting Montesquieu's maxim that "were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator"); INS v. Chadha, 462 U.S. 919, 951 (1983) (stating that "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted"); J. Harvie Wilkinson III, Our Structural Constitution, 104 Colum. L. Rev. 1687, 1707 (2004) (observing that "threshold question" for judge is not, "How should I resolve this case?" but "To whom does the Constitution entrust the resolution of this issue?").

It is also the rule of law—to which both sides in a lawsuit have a right—that requires a court to consider whether certain defenses, such as qualified immunity, shield a particular defendant in any event from a suit for damages. See, e.g., Pearson v. Callahan, 555 U.S. 223, 231–32 (2009) (reiterating that qualified immunity should be decided at earliest possible stage of litigation because it is immunity from suit, not just liability).

Thus, the rule of law animates this dissent no less than the majority opinion.

arrest and excessive force in arrest from Fourth Amendment prohibition of unreasonable searches and seizures); accord Carlson v. Green, 446 U.S. 14 (1980) (implying action for deliberate indifference to prisoner's medical needs from Eighth Amendment prohibition of cruel and unusual punishment); Davis v. Passman, 442 U.S. 228 (1979) (implying action for sex discrimination in federal employment from equal protection component of Fifth Amendment). The Court has never done so again. Instead, it has "consistently refused to extend Bivens liability to any new context or new category of defendants," Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 68 (2001), emphasizing that "implied causes of actions are disfavored," Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009), and "in most instances . . . unjustified," Wilkie v. Robbins, 551 U.S. 537, 550 (2007).

This reluctance to extend Bivens is grounded in our constitutional structure of separated powers. As the Supreme Court has explained, deciding whether to extend Bivens focuses not on "the merits of the particular remedy" sought, but on "who should decide whether such a remedy should be provided," specifically, the legislative branch of government, Congress, or the adjudicative branch, the judiciary. Bush v. Lucas, 462 U.S. 367, 380 (1983). For more than thirty years now, the Supreme Court has invariably answered that question in favor of Congress. See,

e.g., Wilkie v. Robbins, 551 U.S. at 562 ("'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act in the public's behalf." (quoting Bush v. Lucas, 462 U.S. at 389)).

Heeding this precedent, our own court, en banc, has stated "that the Bivens remedy is an extraordinary thing that should rarely if ever be applied in new contexts." Arar v. Ashcroft, 585 F.3d 559, 571 (2d Cir. 2009) (en banc) (internal quotation marks omitted). Most particularly, it should not be applied in a new context if any alternative process is available to address the claimed constitutional interest or if "special factors" counsel hesitation in recognizing a new damages action. Bush v. Lucas, 462 U.S. at 378; accord Minneci v. Pollard, 132 S. Ct. 617, 621 (2012); Wilkie v. Robbins, 551 U.S. at 550; Arar v. Ashcroft, 585 F.3d at 572 (collecting cases). In short, a Bivens remedy is never "an automatic entitlement"; it "has to represent a judgment about the best way to implement a constitutional guarantee." Wilkie v. Robbins, 551 U.S. at 550.

Applying these principles here, I conclude that plaintiffs' constitutional challenges to an alleged executive policy for confining lawfully arrested illegal aliens in the aftermath of the 9/11 attacks cannot pass the stringent test for recognizing a Bivens action. In holding otherwise, the panel majority maintains that plaintiffs'

6

challenges to the conditions of their confinement—with the exception of their Free Exercise challenge—"stand[] firmly within a familiar Bivens context," thus avoiding the need to consider factors counseling hesitation or alternative remedies. Majority Op., ante at 31–32, 35–36.[3] The majority can reach that conclusion, however, only by fashioning a new standard for construing the few recognized Bivens contexts that employs an impermissibly "high level of generality." Wilkie v. Robbins, 551 U.S. at 561 (cautioning against such construction); accord Arar v. Ashcroft, 585 F.3d at 572. I respectfully disagree with that analysis.[4]

---

[3] I concur in the panel judgment dismissing plaintiffs' Free Exercise challenge. See Majority Op., ante at 35–36. Not only has the Supreme Court consistently declined to extend a Bivens remedy to a First Amendment claim in any context, see, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009), but also Congress has provided alternative relief under the Religious Freedom Restoration Act, see 42 U.S.C. § 2000bb et seq.

[4] I dissent from the majority's allowance of Bivens claims against both the DOJ and the MDC Defendants even though the former group, having secured dismissal on other grounds in the district court, did not renew their Bivens challenge in defending that judgment on appeal. No matter. We can affirm on any ground supported by the record, see Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 413 (2d Cir. 2014), and the lists-merger theory on which the majority reverses dismissal was never advanced by plaintiffs' in either the district court or on appeal, see infra at 43 n.28.

7

B.   Plaintiffs' Claims Do Not Arise in an Established *Bivens* Context

1.   The *Arar v. Ashcroft* Standard for Identifying *Bivens* Context Is Holistic and Cannot Be Reduced to Two Factors

In deciding whether a claim arises in a previously recognized <u>Bivens</u> context, this panel is bound by our court's <u>en banc</u> decision in <u>Arar v. Ashcroft</u>, which defines "context" as "a potentially recurring scenario that has similar legal and factual components." 585 F.3d at 572. The majority pays lip service to this definition, <u>see</u> Majority Op., <u>ante</u> at 29, but then significantly narrows it to demand commonality only as to the "rights injured" and the "mechanism of injury," <u>id.</u> at 32. This substitution cannot be reconciled with controlling precedent. <u>Arar</u>'s definition of context is unqualified, contemplating a careful, holistic examination of all legal and factual components of the "scenario" in which a claim arises to see if it is, indeed, a recurrent example of a previously recognized <u>Bivens</u> context. <u>Arar v. Ashcroft</u>, 585 F.3d at 572. Such an inquiry does not denominate any particular factors—such as the "rights injured" or "mechanism of injury"—as determinative. Nor does it pronounce other factors—such as a challenge to an executive policy, implicating the exercise of national security and immigration authority in a time of

8

crisis—irrelevant.[5] By doing both here, the majority not only fails to conduct the full inquiry mandated by <u>Arar</u>'s definition of context. It also fails to heed the Supreme Court admonition that animates the <u>Arar</u> definition, <u>i.e.</u>, that a <u>Bivens</u> remedy—generally "disfavored," <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675, and usually "unjustified," <u>Wilkie v. Robbins</u>, 551 U.S. at 550—is never "an automatic entitlement" but, rather, the product of a considered "judgment about the best way to implement a constitutional guarantee" in particular circumstances, <u>id.</u> Such a judgment necessarily requires more than the general identification of a constitutional right or a mechanism of injury. It demands consideration of all factors counseling for and against an implied damages action in the specific legal and factual circumstances presented.

It is precisely because a <u>Bivens</u> judgment is made only after weighing all factors relevant to a given scenario that, when another case arises presenting similar legal and factual components, a court need not repeat the process. But where a

---

[5] In pronouncing the national security challenges following the 9/11 attacks irrelevant to a <u>Bivens</u> context determination, the majority cites <u>Iqbal v. Hasty</u>, 490 F.3d 143 (2d Cir. 2007), <u>rev'd in part sub nom. Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). <u>See</u> Majority Op., <u>ante</u> at 31. That reliance is misplaced because it conflates the question of clearly established <u>rights</u>—the qualified immunity concern at issue in <u>Iqbal v. Hasty</u>, 490 F.3d at 159—with the distinct <u>Bivens</u> question of previously established <u>context</u>.

proposed <u>Bivens</u> claim presents legal and factual circumstances that were <u>not</u> present in an earlier <u>Bivens</u> case, a new assessment is necessary because no court has yet made the requisite "judgment" that a judicially implied damages remedy is "the best way" to implement constitutional guarantees in <u>that</u> context. <u>Wilkie v. Robbins</u>, 551 U.S. at 550.

That is the concern here. No court has ever made the judgment that an implied damages remedy is the best way to implement constitutional guarantees of substantive due process, equal protection, and reasonable search when lawfully arrested illegal aliens challenge an executive confinement policy, purportedly made at the cabinet level in a time of crisis, and implicating national security and immigration authority. In the absence of a judgment made in <u>that</u> context, the majority cannot conclude that a <u>Bivens</u> remedy is available to these plaintiffs simply because they assert rights and mechanisms of injury present in some other <u>Bivens</u> cases. Indeed, because rights and mechanisms of injury can arise in a variety of circumstances, presenting different legal and factual components, these two factors cannot alone identify context except at an impermissibly high level of generality. <u>See</u> <u>Wilkie v. Robbins</u>, 551 U.S. at 561; <u>Arar v. Ashcroft</u>, 585 F.3d at 572.

This generality concern is only exacerbated by the majority's apparent

10

willingness to mix and match a "right" from one <u>Bivens</u> case with a "mechanism of injury" from another and to conclude that wherever such a right and such a mechanism of injury are paired together, the resulting <u>Bivens</u> claim arises in an established context. <u>See</u> Majority Op., <u>ante</u> at 31–35; 37. The problem is that no court has previously made the requisite judgment with respect to that pairing, much less made it in a legal and factual scenario similar to the one presented here.

2. <u>The Majority Cites No Case Affording a <i>Bivens</i> Remedy in a Scenario Legally and Factually Similar to that Presented Here</u>

a. <u>Punitive Confinement Claim</u>

The majority cites two cases, <u>Carlson v. Green</u>, 446 U.S. 14, and <u>Thomas v. Ashcroft</u>, 470 F.3d 491 (2d Cir. 2006), in which federal prisoners were allowed to maintain <u>Bivens</u> actions for injuries sustained in confinement. <u>See</u> Majority Op., <u>ante</u> at 32–33. But in each case, the claim asserted was deliberate indifference to the prisoner's particular medical needs. That scenario is neither legally nor factually similar to a substantive due process claim of punitive pre-trial confinement implied from allegedly purposeless restrictions. <u>See generally</u> <u>Bell v. Wolfish</u>, 441 U.S. 520 (1970).[6] Indeed, the difference in context is only highlighted by law affording prison

---

[6] When, in <u>Bell v. Wolfish</u>, the Supreme Court discussed the substantive due process prohibition on punitive pre-trial confinement, it did so on a petition for a writ of

11

authorities considerable discretion in establishing confinement policies. See generally Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1517 (2012).

Deliberate indifference to an individual inmate's particular health needs was also the basis for the constitutional claim in Correctional Services Corp. v. Malesko, 534 U.S. 61. In that case, however, the Supreme Court declined to extend a Bivens remedy to such a claim when brought against a private corporation operating detention facilities under a contract with the Bureau of Prisons ("BOP"). See id. at 74. Thus, the Malesko observation cited by the majority—that "[i]f a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a Bivens claim against the offending individual officers, subject to the defense of qualified immunity," Majority Op., ante at 33 (quoting Malesko, 534 U.S. at 72)—cannot be read apart from the context in which it was made. It would, in fact, be extraordinary to conclude that in a deliberate indifference case such as Malesko, in which all claims against individuals had been dismissed, and in which the Supreme Court declined to extend Bivens to the private corporate defendant, the Court was, nevertheless, using a single sentence of dictum to sweep well beyond Carlson and to hold that Bivens remedies are available to federal prisoners raising any constitutional

habeas corpus, not in a Bivens action. See 441 U.S. at 526, 528.

12

challenge to any aspect of their confinement against individual federal employees. Indeed, that reading is foreclosed in this circuit by Arar, which observed that Carlson extended Bivens to Eighth Amendment violations by prison officials, after which "the Supreme Court has declined to extend the Bivens remedy in any new direction at all." Arar v. Ashcroft, 585 F.3d at 571 (emphasis added).

In Tellier v. Fields, also cited by the majority, ante at 34, a prison inmate did seek a Bivens remedy for restrictive confinement, but the right he asserted was procedural not substantive due process. See 280 F.3d 69, 73 (2d Cir. 2001). In short, he complained that defendants had failed to follow controlling procedures for imposing prison discipline. He did not contend that the restrictive conditions themselves were substantively unreasonable, a claim with quite different legal and factual components.[7]

In sum, the panel majority points to no case in which the Supreme Court or this court has yet extended a Bivens remedy to claims of punitive confinement by federal pre-trial detainees, and certainly not in the unprecedented context of a challenge to executive policy implicating the exercise of national security and

---

[7] This court has already dismissed procedural due process challenges to the confinement policy here at issue on grounds of qualified immunity. See Iqbal v. Hasty, 490 F.3d at 167–68.

immigration authority in a time of crisis.[8]

###### b. Discriminatory Confinement Claim

Nor does the majority cite to any case affording a <u>Bivens</u> remedy for alleged discriminatory conditions of confinement. The context of the single equal protection case cited, <u>Davis v. Passman</u>, 442 U.S. 228, was employment discrimination by a member of Congress. <u>See</u> Majority Op., <u>ante</u> at 32 n.15. That scenario bears almost no factual and legal similarity to the equal protection claim here, which is informed not only by the discretion afforded prison authorities in establishing confinement policies, <u>see generally</u> <u>Florence v. Bd. of Chosen Freeholders</u>, 132 S. Ct. at 1517, but also by the particular circumstances of the 9/11 attacks, <u>see generally</u> <u>Ashcroft v.</u>

---

[8] The majority cites two cases—not controlling on this court—that allowed federal detainees to pursue a <u>Bivens</u> remedy for restrictive confinement. <u>See</u> <u>Bistrian v. Levi</u>, 696 F.3d 352, 374–75 (3d Cir. 2012); <u>Cale v. Johnson</u>, 861 F.2d 943, 947 (6th Cir. 1988), <u>abrogated on other grounds by</u> <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378 (6th Cir. 1999 (<u>en banc</u>). In neither case, however, did these courts assess "context" by reference to the standard we articulated in <u>Arar</u>. In fact, <u>Bistrian</u> conducted no <u>Bivens</u> extension analysis. Much less were these other circuit courts confronted with the circumstances contributing to the unique scenario presented here.

Insofar as the majority cites the <u>dissenting</u> opinion in <u>Arar</u> for the proposition that this court has "presumed the availability of a <u>Bivens</u> remedy for substantive due process claims," Majority Op., <u>ante</u> at 32 n.15 (citing <u>Arar</u>, 585 F.3d at 598 (Sack, J., dissenting)), it is, of course, not the dissent, but the <u>en banc</u> majority opinion in <u>Arar</u> that controls our context consideration here. For reasons already discussed, that controlling opinion requires us to look to more than the right alleged to identify an established <u>Bivens</u> context.

Iqbal, 556 U.S. at 682 (observing that because 9/11 attacks were ordered and conducted by Arab Muslims, it was "no surprise" that legitimate law enforcement policies to identify 9/11 assailants and to prevent future attacks "would produce a disparate incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims").

Even in the context of employment discrimination claims, the Supreme Court has been reluctant to construe Davis v. Passman to reach beyond its particular factual scenario, especially where factors—not present in Davis—counsel hesitation. See Chappell v. Wallace, 462 U.S. 296, 297–305 (1979) (declining to extend Bivens to enlisted soldiers' claims of race discrimination against commanding officers). If, as the majority seems to recognize, Davis cannot be construed to afford a Bivens remedy for every claim of employment discrimination, see Majority Op., ante at 32 n.15, it can hardly be understood to afford a Bivens remedy in the altogether different context of alleged prison confinement discrimination.

c.    Strip-Search Claim

In challenging the strip-search component of their restrictive confinement, the MDC Plaintiffs invoke the Fourth as well as the Fifth Amendment. The Fourth Amendment cases cited by the majority—Bivens, Groh v. Ramirez, 540 U.S. 551

15

(2004), and <u>Castro v. United States</u>, 34 F.3d 106 (2d Cir. 2006), <u>see</u> Majority Op., <u>ante</u> at 36–37—do not present scenarios similar to that here.

The potentially recurring scenario in <u>Bivens</u> was unlawful arrest, executed without probable cause and with excessive force. <u>See</u> 403 U.S. at 389. That hardly represents a judgment that an implied <u>Bivens</u> damages action is the best way to vindicate <u>every</u> Fourth Amendment claim. <u>See</u> Majority Op., <u>ante</u> at 37. Rather, to come within the context established by <u>Bivens</u>, a Fourth Amendment claim must have legal and factual components akin to unlawful arrest. <u>See generally</u> <u>Arar v. Ashcroft</u>, 585 F.3d at 572. Plaintiffs here do not challenge their arrests, which were all supported by probable cause to believe that each detained alien had violated immigration laws, and which were all effected without undue force. Instead, plaintiffs challenge a policy of restrictive confinement (including strip searches) <u>after</u> lawful arrest.

As for <u>Groh</u> and <u>Castro</u>, the searches there at issue were of private residences, a factually distinct scenario presenting different legally cognizable expectations of privacy giving rise to different legal standards of constitutional reasonableness than those applicable to prison searches. <u>See</u> <u>Covino v. Patrissi</u>, 967 F.2d 73, 75 (2d Cir. 1992) (observing, in § 1983 action, that constitutionality of pre-trial detainee strip

16

searches should be assessed under "legitimate penological interests" standard outlined in Turner v. Safley, 482 U.S. 78, 87 (1987)); accord Iqbal v. Hasty, 490 F.3d at 172.

To summarize, I respectfully dissent from the majority's conclusion that plaintiff's policy-challenging claims to restrictive confinement arise in a familiar Bivens context because (1) to the extent the majority employs a rights-injury calculus to reach that conclusion, it construes context at an impermissibly high level of generality; and (2) no case cited by the plaintiffs or the majority has yet made the requisite judgment that a Bivens remedy is the best way to implement constitutional rights in a scenario with legal and factual components similar to those presented here. In short, the context here is "fundamentally different from anything recognized in Bivens or subsequent cases." Correctional Servs. Corp. v. Malesko, 534 U.S. at 70. Thus, this court must conduct the full analysis necessary to extend a Bivens remedy to a new context. Because the majority declines to do so, see Majority Op., ante at 38 n.17, I undertake that task here.

C. Factors Counseling Against Extending *Bivens* to Plaintiffs' Policy-Challenging Claims

Not only do the unique circumstances of this case not fall within an established Bivens context, but a number of those circumstances also counsel

hesitation in extending a <u>Bivens</u> remedy here.  <u>See</u> <u>Bush v. Lucas</u>, 462 U.S. at 378 (instructing courts to pay "particular heed" to "any special factors counseling hesitation before authorizing a new kind of federal litigation"); <u>accord</u> <u>Minneci v. Pollard</u>, 132 S. Ct. at 621; <u>Wilkie v. Robbins</u>, 551 U.S. at 550; <u>Arar v. Ashcroft</u>, 585 F.3d at 573 (characterizing "special factors" as "embracing category," which includes any circumstance provoking hesitation about propriety of court entertaining damages claim in absence of congressional action).  I discuss four factors in particular, the first three of which are inextricably intertwined: (1) plaintiffs challenge an official executive policy (rather than rogue action), implicating (2) the executive's immigration authority, (3) as well as its national security authority, and (4) Congress has afforded no damages remedy to 9/11 detainees despite awareness of the concerns raised here.

### 1.    Official Executive Policy

Plaintiffs challenge what they themselves characterize as an official confinement policy propounded by the nation's two highest ranking law enforcement officials, the Attorney General and the FBI Director, in response to the national security threat raised by the terrorist attacks of 9/11.  Neither plaintiffs nor the panel majority identifies any case affording a <u>Bivens</u> remedy in the context of a

constitutional challenge to executive branch policy, and certainly not to policy made at the cabinet level. This is not surprising. A <u>Bivens</u> action has never been considered a "proper vehicle for altering an entity's policy." <u>Correctional Servs. Corp. v. Malesko</u>, 534 U.S. at 74. While <u>Malesko</u> made this observation in declining to extend <u>Bivens</u> to a suit against a corporate defendant, this court has recognized <u>en banc</u> that it applies with equal force to claims against individuals. As we explained in <u>Arar v. Ashcroft</u>, allowing a private party to maintain a <u>Bivens</u> action against federal officials for "policies promulgated and pursued by the executive branch, not simply isolated actions of individual federal employees . . . is without precedent and implicates questions of separation of powers as well as sovereign immunity." 585 F.3d at 578.

That admonition counsels particular hesitation here where the challenged confinement policy was purportedly propounded and maintained not by rogue actors, <u>see</u> <u>Kreines v. United States</u>, 33 F.3d 1105, 1108 (9th Cir. 1994) (stating that <u>Bivens</u> actions are generally brought "against rogue officers who step outside the scope of their official duties"), but by persons specifically charged by the President

with primary responsibility for homeland defense after 9/11.[9] In this regard, it is worth recalling that the confinement policy here at issue was not the only action taken by the nation in response to the security exigencies presented by the 9/11 attacks. Within a week, the United States went to war.[10] Defendants Ashcroft and Mueller were among those senior officials who served as the President's "war council," and it was in that context that they were charged with homeland defense.[11] These circumstances should only add to our hesitation in judicially implying a damages remedy against executive officials who might well be understood to have been acting as "the hand of the president" in formulating policies responding to a

[9] See The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks upon the United States ("9/11 Report") 333 (2004), available at http://1.usa.gov/1AMXOO4 (detailing President's written assignment of responsibility for homeland security after 9/11 to Attorney General Ashcroft, FBI Director Mueller, and CIA Director George Tenet); see also Jack Goldsmith, The Terror Presidency 75 (2007) (recounting that, at September 12, 2001 meeting of National Security Council, President Bush told Attorney General Ashcroft, "'Don't ever let this happen again,'" a "simple sentence" that "set the tone for everything Ashcroft's Justice Department would do in the aftermath of 9/11").

[10] See Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001).

[11] See 9/11 Report 330 (identifying Attorney General and FBI Director, along with Vice President, Secretaries of State and Defense, Chairman and Vice-Chairman of Joint Chiefs, National Security Advisor, CIA Director, and President's Chief of Staff, as "top advisers" convened by President on night of 9/11 and subsequently denominated by him as his "war council" in responding to terrorist attacks).

national emergency.[12]

Nor is a different conclusion warranted here because subordinates of the Attorney General may have disagreed among themselves about the parameters of the challenged policy. See Majority Op., ante at 49.[13] As this court has recognized, a Bivens damages action is not the appropriate vehicle for reopening executive branch debates so that the judiciary can second-guess the final policy decision. See Benzman v. Whitman, 523 F.3d 119, 126 (2d Cir. 2008) (observing that "right of federal agencies to make discretionary decisions when engaged in disaster relief without the fear of judicial second-guessing" raises separation-of-powers concern cautioning hesitation in extending Bivens (internal quotation marks omitted)). The

---

[12] In Ponzi v. Fessenden, 258 U.S. 254, 262 (1922), Chief Justice (and former President) Taft described the Attorney General as "the hand of the president" in protecting United States interests in legal proceedings.

[13] The majority locates evidence of disagreement between the FBI and INS with respect to the MDC Plaintiffs' continued restrictive confinement in the ADMAX SHU in an OIG Report's account of a November 2, 2001 meeting. See Dep't of Justice, Office of the Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks ("OIG Report") 55–56 (April 2003), available at http://1.usa.gov/1ygkjKg. This is misleading. As I explain infra at 52–53, the OIG Report makes plain that the disagreement voiced by FBI and INS representatives at that meeting pertained not to whether illegal aliens detained at the MDC should continue to be held in the ADMAX SHU, but to whether New York list detainees (housed both restrictively at the MDC and in general population at the Passaic County Jail) should continue to be held at all.

21

Fourth Circuit reached that same conclusion in declining to extend <u>Bivens</u> to a due process challenge to the executive's designation of enemy combatants in the war on terrorism, a matter on which the FBI and Defense Department had allegedly disagreed. <u>See</u> <u>Lebron v. Rumsfeld</u>, 670 F.3d 540 (4th Cir. 2012). In so ruling, <u>Lebron</u> observed that the claims not only intruded on "past executive deliberations affecting sensitive matters of national security," but also risked chilling frank, future policy discussions in this area "shadowed as they might be by the thought that those involved would face prolonged civil litigation and potential personal liability." <u>Id.</u> at 551.

As earlier stated, hesitation in extending <u>Bivens</u> does not suggest that federal policymakers—even those appointed by the President and of cabinet rank—are not bound by constitutional constraints. <u>See</u> <u>supra</u> at 1–2. It simply recognizes that where an executive policy is at issue, Congress, not the judiciary, is the branch best suited to decide whether a damages action is the appropriate vehicle for challenging that policy. <u>See</u> <u>Arar v. Ashcroft</u>, 585 F.3d at 574 (explaining that "federal system of checks and balances provides means to consider allegedly unconstitutional executive policy, but a [judicially created] private action for money damages against individual policymakers is not one of them"); <u>see also</u> <u>Vance v. Rumsfeld</u>, 701 F.3d

22

193, 205 (7th Cir. 2012) (en banc) (observing that "normal means to handle defective policies and regulations is a suit under the Administrative Procedure Act or an equivalent statute, not an award of damages against the policy's author").

### 2. Implicating Executive's Immigration Authority

Further removing plaintiffs' claims from any recognized Bivens context, and certainly counseling hesitation in extending a Bivens remedy, is the fact that the challenged policy implicates the executive's immigration authority. As the Supreme Court has stated—in general and not simply with respect to Bivens—"any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government," matters "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" absent congressional authorization. Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952); accord Arar v. Ashcroft, 585 F.3d at 570.

The majority, however, concludes that plaintiffs' immigration status is irrelevant to assessing a Bivens context because illegal aliens have the same rights as citizens to be free from punitive or discriminatory conditions of confinement. See Majority Op., ante at 35. Whatever the merits of that conclusion generally, it begs

23

the relevant <u>Bivens</u> extension question, which is not whether the Constitution affords illegal aliens certain rights co-extensive with those of citizens, but whether a judicially implied damages remedy is the best way to implement such rights when the plaintiff is an illegal alien and not a citizen. <u>See</u> <u>Wilkie v. Robbins</u>, 551 U.S. at 550; <u>Mirmehdi v. United States</u>, 689 F.3d 975, 981 (9th Cir. 2012) (observing that "immigrants' remedies for vindicating the rights which they possess under the Constitution are not coextensive with those afforded to citizens," and declining to extend <u>Bivens</u> to illegal alien's claim of wrongful detention pending deportation).

Even assuming that in the familiar <u>Bivens</u> contexts of false arrest or deliberate indifference, the law were to conclude that the distinction between citizens and aliens did not counsel hesitation in extending a <u>Bivens</u> remedy, that is not this case. Plaintiffs here seek to employ a <u>Bivens</u> action to challenge an executive policy for the restrictive confinement of lawfully arrested illegal aliens while the FBI and CIA determined if they had any connection to recent terrorist attacks by aliens operating in this country or if they posed a threat of future attacks. This is hardly a familiar <u>Bivens</u> context, and such an intrusion on the executive's immigration authority counsels hesitation in denominating a judicially implied damages remedy against policymakers as the "best way" to implement constitutional guarantees in those

24

circumstances.  <u>Wilkie v. Robbins</u>, 551 U.S. at 550.

### 3.	Implicating Executive's National Security Authority

Plaintiffs' claims also propose to inquire into—and dispute—the executive's exercise of its national security authority.  Indeed, that seems to be their primary purpose.  This is an unprecedented <u>Bivens</u> context strongly counseling hesitation.

To explain, plaintiffs' due process and equal protection claims require proof of defendants' specific intent, either to punish, <u>see</u> <u>Bell v. Wolfish</u>, 441 U.S. at 538, or to discriminate, <u>see</u> <u>Washington v. Davis</u>, 426 U.S. 229, 241–42 (1976).  Such intent may be either express or implied.  <u>See</u> <u>Brown v. City of Oneonta</u>, 221 F.3d 329, 337 (2d Cir. 2000).  The majority here concludes that plaintiffs plausibly <u>imply</u> proscribed intent through allegations that the challenged confinement policy was "not reasonably related to a legitimate goal."  <u>See</u> Majority Op., <u>ante</u> at 55–58 (citing <u>Bell v. Wolfish</u>, 441 U.S. at 539). It similarly concludes that plaintiffs' plausibly plead that frequent strip searches were unreasonable relative to any legitimate penological interest.  <u>See</u> <u>id.</u> at 97.

The "legitimate goal" at issue here is national security.  MDC Plaintiffs propose to prove that their confinement in the ADMAX SHU was punitive and/or discriminatory by showing that there was no real national security need to maintain

25

them in such restrictive confinement pending FBI-CIA clearance, at least not in the absence of prior individualized suspicion that each alien posed a terrorism threat. Plaintiffs propose to make essentially the same showing in challenging the reasonableness of the strip-search policy that accompanied restrictive confinement. Thus, the executive's exercise of national security authority, far from being irrelevant to plaintiffs' Bivens claims, see Majority Op., ante at 31, will be the critical focus of this litigation—and of the exhaustive discovery that will undoubtedly attend it.

The Supreme Court has never afforded a Bivens remedy to a party challenging the executive's exercise of its national security authority. See Doe v. Rumsfeld, 683 F.3d 390, 394 (D.C. Cir. 2012) (making observation in declining to recognize Bivens action). Indeed, the Court has observed—in general and not simply with respect to Bivens—that "[m]atters intimately related to . . . national security are rarely proper subjects for judicial intervention" in the absence of congressional authorization. Haig v. Agee, 453 U.S. 280, 292 (1981); see Department of Navy v. Egan, 484 U.S. 518, 529–30 (1988) (stating that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security

26

affairs"); accord Arar v. Ashcroft, 585 F.3d at 578 (noting that intrusion on executive's national security authority raises "grave concerns about the separation of powers" dictated by the Constitution and, thus, counsels hesitation in extending Bivens).

Further counseling hesitation is the judiciary's limited competency to make national security assessments, see Arar v. Ashcroft, 585 F.3d at 575–78, particularly ones that could be informed by classified information, see generally Boumediene v. Bush, 553 U.S. 723, 797 (2009) (observing that federal judges do not "begin the day with briefings that may describe new and serious threats to our Nation and its people").[14] That competency concern is only heightened here by the extensive inquiry that will be necessary to understand and assess the risk concerns reasonably informing the challenged restrictive confinement policy. At a minimum, such an inquiry would have to consider the 9/11 attacks, the al Qaeda terrorist organization that ordered them, the attacks' alien perpetrators, and how those aliens—and, therefore, similarly minded others—could operate in the United States without

---

[14] See also Goldsmith, The Terror Presidency 71–74 (describing "threat matrix" provided daily to President and select officials, including Attorney General and FBI Director).

detection.[15] It would have to consider the history of al Qaeda attacks on American interests prior to 9/11,[16] as well as terrorists' frequent use of immigration fraud to conceal their murderous plans.[17] It would have to consider past life-threatening actions by Islamic terrorists while in federal custody.[18] It would have to consider events after 9/11—during the time when the challenged confinement policy was maintained—that fueled fears of further attacks.[19]

---

[15] See, e.g., 9/11 Report 227–29 (reporting how, when 9/11 hijackers Mohamed Atta and Marwan al Shehhi encountered difficulty re-entering United States in January 2001 without presenting student visas, they nevertheless persuaded INS inspectors to admit them so that they could continue flight training).

[16] Previous al Qaeda attacks included (1) the 1993 World Trade Center bombing (six deaths); (2) the thwarted 1993 conspiracy to bomb New York City landmarks led by the "Blind Sheikh," Omar Abdel Rahman; (3) the thwarted 1995 plot to explode American commercial airplanes over the Pacific Ocean, led by Ramzi Yousef; (4) the 1996 bombing of an apartment complex housing United States Air Force personnel in Khobar, Saudi Arabia (19 deaths); (5) the 1998 bombings of United States embassies in Tanzania and Kenya (224 deaths); (6) the thwarted millennial bombing of Los Angeles International Airport; and (7) the 2000 bombing of the U.S.S. Cole (17 deaths). See United States v. Farhane, 634 F.3d 127, 132 n.4 (2d Cir. 2011); In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 103–05 (2d Cir. 1998).

[17] See, e.g., 9/11 Report 177–78 (discussing how conspirators in Los Angeles Airport plot followed "a familiar terrorist pattern" of using "fraudulent passports and immigration fraud to travel" in furtherance of their scheme).

[18] See, e.g., infra at 67–68 (discussing prison actions of Omar Abdel Rahman and Mamdouh Mahmud Salim).

[19] Among these events were (1) the September 18, 2001 transmittal of anthrax in letters sent to various government and media offices, killing five, and infecting 17;

28

Hesitation is also counseled by sober recognition that national security assessments, "particularly in times of conflict, do not admit easy answers, especially not as products of the necessarily limited analysis undertaken in a single case." Lebron v. Rumsfeld, 670 F.3d at 549. This contrasts sharply with "the small number of contexts in which courts have implied a Bivens remedy," where it generally has "been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued." Arar v. Ashcroft, 585 F.3d at 580.

Here, the majority proposes to draw a line between generally and restrictively confining illegal aliens until they are cleared of terrorist connections. It concludes that general confinement raises no constitutional concerns—even though the aliens

---

(2) the mysterious November 12, 2001 crash of an American Airlines plane soon after takeoff from John F. Kennedy Airport, killing all onboard; (3) the thwarted December 22, 2001 attempt by Richard Reid to detonate a shoe bomb onboard an American Airlines plane traveling from Paris to Miami; and (4) the January 2002 kidnapping, and February 2002 beheading of Wall Street Journal reporter Daniel Pearl in Pakistan. Subsequent investigation would link the last two events to al Qaeda, with 9/11 mastermind Khalid Sheikh Mohammed claiming particular credit for the Pearl murder. See Peter Finn, Khalid Sheik Mohammed killed U.S. Journalist Daniel Pearl, report finds, Wash. Post, Jan. 20, 2011, http://wapo.st/NyvICX; Pam Belluck, Threats and Responses: The Bomb Plot; Unrepentant Shoe Bomber Is Given a Life Sentence For Trying to Blow Up Jet, N.Y. Times, Jan. 31, 2003, http://nyti.ms/ZhFZJF.

so confined were mostly Arab and Muslim. But it concludes that restrictive confinement of such aliens (at least in the absence of individualized suspicion) goes too far reasonably to relate to national security. See Majority Op., ante at 40–41. Setting aside the question of judicial competency to make this national security assessment, the Supreme Court has specifically cautioned against extending Bivens to claims that propose to show that government officials "went too far" in pursuit of a legitimate objective. Wilkie v. Robbins, 551 U.S. at 556–57. That caution is particularly apt here where, before 9/11, the executive had never had to consider whether, and how restrictively, to confine illegal aliens in the aftermath of a surprise terrorist attack by aliens operating within this country. Much less had the courts ever confronted these questions. Precedent provided no easy answer—and certainly no easy negative answer—to whether it "reasonably related" to national security to hold lawfully arrested illegal aliens in restrictive confinement, at least until the FBI and CIA cleared them of terrorist connections. The law does not, after all, invariably demand individualized suspicion to support the restrictive confinement of lawfully arrested persons to ensure security, a point I discuss further infra at 62–63, and with which the majority agrees. See Bell v. Wolfish, 441 U.S. at 560–62; accord Florence v. Bd. of Chosen Freeholders, 132 S. Ct. at 1523; Whitley v. Albers, 475 U.S. 312, 316

30

(1986); <u>Block v. Rutherford</u>, 468 U.S. 576, 577 (1984); <u>see also</u> Majority Op., <u>ante</u> at 58 n.31.

Where plaintiffs' policy-challenging claims thus turn on a "reasonably related" inquiry implicating national security decisions made within "a complex and rapidly changing legal framework beset with critical legal judgments that have not yet been made, as well as policy choices that are by no means easily reached," we not only confront a new <u>Bivens</u> context, but also one strongly counseling hesitation. <u>Arar v. Ashcroft</u>, 585 F.3d at 575, 580 (declining to extend <u>Bivens</u> to claim requiring "inquiry into the perceived need for the [challenged] policy, the threats to which it responds, the substance and sources of the intelligence used to formulate it, and the propriety of adopting specific responses to particular threats").

Again, this does not mean that executive detention and confinement decisions implicating national security are insulated from judicial review. The Constitution's guarantee of habeas corpus ensures against that. <u>See</u> <u>Boumediene v. Bush</u>, 553 U.S. at 771; <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 525, 533 (2004); <u>see also</u> <u>Bell v. Wolfish</u>, 441 U.S. at 526. But the fact that the Constitution expressly affords a liberty-safeguarding remedy against the sovereign even when national security concerns are present is hardly an invitation to the judiciary to imply a damages remedy

against individual executive officials in these circumstances. See Lebron v. Rumsfeld, 670 F.3d at 550 (drawing distinction). Such a decision is more properly made by the legislative rather than the adjudicative branch of government.[20]

Thus, where, as here, plaintiffs urge this court to imply a damages action where none has been provided by Congress so that persons unlawfully in this country can challenge executive policy relating to national security in a time of crisis, a proper regard for separation of powers counsels hesitation in judicially extending Bivens to that new context. Indeed, I would decline to extend Bivens to plaintiffs' policy-challenging claims for this reason alone. There is, however, yet one further factor counseling hesitation.

### 4. Congress's Failure To Provide a Damages Remedy

The judiciary will not imply a Bivens action where Congress itself "has provided what it considers adequate remedial mechanisms for constitutional

---

[20] Were Congress to afford compensatory relief in the circumstances at issue, it is hardly obvious that it would place the burden on individual officials rather than the sovereign on whose behalf they acted. See generally John Paul Stevens, Reflections About the Sovereign's Duty to Compensate Victims Harmed by Constitutional Violations, Lawyers for Civil Justice Membership Meeting ("Stevens Reflections") 11 (May 4, 2015), available at http://1.usa.gov/1Ih51e4 (proposing that "sovereign, rather than its individual agents," compensate any persons whose rights were violated in course of 9/11 investigation).

violations." Schweiker v. Chilicky, 487 U.S. 412, 423 (1988). Even where a congressionally prescribed remedy is lacking, however, courts will hesitate to extend Bivens to a new context where there is reason to think Congress's inaction is not "inadvertent." Id.; accord Dotson v. Griesa, 398 F.3d 156, 167 (2d Cir. 2005). That conclusion is warranted here, where Congress has not provided a damages remedy to post-9/11 detainees despite its awareness that (1) DOJ was arresting and detaining illegal aliens as part of its response to 9/11, (2) DOJ might press hard against constitutional bounds in its efforts to safeguard national security, and (3) concerns had arisen pertaining to the detention of Arab and Muslim aliens.

As to the first point, Attorney General Ashcroft and FBI Director Mueller (as well as other DOJ officials) repeatedly testified before Congress that the arrest of illegal aliens was part of DOJ's post-9/11 strategy against terrorism.[21]

As to the second point, when Congress enacted the PATRIOT Act in October

---

[21] See, e.g., Dep't of Justice Oversight: Preserving Our Freedoms While Defending Against Terrorism: Hearing Before the S. Comm. on the Judiciary, 107th Cong. 312 (Dec. 6, 2001) (statement of John Ashcroft, Att'y Gen. of the United States) (explaining "deliberate campaign of arrest and detention to remove suspected terrorists who violate the law from our streets," noting that "INS has detained 563 individuals on immigration violations" and that BOP had "acted swiftly to intensify security precautions in connection with al Qaeda and other terrorist inmates," and adding that DOJ "has briefed members of the House, the Senate and their staffs on more than 100 occasions").

33

2001, it anticipated possible DOJ overreaching and required the Department's Inspector General to review and report semi-annually to Congress on any identified abuses of civil rights and civil liberties in fighting terrorism.[22] Indeed, it is pursuant to this legislative mandate that the Inspector General provided Congress with the very OIG Reports upon which plaintiffs rely in pleading their complaint.

As to the third point, these OIG Reports discussed concerns about the treatment of confined Arab and Muslim aliens, and Congress's attention to these concerns is evident in the public record.[23] Despite its awareness of these matters, however, neither in enacting the PATRIOT Act, nor in the more than thirteen years that have now followed—during which time portions of the PATRIOT Act were re-authorized five times[24]—has Congress afforded a damages remedy to aliens who

---

[22] See Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("PATRIOT Act"), Pub. L. No. 107-56, § 1001, 115 Stat. 272, 391 (2001).

[23] See, e.g., Oversight Hearing: Law Enforcement and Terrorism: Hearing Before the S. Comm. on the Judiciary, 108th Cong. 192 (July 23, 2003) (questioning by Sen. Patrick Leahy of FBI Director Mueller about OIG report "alleging, among other things, the abuse of immigrants being held in Federal custody," particularly "Muslim and Arab immigrants being held on civil violations of our immigration laws").

[24] See Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015 ("USA FREEDOM Act"), Pub. L. No. 114-23, 129 Stat. 268 (2015); PATRIOT Sunsets Extension Act of 2011, Pub. L. No.

were, or in the future could be, detained in connection with terrorism investigations.

We must presume that Congress was aware that alternative, albeit non-compensatory, remedies were available to challenge unconstitutional confinement, notably, habeas corpus and the "remedial mechanisms established by the BOP, including suits in federal court for injunctive relief." Correctional Servs. Corp. v. Malesko, 534 U.S. at 74 (observing that injunctive relief has long been recognized as proper means for altering unconstitutional policy); see Bell v. Wolfish, 441 U.S. at 526 (habeas corpus review).[25] Where Congress, with awareness of the concerns at issue, as well as the remedies available to address them, legislates repeatedly in an

---

112-14, 125 Stat. 216 (2011); Act to Extend Expiring Provisions of the USA PATRIOT Improvement and Reauthorization Act of 2005 and Intelligence Reform and Terrorism Prevention Act of 2004 until February 28, 2011, Pub. L. No. 111-141, 124 Stat. 37 (2010); USA PATRIOT Act Additional Reauthorizing Amendments Act of 2006, Pub. L. No. 109-178, 120 Stat. 278 (2006); USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192 (2005).

[25] MDC Plaintiff Baloch was among the illegal aliens arrested in the 9/11 investigation who filed a habeas petition to challenge his confinement. See Turkmen v. Ashcroft, No. 02 CV 2307 (JG), 2006 WL 1662663, at *5 (E.D.N.Y. June 14, 2006) ("Turkmen I") (stating that Baloch filed habeas petition and six weeks later was transferred from ADMAX SHU to general population), aff'd in part, vacated in part, 589 F.3d 542 (2d Cir. 2009) ("Turkmen II"); see also OIG Report 87, 99–100, 102 (reporting other detainees' filing of habeas petitions).

The Ninth Circuit has cited the availability of a habeas remedy (and plaintiffs' pursuit of such relief) as a factor counseling hesitation in extending Bivens to claims of unlawful detention. See Mirmehdi v. United States, 689 F.3d at 982.

35

area without affording a damages remedy, there is strong reason to think that its inaction was not inadvertent and, thus, for the judiciary to hesitate before extending Bivens to that area. See Klay v. Panetta, 758 F.3d 369, 376 (D.C. Cir. 2014) ("If Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under Bivens, respect for the separation of powers demands that courts hesitate to imply a remedy."); Lebron v. Rumsfeld, 670 F.3d at 551–52 (observing that where "Congress was no idle bystander" and had "devoted extensive attention" to the concerns at issue in case but nonetheless did not create damages remedy, court could infer that "congressional inaction ha[d] not been inadvertent"); cf. Arar v. Ashcroft, 585 F.3d at 573 (stating that "complexity" of remedial immigration scheme created (and frequently amended) by Congress would ordinarily warrant "strong inference that Congress intended the judiciary to stay its hand and refrain from creating a Bivens action in this context").

Accordingly, insofar as plaintiffs invoke Bivens to challenge an official executive policy for the restrictive confinement and strip searching of illegal aliens in the aftermath of the 9/11 attacks, I conclude that their claims must be dismissed because a Bivens remedy has not been extended to such a context, and factors strongly counsel against this court doing so here. If illegal aliens should be afforded

36

a damages remedy to challenge an executive policy implicating immigration and national security authority, that decision should be made by Congress rather than by the courts. See Arar v. Ashcroft, 585 F.3d at 580–81 ("Congress is the appropriate branch" to decide whether policy decisions "directly related to the security of the population and the foreign affairs of the country" should be "subjected to the influence of litigation brought by aliens").

## II. Defendants Are Entitled to Qualified Immunity

### A. The Concept of Qualified Immunity

Whether or not a Bivens action is available to challenge the executive policy at issue, defendants are entitled to dismissal on grounds of qualified immunity. Qualified immunity—a concept derived from common law—shields federal and state officials from claims for money damages "unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). For law to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarity to have placed the constitutional question "beyond debate." Id. at 2083; accord Carroll v.

37

Carman, 135 S. Ct. 348, 350 (2014).  Put another way, the law must have made "the contours" of the asserted right "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083 (internal quotation marks omitted).

Qualified immunity affords such a broad shield to protect not simply government officials but government itself, specifically, "government's ability to perform its traditional functions."  Wyatt v. Cole, 504 U.S. 158, 167 (1992).  Thus, qualified immunity is afforded to ensure both that talented persons are not deterred from entering public service by the threat of crippling damages suits, see id., and that those in government service act "with the decisiveness and the judgment required by the public good," Scheuer v. Rhodes, 416 U.S. 232, 240 (1974); accord Filarsky v. Delia, 132 S. Ct. 1657, 1665 (2012); Richardson v. McKnight, 521 U.S. 399, 409 (1997) (describing "unwarranted timidity" on the part of those engaged in public's business as "most important special government immunity-producing concern"); Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (recognizing that qualified immunity is animated by "concern that for the public benefit, public officials be able to perform their duties unflinchingly and without constant dread of retaliation").

Toward this end, qualified immunity serves to give public officials "breathing room to make reasonable but mistaken judgments" without fear of disabling liability. <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted). Indeed, the standard is sufficiently forgiving that it protects "'all but the plainly incompetent or those who knowingly violate the law.'" <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. at 2085 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).[26]

It is difficult to imagine a public good more demanding of decisiveness or more tolerant of reasonable, even if mistaken, judgments than the protection of this nation and its people from further terrorist attacks in the immediate aftermath of the horrific events of 9/11.[27] Whatever lessons hindsight might teach about how best to achieve this legitimate government objective within our system of laws, I cannot

---

[26] The Supreme Court's recent repeated unanimous awards of qualified immunity emphasize the narrow circumstances in which government officials may be held personally liable for their actions in suits for money damages. <u>See, e.g.</u>, <u>Taylor v. Barkes</u>, 135 S. Ct. 2042, 2044 (2015); <u>Carroll v. Carman</u>, 135 S. Ct. at 350–52; <u>Lane v. Franks</u>, 134 S. Ct. 2369, 2383 (2014); <u>Wood v. Moss</u>, 134 S. Ct. 2056, 2070 (2014); <u>Plumhoff v. Richard</u>, 134 S. Ct. 2012, 2023–24 (2014); <u>Stanton v. Sims</u>, 134 S. Ct. 3, 7 (2013).

[27] <u>See generally</u> Stevens Reflections 9 (advocating <u>absolute</u> immunity for "dedicated public officials"—including Ashcroft and Mueller—who, in aftermath of 9/11, were "attempting to minimize the risk of another terrorist attack," while proposing that federal government assume responsibility for compensating any persons whose rights were violated).

conclude that defendants here were plainly incompetent or defiant of established law in instituting or maintaining the challenged restrictive confinement policy. Insofar as the majority decides otherwise based on its determinations that plaintiffs have (1) plausibly pleaded violations of Fourth and Fifth Amendment rights, (2) which rights were clearly established at the time of defendants' actions, I respectfully dissent. As to the second point in particular, I think the majority defines established law at an impermissibly "high level of generality." Id. at 2084.

B.    Punitive Confinement

The MDC Plaintiffs having been lawfully arrested for, but not yet convicted of, violations of federal immigration law, their confinement status was that of pre-trial detainees. The Fifth Amendment guarantee of substantive due process does not permit pre-trial detainees to be subjected to confinement, or to restrictive conditions of confinement, "for the purpose of punishment." Bell v. Wolfish, 441 U.S. at 538. At the same time, due process does not preclude restrictive confinement "incident of some other legitimate government purpose." Id. In short, pre-trial confinement, or a condition of pre-trial confinement is not deemed "punishment" in the abstract, but only by virtue of the purpose for which it is imposed.

To maintain a punitive confinement claim, then, a pre-trial detainee must

40

plausibly plead that a defendant imposed restrictive confinement with the specific intent to punish. See id. Where, as here, plaintiffs propose for such intent to be implied, they must plead facts sufficient to admit a plausible inference that the challenged conditions of their confinement were "not reasonably related to a legitimate goal" but, rather, were "arbitrary or purposeless." Id. at 539. The burden is significant because a reasonable relatedness inquiry is not an end in itself. Rather, it is a proxy for determining a defendant's true intent. Thus, a plaintiff does not plausibly plead punitive intent simply by alleging some mismatch between challenged conditions of confinement and the legitimate goal they are intended to serve. See, e.g., id. at 558–60 (rejecting challenge to routine body cavity searches of pre-trial detainees following contact visits even though there had been only one reported attempt to smuggle contraband into facility in body cavity); accord Block v. Rutherford, 468 U.S. at 587 (rejecting lower courts' characterization of total ban on contact visits as excessive in relation to security and other interests at stake). The mismatch must be so glaring as to make the challenged condition "arbitrary or purposeless" relative to any legitimate goal. Moreover, when the professed legitimate goal is security, the plausibility of any arbitrary or purposeless assertion must be considered in light of the "wide-ranging deference" that the law accords

41

prison administrators in determining the conditions necessary to preserve discipline and security. Bell v. Wolfish, 441 U.S. at 547 (cautioning that courts must not depend on their own "idea of how best to operate a detention facility"); accord Florence v. Bd. of Chosen Freeholders, 132 S. Ct. at 1517; Trammell v. Keane, 338 F.3d 155, 163 (2d Cir. 2003).

Further, as the Supreme Court recently explained in rejecting an earlier discriminatory confinement challenge to the very policy here at issue, plaintiffs cannot carry their pleading burden by alleging facts that admit only a "possibility" of defendants' proscribed intent. Ashcroft v. Iqbal, 556 U.S. at 678. "[F]acts that are merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). This is particularly so where "more likely" legitimate explanations for defendants' actions are "obvious." Id. at 681–82.

### 1. DOJ Defendants

The panel majority concludes—and I agree—that plaintiffs fail plausibly to plead that the DOJ hold-until-cleared policy, as applied ab initio to illegal aliens arrested in the course of the FBI's 9/11 investigation, implies the DOJ Defendants' punitive intent. The "obvious" and "more likely explanation[]" for the policy was

42

the government's legitimate interest in national security, specifically, in identifying and apprehending any persons connected with the 9/11 terrorist attacks and in detecting and preventing future attacks. Id. In pursuing those goals, the DOJ Defendants were entitled to assume that subordinates would lawfully implement the hold-until-cleared policy. See Majority Op., ante at 40; see also Turkmen v. Ashcroft, 915 F. Supp. 2d 314, 340 (E.D.N.Y. 2013) ("Turkmen III").

Where I depart from the majority is in its determination that plaintiffs plausibly plead that the DOJ Defendants' legitimate national security purpose transformed to proscribed punitive intent by November 2001, when they approved merger of the FBI New York detainee list with the INS national detainee list, thereby maintaining the MDC Plaintiffs in the ADMAX SHU pending FBI-CIA clearance without individualized suspicion of these aliens' connection to terrorism. See Majority Op., ante at 40–42. Much less can I agree that clearly established law alerted every reasonable official that such actions violated substantive due process.[28]

---

[28] Plaintiffs themselves never raised this lists-merger theory, either in their briefs to this court or in the district court. The majority, however, views merger of the New York and national lists as the critical event because it construes the pleadings to allege that "illegal aliens were being detained in punitive conditions of confinement in New York" with "no suggestion that those detainees were tied to terrorism except for the fact that they were, or were perceived to be Arab or Muslim." Majority Op., ante at 40–41. This is not apparent in the record.

43

<u>First</u>, insofar as the November 2001 lists-merger decision is the critical factor

---

For example, when MDC Plaintiff Purna Raj Bajracharya was placed in restrictive confinement, federal officials knew that, approximately two weeks before the 9/11 attacks, he had been observed videotaping a Queens building that housed both a New York FBI unit and the Queens County District Attorney's Office. <u>See</u> <u>id.</u> at 19. They further knew that when Bajracharya—who had lived illegally in the United States for five years—was questioned about this conduct, he falsely claimed to be a tourist. While these circumstances did not conclusively link Bajracharya to terrorism, no more so did Zacarias Moussaoui's pre-9/11 interest in flight simulator training for large jets. What both circumstances did provide, however, was individualized suspicion for investigating these mens' ties to terrorism, which in Moussaoui's case led to his conviction for participation in the 9/11 conspiracy. <u>See</u> <u>United States v. Moussaoui</u>, 591 F.3d 263, 266 (4th Cir. 2010).

Further, New York list detainees were <u>not</u> uniformly detained in "punitive" conditions—by which I understand the majority to be referring to highly restrictive conditions of confinement rather than to the intent with which such restrictions were imposed. Much less were they so confined for no reason other than ethnicity or religion. This is evident from the fact that the vast majority of the approximately 300 persons on the New York list at the time of the merger decision were Arab or Muslim. Nevertheless, no more than 84 detainees were ever restrictively confined in the ADMAX SHU. <u>See</u> OIG Report 2, 22, 111. The remainder were held in general confinement at the Passaic County Jail. The designation difference appears generally to have been based on whether an arrested illegal alien was designated "high interest," "of interest," or "interest undetermined" to the 9/11 investigation. <u>See</u> OIG Report 18, 111 (explaining that arrested illegal aliens in first category were generally held in high security confinement at MDC, while persons in latter two categories were generally held in less restrictive confinement at Passaic County Jail). Nevertheless, because the OIG Report provides no specifics on this point, and because plaintiffs allege that some of them were detained at the MDC "even though they had not been classified 'high interest,'" Fourth Am. Compl. ¶ 4. I do not pursue the matter further. Rather, I proceed to explain why plaintiffs fail, even under the majority's lists-merger theory, plausibly to plead a claim for punitive (or discriminatory) confinement, much less one supported by clearly established law.

44

in the majority's identification of a plausible punitive confinement claim, plaintiffs fail to plead a sufficient factual basis for ascribing the merger decision to any of the three DOJ Defendants. See Ashcroft v. Iqbal, 556 U.S. at 678. Their allegations—that Attorney General Ashcroft "ordered that" New York list detainees "be detained until cleared and otherwise treated as 'of interest,'" and that FBI Director Mueller and INS Commissioner Ziglar "were fully informed of this decision, and complied with it," Fourth Am. Compl. ("Compl.") ¶ 47—are plainly not based on personal knowledge and, in fact, are belied by the very OIG Report on which they rely to support their claims, see id. ¶ 3 n.1. That report states quite clearly that it was Associate Deputy Attorney General Stuart Levey who, at the end of the November 2, 2001 meeting with FBI and INS representatives, "decided that all the detainees on the New York list would be added to the INS Custody List and held without bond." OIG Report 56. To be sure, plaintiffs profess to incorporate the OIG Report into their pleadings only to the extent it is not "contradicted" by their own allegations. Compl. ¶ 3 n.1. But that begs the question of whether there is sufficient factual matter—either in plaintiffs' allegations or in the OIG Report—plausibly to ascribe merger responsibility to any of the DOJ Defendants. There is not. Nothing in the OIG Report indicates that Levey's merger decision was ever ordered or endorsed

45

by Attorney General Ashcroft, FBI Director Mueller, or INS Commissioner Ziglar, or even communicated to them.

In concluding otherwise, the majority asserts that OIG identification of Levey as the lists-merger decisionmaker does not absolve Ashcroft of responsibility because the OIG appears not to have asked Ashcroft about his role in that decision. See Majority Op., ante at 50. To the extent this implies OIG negligence or oversight, that hardly supplies a factual basis for inferring Ashcroft's responsibility. See Ashcroft v. Iqbal, 556 U.S. at 678. In any event, negligence is belied by the OIG's detailed 198-page, single-spaced report, which includes a careful discussion of when, how, and by whom the merger decision was made. See OIG Report 55–57; see also Compl. ¶ 3 n.1 (describing "well-documented" OIG Report).[29]

Nor can the majority infer Ashcroft's responsibility simply by referencing "the importance of the merger and its implications for how [Ashcroft's] lawful original

_____

[29] The majority responds that I mistakenly treat "the OIG reports as a repository of all . . . facts" relevant to plaintiffs' claims, "measur[ing] plausibility by the absence or presence of fact-findings" in these reports. See Majority Op., ante at 50. Not so. It is plaintiffs who support their pleadings by incorporating the OIG Reports. And it is the majority that maintains that statements in (or in the instant example, an omission from) the OIG Report, reasonably establish the plausibility of plaintiffs' claims. I herein demonstrate only why no "factual matter" supports such a conclusion. Ashcroft v. Iqbal, 556 U.S. at 678.

[hold-until-cleared] order was being carried out." Majority Op., <u>ante</u> at 51. Not only is the assertion conclusory, but also <u>Ashcroft v. Iqbal</u> holds that even facts "merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility." 556 U.S. at 681–82 (internal quotation marks omitted).

Insofar as the majority maintains that the OIG Report itself provides factual support for a plausible inference that Ashcroft, not Levey, was the ultimate merger decisionmaker, the conclusion does not bear close examination. For example, the majority highlights part of the OIG Report indicating that, at the same November 2 meeting where the lists-merger question arose, an INS official questioned the need for CIA (as well as FBI) checks prior to releasing 9/11 detainees, prompting Levey to reply that he would need to check to see if "'any detainees could be released without the CIA check.'" Majority Op., <u>ante</u> at 51 (quoting OIG Report 56). The majority reasons that if this statement is construed to suggest Levey's "lack of authority" to make a decision as to CIA checks, it plausibly "supports the conclusion that Levey . . . had to take [the question] to more senior officials." <u>Id.</u> at 51–52. The majority then quotes another part of the OIG Report indicating that, in late November, when the INS Chief of Staff asked if DOJ would reconsider the CIA check requirement, Levey was still concerned about "'chang[ing] the CIA check

47

policy without additional input.'" Id. at 52 (quoting OIG Report 62). It concludes that "if Levey was not comfortable changing the CIA check policy without input from more senior officials, he certainly would not have been comfortable making the decision on his own to double the number of detainees subject to that policy in the first instance" and, therefore, it is plausible to think that he brought the question to Ashcroft. Id.

This reasoning is wholly speculative in assuming Levey's equal discomfort with the CIA check and merger decisions. Moreover, the majority's inference that Ashcroft was the consulted "senior official" is defeated by the very OIG Report on which it purports to rely. That report specifically identifies the person Levey consulted about continuing CIA checks: it was not Attorney General Ashcroft, but "David Laufman, the Deputy Attorney General's Chief of Staff." OIG Report 62. It was Laufman who advised Levey to continue the CIA checks. See id.[30] In its footnote acknowledgment of Laufman's role, the majority denies any intent to imply Ashcroft's responsibility for the CIA checks decision. It maintains that "the only

---

[30] The majority can hardly have overlooked the OIG's identification of Laufman because it occurs in the very sentence of the Report that the majority quotes (in part) about Levey's continuing discomfort with making a CIA check decision in late November 2001. See OIG Report 62.

relevance of the CIA checks decision, period, is that Levey was not capable of making it on his own, suggesting that he also would not be able to make the list merger decision on his own." Majority Op., ante at 52 n.27. What the majority fails to explain, however, is how that analogy supports an inference that Ashcroft made the merger decision.

While that could end this discussion, I further note that the OIG Report does not, in fact, permit one to infer from Levey's discomfort with canceling CIA checks on his own that he must have been equally uncomfortable with making the lists-merger decision. The OIG Report expressly states that Levey made the lists-merger decision "[a]t the conclusion of the [November 2] meeting" at which the subject was first raised to him. OIG Report 56. In short, there was no delay in Levey's making of the merger decision for him to consult with Ashcroft or anyone else, leaving the majority's reasoning on this point wholly without any basis in fact.

The majority responds that because "the issue of the New York list was discovered in October 2001, . . . surely it is plausible that Levey consulted with more senior officials, including Ashcroft, prior to [the November 2] meeting." Majority Op., ante at 53 (emphasis in original). Even if this were an accurate account of events, it admits no more than a possibility that Levey consulted with anyone in the

interim, much less that the person consulted was Ashcroft. But I do not think this account is accurate. While the OIG Report does detail an October 22, 2001 meeting at which DOJ, FBI, and INS representatives discussed "problems presented by the New York List," the critical fact omitted by the majority is that Levey was not in attendance. OIG Report 55. The OIG Report states that what Levey attended was a "follow-up meeting" on November 2, 2001. It was there that he heard the competing views of the three interested entities, and made the merger decision. Id. at 55–56. The majority nevertheless deems it plausible that Levey learned about the October New York list discussion in advance of the November meeting because "Levey would not attend the November 2 meeting without knowing its agenda." Majority Op., ante at 53 n.29. This gave him "time to consult with more senior officials, including Ashcroft, before communicating a decision" at the November 2 meeting. Id. (emphasis added). Such attenuated reasoning stops well "short of the line between possibility and plausibility." Ashcroft v. Iqbal, 556 U.S. at 681–82 (internal quotation marks omitted). It is pure speculation.[31]

---

[31] In another footnote, the majority further asserts that Levey's communication with Ashcroft about the lists-merger decision, and Ashcroft's approval of the merger, find support in Ziglar's statement to the OIG that "he [i.e., Ziglar] contacted the Attorney General's Office on November 7, 2001 [i.e., five days after Levey had already made the merger decision], to discuss concerns about the clearance process, especially the

50

Thus, the pleadings, even with incorporation of the OIG Report, do not "contain sufficient factual matter" plausibly to ascribe the lists-merger decision to the DOJ Defendants  Ashcroft v. Iqbal, 556 U.S. at 678 (stating that well-pleaded facts must permit court to infer more than mere possibility of misconduct).

Second, even if plaintiffs could plausibly allege the DOJ Defendants' responsibility for the merger decision—which they cannot—plaintiffs fail to plead that these defendants thereby intended for plaintiffs to be held in the MDC's ADMAX SHU.  The Complaint pleadings quoted at the start of the preceding point, see supra at 44–45, assert only that New York list detainees should be designated as "of interest" and held until cleared; they make no mention of any DOJ Defendant dictating aliens' continued confinement in the ADMAX SHU, or even their awareness of that result.  Indeed, after merger, most New York list detainees continued to be held in general confinement at the Passaic County Jail.  See OIG

---

impact of adding the New York cases to the INS Custody list."  OIG Report 66.  But the OIG Report makes clear that who Ziglar called was not Ashcroft himself, but his Chief of Staff, and that the person he in fact spoke with was Deputy Chief of Staff David Israelite.  Id. at 66–67.  Further, when Ziglar's quoted statement is read in the context of preceding and subsequent paragraphs, it is plain that his concerns related only to the "slow pace" of the FBI's clearance process, not to the conditions of confinement for New York list detainees held at the MDC.  Id.  These facts cannot admit a plausible inference that Ashcroft made the merger decision, much less that he made it for a punitive purpose.

51

Report 111.

Moreover, the OIG Report's detailed discussion of the lists-merger decision gives no indication that the issue of continued restrictive—as opposed to general—confinement informed the merger decision in any way. The Report explains that INS officials opposed merger because of "how it would look when [INS] statistics regarding the number of September 11 detainees doubled overnight." OIG Report 55. The INS feared these high numbers would persist because of the time it was taking the FBI New York office to conduct clearance inquiries. The INS predicted that such delay would make it difficult for its attorneys to argue for continued detention without bail. See id. at 55–56.[32] Viewed in this context, the statement of Victor Cerda, Ziglar's Chief of Staff, explaining INS's opposition to the merger decision—"INS did not want to begin treating all the detainees on the New York list under the more restrictive INS policies applicable to September 11 detainees," OIG Report 56—can only be understood to reference the INS policy of

---

[32] At the same time that the OIG Report criticized the slow pace of FBI clearance, it acknowledged that the FBI New York office was under enormous pressure after the 9/11 attacks, both in investigating that event and in preventing future attacks. The New York office had by far the most leads to pursue, in the course of which it encountered the most illegal aliens. See OIG Report 2, 22 (indicating that, of the 762 illegal aliens arrested during the 9/11 investigation nationwide through August 6, 2002, 491 were arrested in New York).

holding all 9/11 detainees without bond, a restriction that it did not apply to illegal aliens generally, see id. at 73.  In sum, the merger debate between the INS and FBI was about whether illegal aliens on the New York list should continue to be detained at all, not about the conditions of their confinement.  Thus, the debate admits no inference that the merger decision—by whomever made—was motivated by a desire to subject the MDC Plaintiffs to restrictive confinement.

Third, as the district court observed in dismissing plaintiffs' punitive confinement claim against the DOJ Defendants, plaintiffs do not allege that these defendants "were even aware" of the challenged restrictive confinement conditions at the MDC.  Turkmen III, 915 F. Supp. 2d at 340.  The majority nevertheless concludes that the Complaint admits an inference of such awareness, pointing to allegations that (1) FBI Director Mueller oversaw the 9/11 investigation from FBI Headquarters, see Compl. ¶¶ 56–57); and (2) the DOJ Defendants "received detailed daily reports of the arrests and detentions," id. ¶ 47.  See Majority Op., ante at 42.  I respectfully submit that these allegations admit no more than a possibility that the DOJ Defendants ever learned of the particular conditions of confinement imposed by BOP officials at the MDC—or, indeed, at any of the other facilities around the country where the 738  illegal aliens arrested in the course of the 9/11 investigation

53

were held until cleared.

The first allegation, that FBI Director Mueller oversaw the vast 9/11 investigation from headquarters—as opposed to the investigation being run out of one or more field offices—says nothing to support an inference that Mueller would therefore have had personal knowledge as to the particular confinement conditions imposed by the BOP on MDC detainees. See Ashcroft v. Iqbal, 556 U.S. at 678 (holding that complaint must do more than plead facts "merely consistent with a defendant's liability" to cross the line from "possibility" to "plausibility"). To be sure, plaintiffs allege that the MDC defendants formulated the challenged restrictive conditions "in consultation with the FBI." Compl. ¶ 65. But the FBI is an organization with more than 13,000 agents among 30,000 employees. Thus, this pleading hardly admits an inference that the FBI Director himself (much less the Attorney General or INS Commissioner) personally participated in or even knew of these consultations.

As to the second allegation highlighted by the majority, even assuming arguendo that it might admit an inference that the DOJ Defendants received daily reports on the number of illegal aliens detained in the 9/11 investigation, and on facts about such persons relevant to the ongoing terrorism investigation, it is pure

conjecture to think that daily reports to federal authorities at this high level detailed the particular conditions of confinement under which each arrested alien was being held at the various facilities being used for that purpose. See id. Indeed, as the district court observed, plaintiffs themselves allege that the challenged conditions of confinement at the MDC were the "result" of the DOJ Defendants' policy of holding illegal aliens until cleared, rather than a specifically approved element of that policy. Turkmen III, 915 F. Supp. 2d at 340 (citing Compl. ¶ 61).

Nor do those parts of the OIG Report cited by the majority support a different conclusion. See Majority Op., ante at 42–44. A BOP official's statement that "the Department [of Justice] was aware of the BOP's decision to house the September 11 detainees in high-security sections in various BOP facilities," OIG Report 19 (emphasis added), is too vague to ascribe personal awareness to the three DOJ Defendants in this case.[33] Moreover, the statement references how the BOP generally implemented the hold-under-clear policy throughout the country—which

---

[33] Indeed, the OIG Report indicates that a number of DOJ witnesses—including Michael Chertoff, the Assistant Attorney General in charge of the Criminal Division; his Deputy Alice Fisher, who oversaw terrorism issues in the division; David Israelite, the Deputy Chief of Staff to the Attorney General; and Southern District of New York Deputy U.S. Attorney David Kelley, the lead prosecutor on the 9/11 investigation—stated that they either had "no information" or "no input" into where detainees would be held or the conditions of their confinement at the various BOP facilities. Id. at 20.

55

the panel concludes does not support plausible constitutional claims against these defendants. It does not reference the particular MDC restrictive confinement here at issue.

Insofar as the Attorney General's Deputy Chief of Staff recalled "one allegation of prisoner mistreatment being called to the attention of the Attorney General," id. at 20, a single complaint suggests rogue abuse, not the restrictive confinement policy at issue here. Further, the Attorney General's response was not to approve such conduct, but to call for a staff inquiry, hardly action implying punitive intent. See id.

BOP Director Kathy Hawk Sawyer did tell the OIG of conversations she had in the weeks following 9/11 with the Deputy Attorney General's Chief of Staff, David Laufman, and the Principal Associate Deputy Attorney General, Christopher Wray, in which these men expressed "concerns about detainees ability to communicate both with those outside the facility and with other inmates," and urged the BOP to take "policies to their legal limit" to prevent such communication in order "to give officials investigating the detainees time to 'do their job.'" Id. at 112–13. But statements by members of the Deputy Attorney General's staff admit no more than a "possibility" that the Attorney General himself was aware of their

56

content. Ashcroft v. Iqbal, 556 U.S. at 678. That conclusion applies with even more force to the FBI Director or INS Commissioner. Moreover, the Laufman-Wray communications appear to have urged a communication blackout for all 9/11 detainees, not just those held at the MDC. See OIG Report 113. Thus, they cannot support an inference that the DOJ Defendants knew the particular restrictive conditions imposed in that facility. Further, it appears that the BOP lifted the communications blackout on 9/11 detainees—even at the MDC—by mid-October 2001, see id. at 114, which is before the November merger decision that is the majority's triggering date for a plausible claim of punitive and discriminatory confinement by MDC Plaintiffs. Thus, communications before the November merger, by persons other than the DOJ Defendants, about a condition of confinement that BOP lifted before the merger decision was made, support no inference as to what the DOJ Defendants knew about conditions of confinement at the MDC in November 2001.[34]

Fourth, even if plaintiffs' allegations were sufficient to admit an inference that

---

[34] For the same reasons that I think pleadings related to the lists-merger decision do not admit a plausible inference that the DOJ Defendants knew of the particular restrictive conditions of confinement at the MDC, I do not think they admit a plausible inference that the DOJ Defendants knew that such conditions were being imposed without individualized suspicion of terrorist connections.

the DOJ Defendants knew that, as a consequence of the lists' merger, MDC Plaintiffs would remain in restrictive confinement, that would be insufficient to imply the requisite specific intent. As the Supreme Court explained in Ashcroft v. Iqbal, "purposeful" conduct "requires more than intent as volition or intent as awareness of consequences." 556 U.S. at 681. It requires that a decisionmaker undertake a course of action "'because of,' not merely 'in spite of' the action's adverse effects." Id. (internal quotation marks and citation omitted). Here, the pleadings provide no factual basis to conclude that anyone made the merger decision because it would keep the MDC Plaintiffs in restrictive confinement.

Fifth, plaintiffs fail in any event plausibly to allege facts admitting an inference that their continued MDC restrictive confinement after November 2001 was "arbitrary or purposeless" to any legitimate objective, so that plaintiffs' real intent must have been punitive. Bell v. Wolfish, 441 U.S. at 539. That inference is, I submit, foreclosed by the "obvious" and "more likely" explanation for the challenged action: the DOJ Defendants' determination to identify and apprehend anyone involved in the 9/11 attacks and to safeguard the nation from further terrorist attacks. Ashcroft v. Iqbal, 556 U.S. at 681–82.

This non-punitive motivation is no after-the-fact invention. The Supreme

Court recognized it to motivate the entire vast investigation that followed 9/11 and pursuant to which plaintiffs were arrested and confined. See id. at 667 (stating that "FBI and other entities within the Department of Justice began an investigation of vast reach to identify the [9/11] assailants and prevent them from attacking anew," dedicating "more than 4,000 special agents and 3,000 support personnel to the endeavor"). The OIG Report makes the same point. See OIG Report 12–13 (noting Attorney General's directive that all components of DOJ "focus their efforts on disrupting any additional terrorist threats," and general understanding within DOJ that every available legal means should be used "to make sure that no one else was killed").

The panel majority acknowledges that national security concerns "might well" have motivated defendants' challenged actions, see Majority Op., ante at 106, including the merger decision on which it relies to deny dismissal to the DOJ Defendants, see id. at 54–55 (quoting Levey's statement to OIG that, in merging lists, "he wanted to err on the side of caution so that a terrorist would not be released by mistake," OIG Report 56). Indeed, the OIG Report specifically concludes that the merger decision "was supportable, given the desire not to release any alien who might be connected to the [9/11] attacks or [to] terrorism." OIG Report 71.

59

Nevertheless, the majority maintains that, even if the DOJ Defendants were intent on ensuring national security, the mismatch between that object and the restrictive confinement conditions at the MDC was so great (in the absence of individualized suspicion) as to be deemed arbitrary and purposeless, admitting an inference of punitive intent. See Majority Op., ante at 55–58.

Whether a court, upon identifying an obvious non-punitive intent for challenged conduct, can nevertheless allow plaintiffs to pursue a substantive due process claim on a theory of implied punitive intent is not apparent. See, e.g., Ashcroft v. Iqbal, 556 U.S. at 683 (rejecting discrimination claim in such circumstances); Block v. Rutherford, 468 U.S. at 589 (instructing that once court identifies legitimate purpose for challenged confinement policy, its inquiry should end because "further 'balancing' result[s] in an impermissible substitution of [the court's] views" for those of confining authorities). Certainly, the conclusion is not placed "beyond debate" by clearly established law, without which defendants must be afforded qualified immunity. Carroll v. Carmon, 135 S. Ct. at 350; Ashcroft v. al-Kidd, 131 S. Ct. at 2083.

In urging otherwise, the majority cites Bell v. Wolfish, 441 U.S. 520, and Iqbal v. Hasty, 490 F.3d 143. See Majority Op., ante at 61. Bell v. Wolfish held that if a

condition of pre-trial confinement "is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment." 441 U.S. at 539. But that simply states a "general proposition," which affords "little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. Moreover, because Wolfish itself rejected all constitutional challenges to the restrictive conditions there at issue, see 441 U.S. at 560–62, it hardly made the parameters of the substantive due process ban on punitive pre-trial confinement "sufficiently clear that every reasonable official would have understood" that the restrictive conditions here at issue were arbitrary or purposeless to ensuring national security in the absence of individualized suspicion of terrorism, Ashcroft v. Al-Kidd, 131 S. Ct. at 2083 (holding that unless law is so clearly established, official is entitled to qualified immunity).

As for Iqbal v. Hasty, this court did not there place beyond dispute the need for individualized suspicion of terrorism to place 9/11 detainees in restrictive confinement. Indeed, that case made no mention of the lack of such suspicion in observing that "[t]he right of pretrial detainees to be free from punitive restraints was clearly established at the time of the events in question, and no reasonable

61

officer could have thought that he could punish a detainee by subjecting him to the practices and conditions alleged by the Plaintiff." Iqbal v. Hasty, 490 F.3d at 169. In fact, this statement was made in concluding that plaintiffs had adequately alleged Warden Hasty's express punitive intent. That conclusion having been reached under a pleading standard abrogated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. at 680, Hasty's preclusive effect here is open to question. But even if we assume that this court there correctly concluded that the prohibition on punitive restraints is clearly established in any circumstance where a defendant acts with the express intent to punish, Hasty did not hold that the same conclusion applies in the myriad circumstances where plaintiffs propose to imply intent by challenging the reasonableness of a restraint relative to a legitimate objective. Certainly, Hasty did not hold it well established that the restrictive confinement of lawfully arrested persons without individualized suspicion of a security risk is implicitly punitive.

Meanwhile, considerable law indicates that individualized suspicion is generally not required to impose restrictive conditions of confinement on lawfully arrested detainees in pursuit of a legitimate security objective. Block v. Rutherford, 468 U.S. at 585–87, upheld a blanket prohibition on pre-trial detainees' contact visits, observing that the "identification of those inmates who have propensities for

violence, escape, or drug smuggling is a difficult if not impossible task," id. at 587.

Bell v. Wolfish, 441 U.S. at 558, rejected a challenge to body cavity searches of all

pre-trial detainees after contact visits even though there had been only a single past

incident of contraband being concealed in a body cavity. Whitley v. Albers, 475 U.S.

at 316, held, in the context of a prison riot, that a "shoot low" (i.e., below vital

organs) policy could be applied without individual suspicion to any prisoner

climbing stairs leading to where hostages were being held. Most recently, Florence

v. Board of Chosen Freeholders, 132 S. Ct. at 1523, upheld visual strip searches of all

arrestees without individualized suspicion.[35]

The reasoning of these cases applies with equal, if not more, force here where

defendants had an obvious and legitimate interest in identifying anyone connected

with the 9/11 attacks and in safeguarding the nation from further terrorist attacks.

---

[35] The majority attempts to distinguish these cases by saying that, in each, the Supreme Court did not state that individualized suspicion was not required but, rather, determined that the challenged restrictions reasonably related to the legitimate object of prison security. See Majority Op., ante at 58 n.31. The reasoning is perplexing. Implicit in the rejection of challenges to generally applicable restrictive conditions of confinement is the conclusion that no individualized suspicion was necessary for the condition reasonably to relate to the legitimate object of prison security. In any event, the majority points to no case holding a generally applicable restrictive condition to fail the reasonably related inquiry for lack of individualized suspicion, and certainly not one doing so in the context of a condition whose professed object is national security.

Because the attacks were carried out by Arab Muslim aliens who proclaimed themselves members of al Qaeda, it is "no surprise" that authorities focused their investigative and preventative attention on persons encountered in the course of the FBI's 9/11 investigation, who were not lawfully in this country, and who fell within the same ethnic and religious group as the hijackers or as those targeted for recruitment by al Qaeda. Ashcroft v. Iqbal, 556 U.S. at 682 (recognizing that circumstances of 9/11 attacks necessarily produced "disparate, incidental impact on Arab Muslims"); see also United States v. Farhane, 634 F.3d 127, 132 n.4 (2d Cir. 2011) (discussing "fatwa" proclaiming it religious duty of Muslims worldwide to kill Americans and their allies wherever found). Moreover, given (1) the inherent difficulty in identifying in advance of an FBI-CIA investigation who, among such a group of illegal aliens, might have terrorist connections; (2) the serious risk of murderous harm posed by persons with such connections (even while incarcerated[36]); and (3) events following 9/11 fueling fears of further imminent attacks,[37] I cannot conclude that established precedent would have alerted the

---

[36] See infra at 67–68 (discussing actions of Omar Abdel Rahman and Mamdouh Mahmud Salim while incarcerated).

[37] See supra at 28 & n.19 (detailing anthrax scare, airliner crash, shoe bomb attempt, and journalist beheading, all within five months of 9/11 attacks).

Attorney General, the FBI Director, and the INS Commissioner that, in the absence of individualized suspicion of terrorist connections, it was arbitrary or purposeless to national security to hold such illegal aliens in restrictive, rather than general, confinement pending clearance.

In disputing that conclusion, the majority mischaracterizes this dissent to assert that "because the MDC Plaintiffs were, or appeared to be, members of the group—Arab or Muslim males—that were targeted for recruitment by al Qaeda, they may be held in the ADMAX SHU without any reasonable suspicion of terrorist activity." Majority Op., <u>ante</u> at 56. I suggest no such thing. In fact, no plaintiff was "held" on anything less than probable cause, specifically, probable cause to think the alien was in violation of federal immigration laws. Moreover, the majority itself identifies no plausible constitutional claim against the DOJ Defendants for <u>holding</u> 9/11 detainees until they were cleared of terrorism connections—even though detainees were overwhelmingly Arab and Muslim, and detention continued after the lists-merger decision even without individualized suspicion of terrorism for the New York list detainees. <u>See</u> Majority Op., <u>ante</u> at 39–40. Nor does it identify any precedent clearly establishing that substantive due process does not permit detention to be restrictive in such circumstances unless there is individualized

65

suspicion of terrorist connections. It is in the absence of such precedent that I assert the DOJ Defendants are entitled to qualified immunity.

Nor do I suggest that government officials can "hold[] someone in the most restrictive conditions of confinement available simply because he happens to be—or, worse yet, appeared to be—Arab or Muslim." Majority Op., ante at 57. Rather, as I explain in discussing plaintiffs' equal protection claim, the pleadings do not admit a plausible inference that the MDC Plaintiffs were restrictively confined because of their ethnicity or religion. See infra Part II.B.

The majority further misconstrues the dissent "to imply that once 'national security' concerns become a reason for holding someone," there is no need to consider whether restrictive conditions reasonably relate to that objective. See Majority Op., ante at 55. Not so. Bell v. Wolfish makes plain that neither confinement, nor any condition of confinement, can be imposed on pre-trial detainees for the purpose of punishment. See 441 U.S. at 535. Thus, I have never suggested that a legitimate national security purpose for holding someone supports the further imposition of restrictive conditions of confinement without any need to consider whether such conditions also reasonably relate to the same objective, or whether they are so arbitrary and purposeless as to admit an inference that their real

66

purpose was punishment. What I assert is that an arbitrary and purposeless conclusion as to the restrictive conditions here at issue is not so beyond debate that the DOJ Defendants can be denied qualified immunity.

To explain, isolating the 9/11 detainees confined at the MDC from one another and from the outside world while clearance investigations were conducted ensured that—in the event detainees were found to have terrorist connections—they would not have been able to communicate in ways that either furthered terrorist plans or thwarted government investigations. Further, strict restrictions on prison movement and cell conditions minimized the possibility that, while clearance was pursued, an as-yet-unidentified terrorist associate would threaten either national or prison security. We need only look to our own precedent to understand why the executive would reasonably have had such concerns. In the two years before the 9/11 attacks, convicted terrorist Omar Abdel Rahman ("the Blind Sheikh") had managed to use his lawyer to communicate from prison to followers in Egypt that he now sanctioned renewed terrorist attacks. See United States v. Stewart, 590 F.3d 93, 163–65 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part). Also in the year before 9/11, pre-trial detainee Mamdouh Mahmud Salim, charged with participating in the bombings of United States embassies in Africa, viciously

attacked a guard at New York's Metropolitan Correctional Center with a sharpened plastic comb, causing the guard both to lose an eye and to suffer permanent brain damage. See United States v. Salim, 690 F.3d 115, 119–20 (2d Cir. 2012). Both men had been held in some degree of restrictive confinement. Events after 9/11, suggesting ongoing terrorist plots, see supra at 28 & n.19, would only have reinforced the executive's view that national security required that the MDC Plaintiffs be restrictively confined until authorities could determine whether they had terrorist connections. The majority cites no established precedent to the contrary. Nor can it ground an arbitrary and purposeless conclusion in the fact that not all New York list detainees were held in restrictive confinement pending clearance. See Majority Op., ante at 59. As the Supreme Court stated in Bell v. Wolfish, "the Due Process Clause does not mandate a 'lowest common denominator' security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." 441 U.S. at 554. Its singular concern is that defendants' real purpose not be punitive.

With the benefit—or handicap—of hindsight, persons might now debate how well the challenged restrictive confinement policy at the MDC served national

security interests.[38] But it is no more a judicial function to decide how best to ensure national security than it is to decide how best to operate a detention facility. See id. at 539. Rather, on qualified immunity review, our task is to determine whether the MDC Plaintiffs plausibly allege a substantive due process violation that, in late 2001, was so clearly established by precedent as to put the illegality of the DOJ Defendants' actions beyond debate. See Ashcroft v. al-Kidd, 131 S. Ct. at 2083. For the reasons stated herein, I conclude that is not this case and that the DOJ Defendants are, therefore, entitled to dismissal of plaintiffs' punitive confinement claim on the ground of qualified immunity.

### 2. MDC Defendants

By contrast to the DOJ Defendants, MDC Defendants Hasty and Sherman were personally involved in the MDC Plaintiffs' restrictive confinement in the ADMAX SHU both before and after the November 2001 merger decision.[39] As

[38] See 9/11 Report 339 (cautioning, with respect to judging actions leading and responding to 9/11 attacks, that hindsight can both make things seem "crystal clear" that at relevant time were "obscure and pregnant with conflicting meanings," and make it "harder to reimagine" the "preoccupations and uncertainty" of a past time as memories "become colored" by knowledge of what happened and was written later).

[39] The decision to impose strict restrictive confinement was apparently made at the headquarters level of the BOP, see OIG Report 19, with the MDC Defendants establishing the conditions effecting such confinement, see Compl. ¶¶ 24, 26, 68, 75.

69

warden and deputy warden of the MDC, however, these defendants have a particular claim to judicial deference in determining the confinement conditions reasonably related to legitimate security interests. See Florence v. Bd. of Chosen Freeholders, 132 S. Ct. at 1517; Bell v. Wolfish, 441 U.S. at 548. The majority concludes that no such deference is warranted here because the MDC Defendants (1) imposed the conditions without adequate supporting information or an evaluation of their propriety, and (2) maintained the restrictive conditions even after learning that they were not supported by individualized suspicion of the detained aliens' terrorist connections. See Majority Op., ante at 63–65. Moreover, the majority observes that this court denied qualified immunity on a materially identical substantive due process claim in Iqbal v. Hasty, 490 F.3d at 143, 168–69, and identifies no reason to rule differently here. See Majority Op., ante at 73. I respectfully disagree.

First, plaintiffs' pleadings do not admit a plausible inference that Hasty and Sherman imposed restrictive conditions of confinement without any supporting information or assessment of propriety. As to the latter, the OIG Report recounts that, immediately after the 9/11 attacks, BOP Headquarters ordered that "all detainees who were 'convicted of, charged with, associated with, or in any way

70

linked to terrorist activities' . . . be placed in the highest level of restrictive detention." OIG Report 112. A plausible inference of punitive intent cannot reasonably be drawn from the MDC Defendants' carrying out this order without making an independent assessment of its categorical need. The obvious and more likely motivation for their doing so is national and prison security. Defendants reasonably deferred to their superiors' assessment that, in the aftermath of a devastating terrorist attack, lawfully arrested illegal aliens, whom the FBI and CIA were investigating for possible terrorist connections, should be kept "in the most secure conditions available until the suspects could be cleared of terrorist activity." Ashcroft v. Iqbal, 556 U.S. at 683. The Supreme Court has already held that such motivation does not admit a plausible inference of discriminatory intent. See id. No more will it admit a plausible inference of punitive intent.

Further, because it is undisputed that the FBI had designated each MDC Plaintiff as a person "of high interest," or "of interest" in their ongoing terrorism investigation, and that BOP employees relied on this designation in imposing restrictive confinement, see, e.g., Compl. ¶¶ 1–2, 4; see also OIG Report 111–12, 126, 158, it cannot be said that the MDC Defendants acted without any information so as to admit an inference that their conduct was arbitrary or purposeless. See

71

generally <u>Martinez v. Simonetti</u>, 202 F.3d 625, 635 (2d Cir. 2000) (holding that police may reasonably rely on information provided by other officers even when confronted with conflicting accounts).  Thus, these allegations do not plausibly imply discriminatory intent.

<u>Second</u>, insofar as plaintiffs fault the MDC Defendants for maintaining them in restrictive confinement even after learning that the FBI's designations were not based on individualized suspicion, I have already explained with reference to the DOJ Defendants why established precedent does not support that conclusion, much less alert every reasonable federal official that restrictive confinement in the absence of individualized suspicion of a security threat violates substantive due process. <u>See</u> <u>supra</u> at 62–63.

<u>Iqbal v. Hasty</u>, 490 F.3d 140, does not dictate otherwise.  As discussed <u>supra</u> at 61–62, the court there applied a "notice pleading standard" to "general allegations of knowledge" to identify alleged "purposeful infliction of restraints that were punitive in nature." <u>Id.</u> at 169.  In thus identifying <u>express</u> punitive intent, <u>Hasty</u> never discussed whether the pleadings otherwise plausibly <u>implied</u> intent. Although the MDC Defendants were not parties in <u>Ashcroft v. Iqbal</u>, the Supreme Court's rejection of the pleading standard employed in <u>Hasty</u>, <u>see</u> 556 U.S. at 684,

72

does not admit preclusive effect to <u>Hasty</u>'s assessment of the sufficiency of plaintiffs' specific intent claims, particularly insofar as they imply intent.[40]

Accordingly, I would dismiss plaintiffs' policy-challenging punitive confinement claim against the MDC Defendants, as well as the DOJ Defendants, on grounds of qualified immunity.[41]

B.      <u>Discriminatory Confinement</u>

To state a Fifth Amendment claim for discriminatory confinement, a plaintiff must plead sufficient factual matter to show that defendants adopted the challenged restrictive confinement policy not for a neutral reason "but for the purpose of discriminating on account of race, religion, or national origin." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676–77 (explaining that standard is not satisfied by pleadings of intent as "volition" or "awareness of consequences"; instead, pleadings must plausibly allege that defendant undertook conduct "because of," not merely "in spite of[,]" its

_____

[40] Indeed, when reviewing <u>Turkmen I</u> in light of <u>Ashcroft v. Iqbal</u>, we vacated the district court's decision and remanded "for further proceedings consistent with the standard articulated in <u>Twombly</u> and <u>Iqbal</u>." <u>Turkmen II</u>, 589 F.3d at 546–47. On remand, the district court did not cite <u>Hasty</u> in identifying a plausible punitive confinement claim against the MDC Defendants. <u>See</u> <u>Turkmen III</u>, 915 F. Supp. 2d at 341. These developments do not comport with a conclusion that <u>Hasty</u> is dispositive on this appeal.

[41] This dissent does not pertain to plaintiffs' non-policy claims of "unofficial abuse" against the MDC Defendants.

73

discriminatory effect). The Supreme Court articulated this standard in reversing this court's determination that these plaintiffs' original complaint stated a plausible claim for discriminatory confinement based on race, religion, or national origin. See id. at 687. While acknowledging that plaintiffs had pleaded facts "consistent with" purposeful discrimination, the Court concluded that such a claim was not plausible in light of the "obvious," and "more likely" non-discriminatory reason for the challenged confinement policy, specifically, national security concerns about "potential connections" between illegal aliens identified in the course of the FBI's investigation of the 9/11 attacks and Islamic terrorism. Id. at 682–83 (holding that, where all pleadings "plausibly suggest[] is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity," plaintiffs "would need to allege more by way of factual content to nudge [their] claim[s] of purposeful discrimination across the line from conceivable to plausible" (internal quotation marks omitted)).

One might have thought that put plaintiffs' policy-challenging claims of discriminatory confinement to rest. The majority, however, affords the MDC Plaintiffs another opportunity to pursue these claims, concluding that the newest

amended complaint now pleads sufficient facts to show that it is "not more likely"
that the MDC Plaintiffs were held in restrictive confinement because of suspected
ties to terrorism.  Majority Op., ante at 83.

The pleadings the majority cites to support this conclusion as to both the DOJ
and MDC Defendants can be summarized as follows:  (1) the New York FBI office
expressly relied on race, religion, ethnicity, and national origin in targeting persons
identified in their 9/11 investigation for detention; (2) the DOJ Defendants were
aware of and condoned such discriminatory intent by merging the New York FBI
detainee list with the INS national detainee list, knowing that the former list was not
supported by individualized suspicion of a terrorist threat; (3) the MDC Defendants
also knew there was no individualized suspicion tying the aforementioned detainees
to terrorism when they confined them in the ADMAX SHU; and (4) the MDC
Defendants falsely reported that MDC staff had classified the ADMAX SHU
detainees as "high security" based on an individualized assessment when no such
assessment was ever conducted.  See id. at 55–62.  I am not persuaded.

First, the amended complaint's pleadings of purposeful FBI discrimination are
not materially different from those considered in Ashcroft v. Iqbal.  See 556 U.S. at
669 (acknowledging that plaintiffs pleaded purposeful designation of detainees

75

based on race, religion, or national origin); see also id. at 698 (Souter, J., dissenting) (detailing specific allegations that FBI officials implemented policy that discriminated against Arab Muslim men based solely on race, religion, or national origin). Thus, we are bound by the Supreme Court's holding that such allegations are inadequate to plead plausible discriminatory intent in light of the obvious and more likely national security explanation for the challenged confinement. See id. at 681–82.

Not insignificantly, in reaching this conclusion, the Supreme Court acknowledged that it was the perpetrators of the 9/11 attacks who injected religion and ethnicity into the government's investigative and preventative efforts. The Court stated that the attacks "were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim—Osama bin Laden—and composed in large part of his Arab Muslim disciples." Id. at 682. Where a terrorist group thus effectively defines itself by reference to religion and ethnicity, see supra at 64, the Constitution does not require investigating authorities to ignore that reality nor to dilute limited resources casting a wider net for no good reason. It is "no surprise" then that a law enforcement policy—including a

restrictive confinement policy—legitimately aimed at identifying persons with connections to the 9/11 attacks and preventing further attacks "would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." Ashcroft v. Iqbal, 556 U.S. at 682; see also Brown v. City of Oneonta, 221 F.3d at 337 (observing that racial description of perpetrator, "which originated not with the state but with the victim, was a legitimate classification within which potential suspects might be found," even though it might well have disparate impact on minority groups).[42]

Thus, as in Ashcroft v. Iqbal, plaintiffs cannot plausibly imply proscribed discriminatory intent from pleadings merely "consistent with" the New York FBI's alleged purposeful targeting and detention of aliens based on ethnicity and religion. 556 U.S. at 681–82. Here, those characteristics originated with the terrorists not the state, the FBI actions were limited to aliens not lawfully in this country and

---

[42] In recently forbidding investigative stereotyping, the Department of Justice nevertheless stated that, "in conducting activities directed at a specific criminal organization or terrorist group whose membership has been identified as overwhelmingly possessing a listed characteristic, law enforcement should not be expected to disregard such facts in taking investigative or preventive steps aimed at the organizations' activities." U.S. Dep't of Justice, Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity 4 (Dec. 2014), available at http://1.usa.gov/1ytxRoa.

encountered in the course of the 9/11 investigation, and the obvious and more likely reason for the challenged confinement was ensuring national security in the face of an Islamic terrorist threat.[43]

Second, the DOJ Defendants' purported involvement with the lists-merger decision also cannot imply these defendants' discriminatory intent. As I have already explained with respect to punitive intent, plaintiffs fail plausibly to plead these defendants' involvement with that decision. See supra at 44–51.

In any event, the merger decision—by whomever made—applied equally to all New York list detainees, the larger number of whom were not subjected to restrictive confinement, but housed in general prison population at the Passaic

---

[43] In discussing the actions of the New York FBI office—and particularly its maintenance of its own list of 9/11 detainees—the OIG and the majority reference that office's tradition of independence from headquarters. See Majority Op., ante at 24 n.12 (citing OIG Report 54). Such independence does not plausibly imply rogue conduct. To the contrary, in the years before 9/11, the New York FBI office led the nation's pursuit of Islamic terrorism, as is evident in a number of exemplary investigations. See, e.g., 9/11 Report 72 (commending "superb investigative and prosecutorial effort" of New York FBI and U.S. Attorney's Office in identifying and convicting perpetrators of first World Trade Center attack, as well as the "Blind Sheikh" and Ramzi Yousef); see also In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93 (affirming New York convictions for terrorist bombings of American embassies in Africa based on guilty verdicts returned only weeks before 9/11). In short, at the time of the 9/11 investigation, there was no FBI field office with greater knowledge of, or experience investigating, Islamic terrorism than that in New York. This, and not invidious discriminatory intent, is the obvious and more likely explanation for its independence.

County Jail, even though they shared the same racial, religious, and national identities as the MDC Plaintiffs. See supra at 51–52. Such circumstances do not permit discriminatory intent plausibly to be inferred from the merger decision. See generally O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (holding that inference of age discrimination cannot be drawn from "replacement of one worker with another worker insignificantly younger"); James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000) (stating that prima facie case for discrimination required proof of employer "preference for a person not of the protected class"). Indeed, the conclusion that a plaintiff cannot urge an inference of discriminatory purpose from his receipt of treatment less favorable than most members of his own protected class is so obvious that we generally pronounce it summarily. See, e.g., Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 117 (2d Cir. 2010) (summary order). District court opinions in this circuit to the same effect are countless. See, e.g., Baez v. New York, 56 F. Supp. 3d 456, 467–68 (S.D.N.Y. 2014) (collecting cases); White v. Pacifica Found., 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) (collecting cases). Thus, no clearly established law would have alerted every reasonable official that the lists-merger decision violated equal protection.[44]

---

[44] The majority recognizes that the precedent cited herein undermines plaintiffs' equal protection claim, but it maintains that these holdings properly apply on

In concluding otherwise, the majority dismisses the Passaic assignments as a "red herring." Majority Op., ante at 85. The label will not stick. The reality that most Arab Muslim detainees on the New York list were not held in restrictive confinement precludes a plausible inference that arresting FBI agents were intent on discriminating against Arab Muslims in assigning a minority of New York detainees to the MDC. Thus, even if the lists-merger decision can be understood to manifest the DOJ Defendants' "deference to others' designation of detainees for particular facilities," id. at 84, that is not a factual basis for plausibly inferring their discriminatory intent against MDC detainees. To overcome this hurdle, the majority parenthetically suggests that "for all [the DOJ Defendants'] knew, all" New York list detainees were held in restrictive confinement. Id. This is, again, pure speculation. Moreover, because the facts are to the contrary, a plaintiff (or a panel majority)

_____

summary judgment review, not dismissal. See Majority Op., ante at 85 n.39. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), does not admit that conclusion. Therein, the Supreme Court observed that it had earlier ruled "at the summary judgment stage" that an inference of anticompetitive collusion could not be drawn from parallel conduct. Id. at 554 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1976)). It then applied that same rule at the motion to dismiss stage, holding that where plaintiffs' pleadings, taken as true, show only parallel conduct, a conspiracy is not plausibly alleged. See id. at 556. The same principle applies here. Just as evidence of differential treatment within a suspect class is insufficient on summary judgment to demonstrate proscribed discriminatory intent, allegations of such differential treatment are insufficient to plead discriminatory intent so as to defeat a motion for dismissal.

80

looking to locate invidious intent in defendants' <u>possible misunderstanding</u> of the confinement circumstances surely needs to identify some factual basis for its hypothesis. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. That is missing here.

In sum, plaintiffs fail plausibly to plead either that DOJ Defendants were responsible for the lists-merger decision or that the decision was animated by discriminatory intent.

<u>Third</u>, allegations that the DOJ and MDC Defendants maintained the challenged restrictive confinement after learning that the FBI designations were not based on individualized suspicion of terrorist threats are also inadequate to conclude that defendants were "not more likely" concerned with ensuring national and prison security. Majority Op., <u>ante</u> at 83. Indeed, the conclusion is foreclosed by <u>Ashcroft v. Iqbal</u>, 556 U.S. at 681–82, because the discrimination allegations there deemed implausible in light of the more likely national security explanation for defendants' actions included assertions that the MDC Plaintiffs' restrictive confinement was not supported by "any individual determination" that such restrictions were "appropriate or should continue." First Am. Compl. ¶ 97, App. to Pet. for Cert. 173a, <u>Ashcroft v. Iqbal</u>, No. 07-1015 (U.S. Feb. 6, 2008), <u>available at</u> http://1.usa.gov/1CfHJQF. Thus, the majority cannot suggest that when the

81

Supreme Court there rejected an equal protection challenge to efforts by "the Nation's top law enforcement officers . . . to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity," Ashcroft v. Iqbal, 556 U.S. at 682–83, it did not understand that plaintiffs were complaining of the lack of prior individualized suspicion. See Majority Op., ante at 82–83.[45]

In any event, and as already explained, courts have upheld the imposition of restrictive conditions of confinement on lawfully arrested persons without requiring individualized suspicion of a security threat, recognizing both the difficulty in identifying which detainees pose the particular risk needing to be addressed, and the serious harm that can ensue from a failure to do so. See supra at 62–63. Thus, no clearly established law would have alerted reasonable officials that restrictive confinement without individualized suspicion was unconstitutionally punitive or discriminatory in the circumstances presented here.

Fourth, allegations that the MDC Defendants (1) failed to follow BOP procedures requiring "individualized determination of dangerousness or risk" for restrictive confinement, and (2) approved documents falsely representing that such

_____

[45] The lists-merger pleadings support no different conclusion for reasons just discussed. See Majority Op., ante at 84–85.

82

determinations had been made, also do not render it "not more likely" that the challenged conduct was motivated by national security. See Majority Op., ante at 86. This court has already granted qualified immunity to some of these same MDC Defendants on a procedural due process challenge to their failure to follow BOP procedures in connection with the same challenged confinement. See Iqbal v. Hasty, 490 F.3d at 167–68. In doing so, moreover, Hasty acknowledged that the "separation" of the MDC Plaintiffs "from the general prison population could be reasonably understood . . . to relate to matters of national security, rather than an ordinary criminal investigation." Id. at 167. Hasty further noted that, in 2001–2002, neither the Supreme Court nor this court had considered whether BOP administrative segregation procedures had to be afforded "to persons detained under special conditions of confinement until cleared of connection with activities threatening national security." Id.

The fact that plaintiffs here use procedural failures to imply discriminatory intent rather than to assert a denial of procedural due process warrants no different qualified immunity conclusion. As the OIG Report indicates, by October 1, 2001, BOP Headquarters had effectively ceded "individualized" risk assessment responsibility for 9/11 detainees to the FBI. A memorandum of that date from

Michael Cooksey, the BOP Assistant Director for Correctional Programs, "directed all BOP staff, including staff at the MDC, to continue holding September 11 detainees in the most restrictive conditions of confinement possible until the detainees could be 'reviewed on a case-by-case basis by the FBI and cleared of any involvement in or knowledge of on-going terrorist activities.'" OIG Report 116 (quoting Cooksey's October 1, 2001 memorandum). In these circumstances, even if the MDC Defendants might be faulted for approving documents suggesting individualized risk assessments of MDC Plaintiffs that were not made by the BOP, their actions cannot plausibly imply discriminatory intent because they are obviously and more likely explained by reliance on the FBI's designations of each MDC Plaintiff as a person "of high interest," or "of interest," to the ongoing terrorism investigation.

In sum, as to both the DOJ and MDC Defendants, the pleadings highlighted by the majority are insufficient to render "not more likely" what the Supreme Court in <u>Ashcroft v. Iqbal</u> held "obvious" and "more likely": MDC Plaintiffs were restrictively confined pending FBI-CIA clearance for the legitimate purpose of ensuring national security. 556 U.S. at 681–82. Moreover, to the extent the majority implies discriminatory intent from the MDC Plaintiffs' restrictive confinement

84

without individualized suspicion of terrorist connections, no clearly established law would have alerted every reasonable officer that it violated equal protection so to confine these lawfully arrested illegal aliens pending clearance. Accordingly, I conclude that both the DOJ and the MDC Defendants are entitled to dismissal of the MDC Plaintiffs' equal protection claims on the ground of qualified immunity.[46]

## C. Fourth Amendment Claim

As the majority acknowledges, plaintiffs do not assert that the Fourth Amendment absolutely prohibited them from being strip-searched while incarcerated at the MDC. See Majority Op., ante at 95. Rather, plaintiffs contend that the frequency with which they were strip searched—every time they were removed from or returned to their cells, or randomly even when not so moved, "even when they had no conceivable opportunity to obtain contraband"—was constitutionally unreasonable. Compl. ¶ 112. They further allege that the manner in which they were strip searched—with female officers present or in view of other prisoners and staff, with prohibited videotaping, or with humiliating

---

[46] Because I would dismiss plaintiffs' equal protection claims, I would also dismiss their § 1985 claims. See Griffin v. Breckenridge, 403 U.S. 88, 102 (1971) ("The language [in § 1985(3)] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); accord Reynolds v. Barrett, 685 F.3d 193, 201–02 (2d Cir. 2012).

comments—was unconstitutional.  See id. ¶¶ 112–15.

Insofar as plaintiffs seek damages from MDC Defendants Hasty and Sherman for the challenged strip search policy, Ashcroft v. Iqbal does not admit a theory of supervisory liability on a Bivens claim.  See 556 U.S. at 676–77.  Rather, plaintiffs must plausibly plead that each Bivens defendant, "through the official's own individual actions, has violated the Constitution."  Id. at 676.  Plaintiffs do not allege that Hasty and Sherman themselves ever participated in any of the challenged strip searches or that they personally developed the policy.  The latter conduct is attributed to MDC First Lieutenant Joseph Cuciti.  See Compl. ¶ 111.

The majority nevertheless concludes that plaintiffs carry their Iqbal pleading burden by alleging that (1) "Hasty ordered [MDC Captain] Lopresti and Cuciti to design extremely restrictive conditions of confinement," which were "then approved and implemented by Hasty and Sherman," id. ¶ 75; and (2) many of the strip searches "were documented in a 'visual search log' created by MDC staff for review by MDC management, including Hasty," id. ¶ 114.  The majority holds that these pleadings are sufficient to allege Hasty's and Sherman's personal involvement "in creating and executing" the challenged strip-search policy, or at least their awareness of the searches "based on the search log."  Majority Op., ante at 97–98.

86

It then further concludes that neither Hasty nor Sherman is entitled to qualified immunity because, at the time of the MDC Plaintiffs' confinement, it was clearly established that strip searches had to be "'rationally related to legitimate government purposes.'" Id. at 100 (quoting Iqbal v. Hasty, 490 F.3d at 172). I cannot join in this reasoning.

First, insofar as plaintiffs challenge the frequency of the strip searches, it is their burden to plead facts sufficient to demonstrate that the challenged policy lacked a rational relationship to a legitimate government objective, specifically, prison security. See Turner v. Safley, 482 U.S. at 89 (establishing standard for challenging prison regulation); Covino v. Patrissi, 967 F.2d at 78–80 (applying standard to body-cavity search challenge). That burden is, moreover, a heavy one because it requires a showing that the "logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner v. Safley, 482 U.S. at 89–90. I do not think plaintiffs' pleadings plausibly allege that the frequency with which they were strip searched was so unrelated to prison security as to be arbitrary or irrational.

Plaintiffs assert that they were strip searched "even when they had no conceivable opportunity to obtain contraband." Compl. ¶ 112. The conclusion

87

borrows from <u>Hodges v. Stanley</u>, a case in which this court reinstated a complaint challenging a second strip search under circumstances where "it seems clear that there was no possibility that Hodges could have obtained and concealed contraband." 712 F.2d 34, 35 (2d Cir. 1983). <u>Hodges</u>, however, was decided before <u>Turner</u> and <u>Covino</u>. Thus, courts cannot assume that its "no possibility" to obtain contraband conclusion invariably equates to the required showing of no rational relationship to a legitimate government purpose. Notably, <u>Hodges</u> reached the "no possibility" conclusion in circumstances where the prisoner had been searched "<u>immediately</u> prior to the search forming the basis of his complaint." <u>Id.</u> at 35 (emphasis added). Plaintiffs here allege no such immediately successive—and, therefore, purposeless—strip searches. Rather, they complain of random strip searches in their cells or of required strip searches in circumstances involving intervening events—<u>e.g.</u>, before and after non-contact visits—that <u>plaintiffs</u> conclusorily maintain afforded them no opportunity to receive contraband. <u>See</u> Compl. ¶ 112. In the aftermath, however, of an all-too-successful attack on a BOP guard by a restrictively confined terrorist suspect, <u>see</u> <u>United States v. Salim</u>, 690 F.3d at 119–20, it was hardly irrational for prison authorities to conclude that persons under investigation for terrorist connections should be strip searched both

randomly in their cells and whenever they were moved from one location to another to ensure prison security. Hodges cannot be read to make clear to every reasonable officer that such searches were unconstitutional. Indeed, this is precisely the sort of "difficult judgment[] concerning institutional operations" that the Supreme Court has concluded must be made by "prison administrators . . . , and not the courts." Turner v. Safley, 482 U.S. at 89 (internal quotation marks omitted).[47]

Second, with respect to the manner in which the searches were conducted, plaintiffs' claims against Hasty and Sherman depend on these defendants' review

---

[47] The majority's reliance on Iqbal v. Hasty, 490 F.3d at 172, in holding otherwise, see Majority Op., ante at 98, is misplaced for the reasons already discussed. See supra at 61–62.

So too is its citation to N.G. v. Connecticut, 382 F.3d 225 (2d Cir. 2004). See Majority Op., ante at 98 n.44. There, this court held that repetitive strip searches after supervisory transport of persons confined in juvenile facilities were not reasonable under the Fourth Amendment in the absence of reason to suspect the juvenile's possession of contraband. See N.G. v. Connecticut, 382 F.3d at 233–34. It is hardly apparent that the same conclusion applies where the persons being searched are adults and where they are being confined subject to clearance of terrorist activities. The higher risks to prison and public safety of missed contraband in that circumstance, as well as terrorists' proved ability to evade even restrictive confinement does not admit a conclusion that N.G. clearly established unreasonableness in the context here at issue. See generally id. at 234 (acknowledging that continuous custody cannot "guarantee" protection for subsequent access to contraband).

Even if such a conclusion were possible, however, N.G. was not decided until 2004. Thus, the majority can hardly rely on that decision as the clearly established law that, in late 2001, put beyond debate that the strip-search policy here at issue violated the Fourth Amendment.

of a visual search log allegedly created by MDC staff for management. The "possibility" that defendants reviewed such logs is not enough, however, to state a plausible claim against them for the manner of the searches. Ashcroft v. Iqbal, 556 U.S. at 678 (stating that "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully"). Indeed, even if their review of the logs were plausible, it would, at best, support an inference of Hasty's and Sherman's knowledge of the manner in which the searches were being conducted. Further facts indicating more than negligence in these defendants' failure to take corrective action would be necessary plausibly to plead that through their "own individual actions," each had "violated the Constitution." Id. at 676; see also, e.g., O'Neill v. Krzeminski, 839 F.2d 9, 11 n.1 (2d Cir. 1988) ("Negligence is not a basis of liability for constitutional torts.").

I would thus grant Hasty and Sherman dismissal of the MDC Plaintiffs' Fourth Amendment claim on the ground of qualified immunity.

\* \* \*

In sum, I respectfully dissent from the judgment entered on appeal in this case insofar as it allows the MDC Plaintiffs to pursue money damages on policy-challenging Fifth Amendment claims for punitive and discriminatory confinement

against defendants Ashcroft, Mueller, Ziglar, Hasty, and Sherman, and an attendant policy-challenging Fourth Amendment claim for unreasonable strip searches against defendants Hasty and Sherman. I conclude that no established <u>Bivens</u> action is available for plaintiffs to pursue these claims and that significant factors counsel hesitation in extending <u>Bivens</u> to an action challenging executive policy pertaining to immigration and national security made in a time of crisis. In any event, I would grant defendants' motions for dismissal on grounds of qualified immunity because plaintiffs fail either to plead plausible constitutional violations or to demonstrate that clearly established law would have alerted every reasonable official that the challenged actions were unlawful.